# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOMMY GARRISON, an individual, and CHRISTINE GARRISON, an individual, Plaintiffs, v. REGINALD BUDDY RINGGOLD, III aka Rasool Abdul Rahim El, an individual, ROSEGOLD INVESTMENTS, LLP, a Delaware Partnership, and MASTER INVESTMENT GROUP, INC., a California Corporation, Defendants. | Case No.: 19cv244-GPC(RBB)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND**<br><br>**[Dkt. No. 10.]** |

Before the Court is a motion to dismiss filed by Defendant Reginald Buddy Ringgold, III aka Rasool Abdul-Rahim El, on March 5, 2019. (Dkt. No. 10.) Plaintiffs Tommy and Christine Garrison filed an opposition on April 2, 2019. (Dkt. No. 13.) Defendant filed a reply on April 19, 2019. (Dkt. No. 15.) The Court finds that the matter is appropriate for decision without oral argument pursuant to Local Civ. R. 7.1(d)(1). Based on the reasoning below, the Court GRANTS in part and DENIES in part Defendant's motion to dismiss with leave to amend.

/ / / /

**Background**

Plaintiff Tommy Garrison, who is over 65 years old, and his wife, Plaintiff Christine Garrison (collectively "Plaintiffs") filed a complaint for securities violations and financial elder abuse against Defendant Reginald Buddy Ringgold, III aka Rasool Abdul Rahim El, ("Defendant" or "Ringgold"), Rosegold Investments LLP, and Master Investment Group, Inc.[1] (Dkt. No. 1, Compl. ¶¶ 16, 21, 22.)

According to the Complaint, Plaintiffs met Ringgold in September 2016 when he was teaching at the Online Trading Academy ("OTA"), which is a franchised investment seminar company selling a "step-by-step approach to trading and investing." (Dkt. No. 1, Compl. ¶ 28.) Plaintiffs spent over $50,000 with OTA for investment assistance from Ringgold and claim that Ringgold targeted them as vulnerable senior citizens with retirement assets. (Id. ¶¶ 28-29.)

In mid-2017, Ringgold starting using high-pressure tactics, such as yelling and screaming, to coerce Plaintiffs to entrust Ringgold with their retirement funds. (Id. ¶ 30.) Ringgold's strong personality, and his fraudulent representations concerning his qualifications, credentials, licensure and expertise induced Plaintiffs to entrust their retirement savings with Defendants. (Id. ¶ 31.)

Prior to investing with Ringgold, Plaintiffs' retirement monies were invested in stocks and bonds. (Id. ¶ 32.) Ringgold influenced them to sell their retirement assets and invest in Bitconnect, promising high rates of return. (Id.) As a result, Plaintiffs incurred steep losses of about $41,000 when they sold their investments. (Id.)

Ringgold induced Plaintiffs to exchange their dollars into bitcoin through a service called www.localbitcoins.com. (Id. ¶ 33.) Localbitcoins.com is a peer-to-peer bitcoin transaction platform, that allows users to bypass much more liquid order-matching venues. (Id.) On information and belief, Ringgold instructed Plaintiffs to use

---

[1] Default was entered against Defendants Rosegold Investments LLP and Master Investment Group, Inc. on April 3, 2019. (Dkt. No. 14.)

localbitcoins.com for the purpose of concealing the trail of funds into Ringgold's accounts. (Id.)

Plaintiffs were told to buy an increasing amount of bitcoin through localbitcoins.com. (Id. ¶ 34.) To buy these bitcoin in large quantities, Mrs. Garrison drove hours to personally meet strangers from the internet. (Id.) Ringgold asked Mrs. Garrison to buy bitcoin in this manner for his other "clients" as well. (Id.)

In total, Plaintiffs converted $804,784 into bitcoin, which Defendant used to open various cryptocurrency and crypto-securities accounts. (Id.) At Ringgold's direction, Plaintiffs paid $113,090 and $613,260 for bitcoin that were transferred to Ringgold to invest on Plaintiffs' behalf in Bitconnect, a multi-level marketing crypto-Ponzi scheme. (Id. ¶ 35.) He invested Plaintiffs' monies in various investment programs offered by Bitconnect which Ringgold claims came with "no risk" and was "guaranteed." (Id. ¶¶ 57-60.) Ringgold, acting as an investment advisor and a broker-dealer, invested Plaintiffs' retirement money in Bitconnect securities and took between 20%-25% of all funds for himself directly from Plaintiffs' accounts as "Investment Advisory Fees". (Id. ¶ 56.) In mid-January 2018, the Bitconnect Ponzi scheme failed and Plaintiffs lost about 95% of their invested funds.[2] (Id. ¶ 70.)

Furthermore, Ringgold, acting as an investment advisor and a broker-dealer, recommended that Plaintiffs invest in other unsuitable, highly speculative cryptocurrencies and crypto-securities and misleadingly failed to disclose that Initial Coin Offerings ("ICO tokens") are the crypto-version of penny stocks, but worse. (Id. ¶¶ 65, 68.) At Ringgold's direction, Plaintiffs opened accounts and transferred bitcoins to fund the accounts in the amount of $78,434 at various cryptocurrency and crypto-securities platforms such as Bitmex.com, bitserial.io, Cryptonetix.com, Bitpay.com, coinexchange.io, cashaa.com, cryptoxchanger.io, exodus.io and etherdelta.com. (Id. ¶

---

[2] After the Biconnect Ponzi collapse, a class action complaint was filed against Bitconnect. In re Bitconnect Sec. Litig., Case No. 9:18cv80086-DMM (S.D. Fla.)

36.) Plaintiffs lost the entirety of $78,434 they invested in ICO Tokens because the platforms collapsed. (Id. ¶¶ 67-69.)

Around October 14, 2017, shortly after Plaintiffs began purchasing bitcoin, Ringgold provided them with a Private Offering Memorandum "Limited Partnership Offering" ("Offering Memo") in Defendant Rosegold Investments, LLP which, on information and belief, he drafted. *(*Id. ¶ 37.) The Complaint alleges that Ringgold drafted the Offering Memo by cutting and pasting from a private placement memorandum he obtained online and manufactured the information to his specific "fund" and "investment advisory" business. (Id. ¶ 38.) Plaintiffs allege numerous false representations in the Offering Memo. (Id. ¶¶ 39-53.) They include the following:

1. "[Rosegold] is offering manage [sic] accounts services to Christine and Tommy Garrison, . . . [o]nly investors who have a pre-existing relationship with the General Partner or its principals, employees or representatives and are: (i) 'accredited investors' … and (iii) knowledgeable and experienced in management and business matters such that they are capable of evaluating the merits and risks of an investment in the Company will be permitted to invest in the Company." (*Id.* ¶ 39.) This statement was materially false and misleading when made because, Plaintiffs are not "accredited investors" or "capable of evaluating the merits and risks of [the] investment," and Defendants did not investigate whether Plaintiffs satisfied these requirements. (*Id.*)
2. Ringgold represented to Plaintiffs that the offer and sale of securities in Rosegold was made pursuant to "Regulation D Rule 506(b)", was "made in reliance on the exemptions provided for in Section 4(a)(2) of the [Securities] Act [of 1933] and Rule 506(b) of Regulation D." (*Id.* ¶ 40.) These statements were materially false and misleading when made because neither Defendant was registered with the SEC or CFTC in any capacity, and because the offering did not qualify for an exemption from registration with the SEC. (*Id.*)
3. Ringgold represented to Plaintiffs that Rosegold "is being operated as a private investment fund under Section 3(c)(1) of the Investment Company Act of 1940…" (*Id.* ¶ 41.) This statement was materially false and misleading when made because neither Defendant was registered with the SEC or CFTC in any capacity. (*Id.*)
4. Defendants represented to Plaintiffs that "the General Partner of [Rosegold] is Rosegold Investments Trust, a 501(d) unincorporated association[.]" (*Id.* ¶ 42.) This statement was materially false and misleading when made because there is no such thing as a "501(d) unincorporated association" and there is no such entity as the "Rosegold Investments Trust," which could not operate as the general partner

of Rosegold because Defendant Ringgold acted as "general partner" of Rosegold. (*Id.*)

5. Defendants represented to Plaintiffs that "[t]he Platform that the capital will be invested in will furnish to each Investors: (i) audited annual financial reports of each investment; (ii) annual descriptive investment information for each investment." (*Id.* ¶ 43.) These statements were materially false and misleading when made because, inter alia, Defendants had no intention to provide reports to Plaintiffs, audited or otherwise, did not have the capabilities or arrangement for financial statements to be audited, and Defendants have made no such disclosures to Plaintiffs since the Offering Memo was signed in October 2017. (*Id.*)

6. Defendants represented to Plaintiffs that "ROSEGOLD INVESTMENTS TRUST (R.I.T), formed July 2012, R.I.T. is the offshore division of ROSEGOLD INVESTMENTS" and that "[t]he manager of the Company is ROSEGOLD INVESTMENTS TRUST, a Delaware company." (*Id.* ¶ 44.) These statements were materially false and misleading when made because there is no such entity as ROSEGOLD INVESTMENTS TRUST, in Delaware or elsewhere, which cannot be "offshore." (*Id.*)

7. Defendants represented to Plaintiffs that "ROSEGOLD INVESTMENTS TRUST… will serve was [sic] the Investment Manager of the Company and provides discretionary investment advisory and portfolio management services to the Company[.]" (*Id.* ¶ 45.) These statements were materially false and misleading when made because there is no such entity as Rosegold Investments Trust, which was qualified or registered to provide investment advisory or portfolio management services to defendant Rosegold, and was registered with the SEC or CFTC in any capacity, or with any state securities regulator. (*Id.*)

8. Defendants represented to Plaintiffs that "the Investment Manager intends to engage outside registered investment advisors to comply with recent changes to the U.S. Securities Regulations." (*Id.* ¶ 46.) This statement was materially false and misleading when made because Defendants had no intention to engage registered investment advisors, and has not done so since Plaintiffs signed the Offering Memo in October 2017. (*Id.*)

9. Ringgold represented to Plaintiffs that "ROSEGOLD INVESTMENTS TRUST … will serve as the Investment Manager of the Company and provides discretionary investment advisory and portfolio management services to the Company[.]" *(Id.* ¶ 47.) This statement was materially false and misleading when made because, inter alia, there is no such entity as the "Rosegold Investments Trust," which was not registered with the SEC or CFTC in any capacity, or with any state securities regulator. (*Id.*)

10. Ringgold represented to Plaintiffs that "The Investment manager utilizes a multi-disciplined investment approach, the foundation of which is company specific… analysis with diversified sectors. The Investment Manager concentrates on the

5

19cv244-GPC(RBB)

growth potential and predictability of revenues, cash flow, and earnings to determine the extent to which a security is undervalued and whether the Company will take a long or short position in the security." (*Id.* ¶ 48.) This statement was materially false and misleading when made because Defendants had no capability to utilize a "multi-disciplined investment approach," as defendant Ringgold had and has no such capabilities or skills. (*Id.*)

11. Defendants represented to Plaintiffs that "Pursuant to an Investment Advisory Agreement, the Investment Manager will be paid a performance incentive fee computed at a rate of 20.0% per month of [Plaintiffs'] net profit … to be paid bi-weekly" and "the Investor will pay the Investment Manager or an affiliate thereof a monthly management fee (the 'Performance Incentive Fee'), funded by each Investor paid by [sic] weekly, equal to two percent [sic] (20.0%) of the net profits generated off of the Capital Accounts of the Investors of the Company." (*Id.* ¶ 49.) These statements were materially false and misleading when made because, inter alia, there was no legally cognizable "Investment Advisory Agreement," and Defendants were not legally permitted to charge investment advisory fees. (*Id.*)

12. Ringgold represented to Plaintiffs that "[Rosegold's] focus is on long-term investing as opposed to short-term trading. . . that the "Investment Approach of the Investment Manager" consisted of "Fundamental Research" of "Company Management", "Financial Statement Analysis", "Industry Analysis", "Competitors", "Suppliers and Customers", as well as "Qualitative Research", including such factors as "Risk Management", "Secular Trends" and "Hedging". (*Id.* ¶ 50.) These statements were materially false and misleading when made because, inter alia, Defendants' "investment" strategy was comprised of investing in Bitconnect ponzi securities and other extremely speculative cryptocurrencies and crypto-securities. (*Id.*)

13. Defendants represented to Plaintiffs that "Portfolio transactions for the Company … generally will be allocated to brokers on the basis of best execution. . . ." (Id. ¶ 51.) This statement was materially false and misleading when made because Ringgold acted as broker for the account of Plaintiffs at Bitconnect and other crypto order execution platforms that had no processes or procedures to comply with best execution obligations. (*Id.*)

14. Ringgold represented to Plaintiffs that "[Rosegold] is primarily a long investor on U.S. and foreign equity markets; funds focused on energy and minerals; and U.S. governmental & Infrastructure projects." (*Id.* ¶ 52.) This statement was materially false and misleading when made because Rosegold made no such investments, and instead invested Plaintiffs' funds in highly speculative Bitconnect ponzi securities and other extremely speculative cryptocurrencies and crypto-securities. (*Id.*)

15. Ringgold represented to Plaintiffs that the "Fund Auditor" and "Administrator" would be "Master Investment Group" at 5694 Mission Center Road, Suite 489, San Diego, CA 92108. (*Id.* ¶ 53.) These statements were materially false and

6

19cv244-GPC(RBB)

misleading when made because, inter alia, Master Investment Group was a shell company for Defendant Ringgold that provided neither accounting services nor asset administration. (Id.)

Plaintiffs considered the truth of the above misrepresentations as important and reasonably relied on them. (Id. ¶¶ 54, 55.)

Even after the Bitconect collapse, Ringgold tried to convince Plaintiffs to "get back their money." (Id. ¶ 71.) The day after Plaintiffs got their remaining funds out of Bitconnect, Ringgold insisted on meeting Plaintiffs face-to-face to explain an algorithm he claimed to have invented that would make back all the money Plaintiffs lost. (Id.) Ringgold represented that he would "diversify" their funds into all ICO Tokens, then exit when they increased in value. (Id. ¶ 72.)

In late January 2018, when Mrs. Garrison was taking Mr. Garrison to the hospital for his seizure disorder treatment which had materially progressed due to the stress of losing their life savings, Plaintiffs received a call from Ringgold who insisted that Plaintiffs provide him additional funds. (Id. ¶ 73.) When they refused, Ringgold disappeared and has ceased communications with Plaintiffs. (Id. ¶ 74.)

Based on these allegations, Plaintiffs allege violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, for securities fraud; violations of California Corporation Code sections 25000 *et seq.* for unlawful business conduct as an "investment advisor" and "broker"; and violations of California Welfare & Institution Code sections 15610 *et seq*. for financial elder abuse. (Id. ¶¶ 75-95.) Defendant Ringgold moves to dismiss all causes of action in the Complaint.

## Discussion

**A.    Legal Standard as to Federal Rule of Civil Procedure 12(b)(6)**

Federal Rule of Civil Procedure ("Rule") 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or

7

19cv244-GPC(RBB)

sufficient facts to support a cognizable legal theory. See Balistreri v. Pacifica Police Dep't., 901 F.2d 696, 699 (9th Cir. 1990). Under Federal Rule of Civil Procedure 8(a)(2), the plaintiff is required only to set forth a "short and plain statement of the claim showing that the pleader is entitled to relief," and "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).

A complaint may survive a motion to dismiss only if, taking all well-pleaded factual allegations as true, it contains enough facts to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009) (quotations omitted). In reviewing a Rule 12(b)(6) motion, the Court accepts as true all facts alleged in the complaint, and draws all reasonable inferences in favor of the plaintiff. al-Kidd v. Ashcroft, 580 F.3d 949, 956 (9th Cir. 2009).

Where a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" DeSoto v. Yellow Freight Sys., Inc., 957 F.2d 655, 658 (9th Cir. 1992) (quoting Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986)). In other words, where leave to amend would be futile, the Court may deny leave to amend. See DeSoto, 957 F.2d at 658; Schreiber, 806 F.2d at 1401.

/ / / /

/ / / /

## B. Legal Standard as to Federal Rule of Civil Procedure 9(b)

Where a plaintiff alleges fraud in the complaint, Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Rule 9(b) requires that the circumstances constituting the alleged fraud "be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.'" Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009) (internal quotation omitted). A party must set forth "the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." Odom v. Microsoft Corp., 486 F.3d 541, 553 (9th Cir. 2007) (internal quotation marks omitted). As such "[a[verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." Kearns, 567 F.3d at 1124 (citing Vess v. Ciba-Geigy Corp. U.S.A., 317 F.3d 1097, 1106 (9th Cir. 2003)). Thus, to satisfy the specificity requirement of Rule 9(b), a plaintiff is required "to plead evidentiary facts" and the court must "consider what inferences these facts will support—despite the pitfalls and inefficiencies of such an analysis at the pleading stage . . . ." Fecht v. Price Co., 70 F.3d 1078, 1082 (9th Cir. 1995) (emphasis added).

## C. First Cause of Action - Violation of Section 10(b) and Rule 10b-5 as to all Defendants

Defendant moves to dismiss the federal securities fraud cause of action[3] because the Complaint fails to assert the alleged fraudulent misrepresentations with particularity as required by Rule 9(b) and the PSLRA. He also contends that Plaintiffs fails to assert that the fraud was made "in connection with the sale or offer" of any security in relation to the Offering Memo. Finally, he alleges that the other elements to assert a federal

---

[3] Contrary to Defendant's argument, Plaintiffs do not allege a cause of action under Section 17(a) of the 1933 Securities Act.

securities fraud claim are also not properly alleged. Plaintiffs respond that the "most direct evidence of Defendant Ringgold's violations of Section 10(b) and Rule 10b-5 exist in the Offering Memo defendant Ringgold used to solicit funds from the Plaintiffs" and are presented in paragraphs 37-53 of the Complaint. (Dkt. No. 13 at 10[4].) Plaintiffs also argue that the other elements to establish a federal securities violation have been met.

Section 10(b) of the Securities Exchange Act ("Act") makes it unlawful for "any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or . . . for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b–5 implements this provision by making it unlawful to "make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, . . . ." 17 C.F.R. § 240.10b–5(b). Rule 10b-5 also makes it unlawful for any person "[t]o employ any device, scheme, or artifice to defraud" or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5(a), (c). Therefore, to state a securities fraud claim under § 10(b) of the Act and Rule 10b–5, a plaintiff must show (1) a material misrepresentation or omission, (2) scienter, (3) in connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37 (2011) (citation omitted).

In 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA") to curb abuses of securities fraud litigation. Amgen, Inc. v. Conn. Retirement Plans and Trust Funds, 133 S. Ct. 1184, 1200 (2013). These include

---

[4] Page numbers are based on the CM/ECF pagination.

"nuisance filings, targeting of deep-pocket defendants, vexatious discovery request and manipulation by class action lawyers." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 320 (2007). In response to these abuses, the PSLRA imposed a heightened pleading requirement under securities fraud actions under § 10(b) and Rule 10b-5 requiring that falsity and scienter be plead with particularity. Amgen, Inc., 133 S. Ct. at 1200; Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009).

Under the PSLRA's heightened pleading instructions, a complaint alleging that the defendant made a false or misleading statement must: "(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u–4(b)(1); and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' § 78u–4(b)(2)." Tellabs, Inc., 551 U.S. at 321. A complaint alleging claims under section 10(b) and Rule 10b–5 must satisfy the pleading requirements of both the PSLRA and Rule 9(b). In re Verifone Holdings, Inc. Securities Litigation, 704 F.3d 694, 701 (9th Cir. 2012).

First, Defendant argues that the alleged fraudulent misrepresentations are not asserted with particularity as required by Rule 9(b) and the PSLRA. Plaintiffs argue that their § 10(b) and Rule 10b-5 claim is based on the Offering Memo that was provided to them by Ringgold and the Complaint specifically describes the alleged false representations.

The Court agrees with Plaintiffs that paragraphs 37-53 of the Complaint lists the purported misrepresentations in the Offering Memo with specificity. The Complaint alleges that the Offering Memo was provided to Plaintiffs by Ringgold on October 14, 2017. (Dkt. No. 1, Compl. ¶ 37.) Fifteen paragraphs describe the alleged misrepresentations and why they were false. (See id. ¶¶ 39-53.) These facts allege the "who, what, when, where, and how" of the misconduct. See Kearns, 567 F.3d at 1124. Thus, the Court concludes that the Complaint has alleged material misrepresentations with specificity as required by the PSLRA and Rule 9(b).

Next, Defendant claims that Plaintiffs have not shown that the misrepresentations were made "in connection with the sale or offer" of any security. Plaintiffs summarily argue that the misrepresentations in the Offering Memo were made "in connection with the purpose or sale of securities" without any additional arguments or facts.

Section 10(b) and Rule 10b-5 require fraud "in connection with the purchase or sale of securities." 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Under Rule 10b-5, a "purchase or sale requires an 'actual purchase or sale of securities, or a contract to purchase or sell.'" Roberts v. Peat, Marwick, Mitchell & Co., 857 F.2d 646, 650 (9th Cir. 1988) (citing Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 735 (1975)). The word "purchase" includes "any contract to buy, purchase, or otherwise acquire," and the word "sale" includes "any contract to sell or otherwise dispose of." Id. (quoting 15 U.S.C. § 78c(a)(13) and (14)). The "in connection with" component is necessary to establish a causal relationship between the fraud and the resulting injury, id. (citations omitted), while the "purchase or sale" requirement assesses whether a plaintiff has standing to bring a private action seeking damages under the anti-fraud provisions of the federal securities law, Mount Clements Indus., Inc. v. Bell, 464 F.2d 339, 346 (9th Cir. 1972).

Here, the Complaint does not allege any facts that the fraudulent misrepresentations contained in the Offering Memo were made "in connection with the purchase or sale of securities." The Offering Memo[5] purports to provide disclosures to "prospective investors considering the purchase of limited partnerships . . . in Rosegold Investments LLP" and offered manage account services to Plaintiffs in the platform. (Dkt. No. 1-2, Compl. Ex. A, Offering Memo at 4, 13, 14.) The Complaint does not

---

[5] The Court incorporates by reference the Offering Memo which is referenced throughout the Complaint and is attached as an exhibit to the Complaint, (Dkt. No. 1-2, Compl. Ex. A). See United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2002) (a document may be considered part of the pleading "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim . . . and may assume its contents are true for purposes of a motion to dismiss.").

allege that securities were purchased in "Rosegold securities" pursuant to the Offering Memo.[6]

Because Plaintiff have not alleged an actual purchase of securities pursuant to the Offering Memo containing the alleged fraudulent misrepresentations, the other elements to state a federal securities fraud claim of reliance, economic loss and loss causation are also not sufficiently alleged and the Court also declines to address the scienter factor. Therefore, the Complaint fails to allege a claim under § 10(b) and Rule 10b-5.[7]

**D.  Second Cause of Action - California Corporations Code Sections 25004 and 25009**

The Complaint alleges Ringgold, holding himself out as an "investment advisor" and a "broker-dealer, violated Sections 25004 and 25009 of the California Corporations Code because he is not registered, licensed or qualified as an "investment advisor" or a "broker-dealer." (Dkt. No. 1, Compl. ¶¶ 81-87.) In his motion, Defendant argues that this claim must be dismissed because the alleged conduct does not fall within these provisions and even if they did, the Complaint fails to plead the allegations with

---

[6] It appears that Plaintiffs claim that Ringgold advised Plaintiffs as to purchasing three types of securities: "Rosegold securities, the Bitconnect Ponzi scheme, and other crypto-securities." (Dkt. No. 13 at 16.) The Complaint does not allege any purchase of "Rosegold securities" as those are described in the Offering Memo.

[7] To the extent Plaintiffs will claim, in an amended pleading, that the Offering Memo was provided in connection with their investment in the Bitconnect crypto Ponzi scheme, (see Dkt. No. 13 at 14 n. 14), any alleged misrepresentations must have occurred prior to the purchase of securities. Levine v. Diamanthuset, Inc., 950 F.2d 1478, 1487 (9th Cir. 1991) ("In addition to the requirement of an actual purchase or sale (or contract therefor), we have also said that conduct actionable under Rule 10b–5 must occur before investors purchase the securities, if—as here—they allege the fraud induced them to make the purchase."); Roberts v. Peat, Marwick, Mitchell & Co., 857 F.2d 646, 651 (9th Cir. 1988) ("The actionable conduct must occur before the investors become purchasers of securities as required by Blue Chip Stamps [ ]." (citation omitted)). Here, Plaintiffs claim they were provided with the Offering Memo shortly after they began converting their money into bitcoins. (Dkt. No. 1, Compl. ¶ 37.) The Complaint does not provide specific timeframes as to Plaintiffs' purchases in the varying securities offered by Ringgold. In an amended complaint, Plaintiffs must provide specifics as to their purchases in relation to any alleged misrepresentations.

13

particularity. Plaintiffs argue they have sufficiently alleged a claim under Sections 25004 and 25009.

Under California law, an "investment advisor" includes "[a]ny person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing or selling securities . . . ." Cal. Corp. Code § 25009(a). It is a violation when an investment advisor fails to obtain a license when conducting business. See Cal. Corp. Code § 25230 ("It is unlawful for any investment adviser to conduct business as an investment adviser in this state unless the investment adviser has first applied for and secured from the commissioner a certificate . . . ."). California Code of Civil Procedure section 1029.8 provides a private right of action for persons harmed by "[u]nlicensed persons who cause injury or damage . . . as a result of providing goods or performing services for which a license is required under . . . Section 25230 . . . ."

In addition, a "broker-dealer" is "any person engaged in the business of effecting transactions in securities in this state for the account of others or for his own account." Cal. Corp. Code § 25004(a). A private right of action exists for those who purchase securities from unlicensed broker-dealers. Cal. Corp. Code § 25501.5 ("A person who purchases a security from or sells a security to a broker-dealer that is required to be licensed and has not, at the time of the sale or purchase, applied for and secured from the commissioner a certificate . . . may bring an action for rescission of the sale or purchase or, if the plaintiff or the defendant no longer owns the security, for damages."); Cal. Corp. Code § 25210(a) ("no broker-dealer shall effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless the broker–dealer has first applied for and secured from the commissioner a certificate, then in effect, authorizing that person to act in that capacity."). Rule 9(b) does not apply to this cause of action because it does not sound in fraud. See Siegal v. Gamble, Case No. 13 cv3570-RS, 2016 WL 3648503, at *6 (N.D. Cal. July 7, 2016) (claim under section 25001.5 does not sound in fraud and Rule 9(b) does not apply).

Plaintiffs allege that Ringgold both advised Plaintiffs "as to the advisability of investing in, purchasing or selling securities" including Rosegold securities, the Bitconnect Ponzi scheme, and other crypto-securities. (Dkt. No. 1, Compl., ¶¶ 1, 16, 21, 38, 45, 47, 58, 59, 65, 66, 71, 82), and that Ringgold took significant compensation. (Id. ¶¶ 49, 56, 82.) The Complaint also alleges that Defendant Ringgold effected trades for Plaintiffs in the Rosegold offering, the Bitconnect Ponzi scheme, and other cryptosecurities. (Id. ¶¶ 56, 60, 62, 66.)

The Court concludes that, under Rule 12(b)(6), the Complaint alleges a claim for violations of the California securities law as Ringgold performed acts of an investment advisor and broker-dealer and did so without a license. The Court DENIES Defendant's motion to dismiss the second cause of action.

**E.     Third Cause of Action - Financial Elder Abuse as to Mr. Garrison**

The Complaint claims a violation of California's financial elder abuse statute alleging that Mr. Garrison, who was 65 years or older at the time of the facts alleged in the Complaint, was defrauded of his retirement monies. (Dkt. No. 1, Compl.)

Defendant does not specifically challenge this claim and summarily argues, in connection with the other two causes of action, that the Complaint fails to meet the pleading requirements of Rule 9(b) and 12(b)(6). Plaintiffs oppose.

The Elder Abuse Act was enacted by the California Legislature to address the danger of "California seniors losing millions of dollars by purchasing unnecessary financial products." Rosove v. Cont'l Cas. Co., No. 14cv1118-CAS(CWx), 2014 WL 2766161 at *4 (C.D. Cal. June 2, 2014) (citations omitted). Relevant to this case, under the Elder Abuse Act, financial elder abuse occurs when a person ". . . obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both", or obtains such property "by undue influence, as defined in Section 15610.70." Cal. Welf. & Inst. Code §§ 15610.30(a)(1) and (3). Financial abuse occurs "when an elder or dependent adult is deprived of any property right, including by means of an agreement . . . ." Id. § 15610.30(c). "A person or entity shall be deemed to have . .

. obtained . . . property for a wrongful use if, among other things, the person or entity . . . knew or should have known that this conduct is likely to be harmful to the elder . . . ." Id. 15610.30(b). In sum, "[a] claim for financial elder abuse requires one of the following: (1) taking of property for a 'wrongful use,' (2) taking of property with intent to defraud, or (3) taking of property by 'undue influence.'" Johnson v. King, Case No. CV 09-4183 DSF(FMOx), 2009 WL 10675723, at *2 (C.D. Cal. Aug. 31, 2009 (citing Cal. Welf. & Inst. Code § 15610.30).

"'Undue influence' means excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity." Id. § 15610.30(b). The test for "undue influence" is governed by a series of listed factors, including the "vulnerability of the victim", the "influencer's apparent authority", the "actions or tactics used by the influencer", and the "equity of the result." Id. § 15610.70(a)(1)-(4); see Mahan v. Charles W. Chan Ins. Agency, Inc., 14 Cal. App. 5th 841, 856-57 (2017). Moreover, if a cause of action is grounded in fraud, as the financial elder abuse claim, Rule 9(b) applies. See Lintz v. Bank of America, No.: 5:13–CV–01757–EJD, 2013 WL 5423873, at *8 (N.D. Cal. Sept. 27, 2013) ("[f]inancial elder abuse claims must be pleaded with particularity."); Chavers v. GMAC Mortg., LLC, No. 2:11–cv–01097–ODW (SSx), 2012 WL 2343202, at *7 (C.D. Cal. June 20, 2012) (because elder financial abuse is usually grounded in fraud, it must be plead with particularity).

Here, the Complaint alleges facts with particularity as to the financial elder abuse claim. Plaintiff relies on the "undue influence" element of financial elder abuse. Mr. Garrison alleges he was an elder at the time of the alleged fraud and Ringgold used undue influence to obtain his funds. (Dkt. No. 1, Compl. ¶ 14.) Ringgold targeted Mr. Garrison as a vulnerable senior citizen with retirement assets and used high pressure tactics. (Id. ¶ 29.) Ringgold would follow Plaintiffs to and into their bank to convince them to liquidate their investments, and he also pleaded, cried, yelled and screamed at them. (Id. ¶ 30.) Furthermore, Mr. Garrison had a chronic seizure disorder which was known to

Ringgold. (Id. ¶ 73.) Mr. Garrison's illness progressed with the loss of their entire life savings and while being taken to the hospital for treatment, Ringgold called them insisting on additional funds. (Id.) The Court concludes that the Complaint alleges the who, what, when, where and how of the alleged conduct. Accordingly, the Court DENIES Defendant's motion to dismiss the third cause of action.

**F.   Federal Rule of Civil Procedure 12(b)(7) – Failure to Join a Necessary and Indispensable Party**

Defendant claims the Complaint must be dismissed for Plaintiff's failure to join Bitconnect International PLC, the creator and operator of the alleged multi-level marketing Crypto Ponzi scheme, as a necessary and indispensable party to this case. He merely recites the legal standard to support a Rule 12(b)(7) and accompanying Rule 19 inquiry without applying the law to the facts of this case. Plaintiffs respond that Ringgold had not explained how or why Bitconnect is a necessary or indispensable party. Even if Bitconnect was a necessary and indispensable party, Bitconnect is not needed to provide complete relief and none of the parties are subject to substantial risk of incurring double, multiple or otherwise inconsistent obligations.

In reply, Defendant argues that the Complaint, alleging that Plaintiffs were defrauded by funds lost in the BitConnect crypto-currency, implicates BitConnect as part of the alleged scheme and the ultimate destination where the funds ended up. Moreover, BitConnect is a party to a class action lawsuit for defrauding countless other individuals and elders. Therefore, the existing parties are subject to a risk of incurring double, multiple or otherwise inconsistent obligations.

Rule 12(b)(7) allows dismissal of an action for failure to join a necessary and indispensable party under Rule 19. Fed. R. Civ. P. 12(b)(7). The moving party bears the burden of persuasion to support a Rule 12(b)(7) motion. Makah Indian Tribe v. Verity, 910 F.2d 555, 558 (9th Cir. 1990). "A Rule 12(b)(7) motion for failure to join an indispensable party demands a fact specific and practical inquiry." Id. An analysis under Rule 19 is a two-step inquiry. "First, a court must determine whether an absent party

should be joined as a 'necessary party' under subsection (a). Second, if the court concludes that the nonparty is necessary and cannot be joined for practical or jurisdictional reasons, it must then determine under subsection (b) whether in 'equity and good conscience' the action should be dismissed because the nonparty is 'indispensable.'" Va. Sur. Co. v. Northrop Grunman Corp., 144 F.3d 1243, 1247 (9th Cir. 1998).

A party is necessary if: (1) complete relief cannot be granted among existing parties in the party's absence; or (2) whether the absent party "claims an interest relating to the subject of the action and is so situated that disposing of the action in the [party's] absence may" either "impair or impede" the absent party's ability to protect its interest, or "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of those interests." Fed. R. Civ. P. 19(a)(1)(A) & (B). Such a legally cognizable interest must be more than a financial stake in the outcome of the litigation. Makah Indian Tribe, 910 F.2d at 558.

In determining whether complete relief is possible among the existing parties to the suit, the Court is "concerned with consummate rather than partial or hollow relief as to those already parties, and with precluding multiple lawsuits on the same cause of action." Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1043 (9th Cir. 1983). "An absent party need not be joined simply because it may be required to provide indemnity for the loss. The focus is on complete relief between those already parties." Schwarzer, et al., Rutter Group Prac. Guide Fed. Civ. Pro. Before Trial § 7:73 (9th ed. 2018); Tinoco v. San Diego Gas & Elec. Co., 327 F.R.D. 651, 658 (S.D. Cal. 2018) (rejecting defendant's argument that it could seek contribution and indemnity after an unfavorable judgment).

Defendant does not explain or provide any evidence that complete relief is not possible without Bitconnect. Plaintiffs seek injunctive relief and damages of the amounts lost by Ringgold. Where the funds ended up is not relevant as Plaintiffs allege misconduct by Ringgold that caused them to transfer their retirement monies to

18

19cv244-GPC(RBB)

investments he recommended. If they succeed, Plaintiffs will be able to recover full damages from Ringgold. Defendant fails to demonstrate that complete relief is not possible without Bitconnect.

Next, the Court considers whether Bitconnect "claims an interest relating to the subject of the action and is so situated that disposing of the action in [its] absence may" either "impair or impede" the its ability to protect its interest, or expose the parties "to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of those interests." See Fed. R. Civ. P. 19(a)(1)(B). Here, Defendant has not explained how Bitconnect claims a cognizable legal interest in this litigation or even that any party would be subject to double, multiple or inconsistent obligations.[8]

The allegations in the Complaint all concern Ringgold's conduct in fraudulently inducing Plaintiffs to sell their retirement funds and to invest with Ringgold through Bitconnect and other crypto-currencies, and acting as an investment advising and broker-dealer without a license as required by California law. The Complaint also claims that Ringgold imposed undue influence on Mr. Garrison, an elderly individual, to induce Mr. Garrison to invest with him. These allegations solely concern the conduct of Ringgold.

The Court concludes that Ringgold has not met his burden showing that Bitconnect is a necessary party and DENIES Defendant's motion to dismiss pursuant to Rule 12(b)(7).

**G.     Leave to Amend**

Leave to amend, whether or not requested by the plaintiffs, should be granted unless amendment would be futile. Schreiber Distrib. Co., 806 F.2d at 1401. While

---

[8] Plaintiffs may be a potential class member in the Bitconnect class action filed in Florida; however, double recovery is distinct from double obligations as required by Rule 19. See Fox Ins. Co. Inc. v. Humana Inc., No. CV-11-1507-PHX-ROS, 2012 WL 13024088, at *5 (D. Az. May 17, 2012) ("substantial risk" factor looks to the harm to the defendant and the focus on the plaintiff's potential for double or multiple recovery is not the relevant question on Rule 19).

Plaintiffs do not seek leave to amend, the Court concludes that it would not be futile to allow leave to amend and GRANTS Plaintiffs' leave to amend their complaint. See id.

**Conclusion**

Based on the reasoning above, the Court GRANTS in part and DENIES in part Defendant Ringgold's motion to dismiss with leave to amend. Plaintiffs may file an amended complaint within fourteen (14) days of the filing date of this Order. If Plaintiffs do not file an amended complaint, Defendant shall file an answer within twenty-one (21) days of the filing date of this Order. The hearing set on May 17, 2019 shall be **vacated**.

IT IS SO ORDERED.

Dated: May 13, 2019

Hon. Gonzalo P. Curiel
United States District Judge