1
2
3
4

THE RESTIS LAW FIRM, P.C.
William R. Restis, Esq. (SBN 246823)
william@restislaw.com
402 West Broadway, Suite 1520
San Diego, California 92101
Tel: +1.619.270.8383

5

Attorney for Tommy Garrison and Christine Garrison

6
7
8
9
10

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11
12

**TOMMY GARRISON**, an Individual,
**CHRISTINE GARRISON**, an
Individual,

Case No: 3:19-cv-00244-GPC-MSB

13

Plaintiffs,

**FIRST    AMENDED    COMPLAINT
FOR:**

14

v.

15
16
17
18

**REGINALD BUDDY RINGGOLD, III
aka Rasool Abdul Rahim El, an
Individual, ROSEGOLD
INVESTMENTS, LLP, a Delaware
Partnership, and MASTER
INVESTMENT GROUP, INC., a
California Corporation,**

    1.    **Violation of Section 10(b) of
the Securities and Exchange Act of 1934
and SEC Rule 10b-5;**
    2.    **Violation of California
Corporate Securities Law;**
    3.    **Financial Abuse of an Elder**

19
20

Defendants.

**JURY TRIAL DEMANDED**

21
22
23
24
25
26
27
28

Plaintiffs Tommy Garrison and Christine Garrison ("Plaintiffs" or "The Garrisons") allege as to themselves based on their own experience, and as to all other allegations, based on investigation of counsel, which included, *inter alia*, a review of California Department of Business Oversight and Securities and Exchange Commission databases and filings, and publicly available sources concerning defendant Reginald Buddy Ringgold III aka Rasool Abdul Rahim El ("Ringgold"), Rosegold Investments LLP ("Rosegold") and Master Investment Group, Inc. ("MIG," collectively "Defendants").

## I.   **INTRODUCTION**

1.     Through various offers and sales of securities, Ringgold represented to Plaintiffs that he is an "investment advisor" and "finance expert" with "extensive background in global economic analysis and alternative investments." Ringgold represented that he previously "serve[d] as Chief Investment Officer for … a northern California hedge fund with over $310 million in assets under management." Ringgold represented to Plaintiffs that defendant Rosegold is a "CFTC Commodity Trading Advisor Firm."[1] Defendant Ringgold represented to Plaintiffs and other investors that he is an "investment coach" who has been "featured in" the such prominent financial press as the Wall Street Journal, Fox, NASDAQ, Entrepreneur Magazine, The Street and CNBC.[2] These statements, and others as described herein were all false and misleading when made, as neither Ringgold, nor any other defendant has any such talent, skill, experience, registration or licensure. And none of the Defendants have registered with the SEC, CFTC, the State of California, or any state securities regulator in any capacity.

---

[1] *See* Exhibit B, RoseGold Investments Private Offering Memorandum, prepared for Tommy Garrison & Christine Garrison, dated October 2017, at p. 22.

[2] https://reginaldringgold.com

2.     Ringgold induced Plaintiffs to invest $191,524 of their retirement funds with Defendants using materially false and misleading statements and artifices to defraud. At the inducement of defendant Ringgold, Plaintiffs borrowed $613,260 from their friends and family and provided it to Defendants to invest. Ringgold also induced Plaintiffs to pay defendant MIG $15,000 for the creation of a Wyoming LLC, LLP, and Trust as part of Defendants' scheme. In total, Defendants swindled $819,784 from Plaintiffs.[3]

3.     To the best of Plaintiffs' information and belief, their funds have been pocketed by defendant Ringgold, and hidden with related persons or entities, or forever lost in the multi-level marketing crypto-Ponzi scheme known as "Bitconnect,"[4] and worthless "Initial Coin Offerings" of crypto-securities.

4.     When the money was flowing from Plaintiffs to Defendants, defendant Ringgold was there for the "hard sell." Now that the funds have dried up, *and Plaintiffs are destitute,* Ringgold has vanished and refuses to respond.

5.     By making materially false and misleading statements and omissions to Plaintiffs, by perpetrating an artifice to defraud Plaintiffs of their retirement assets, and by engaging in acts and practices which operated as a fraud and deceit upon Plaintiffs, Defendants have violated the antifraud provisions of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act," 15 U.S.C. § 78j[b]) and Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5).

6.     By satisfying the requirements of an "investment advisor" and "broker-dealer," but failing to register and obtain the necessary licenses therefor, Defendants

---

[3] To gain funds for his scheme, defendant Ringgold induced Plaintiffs to sell their retirement assets, including index fund securities such as QQQ and SPY, to invest in Ringgold's scam. At Ringgold's insistence, Plaintiffs sold these investments for approximately $41,000 in losses.

[4] *See In re Bitconnect Securities Litigation,* No 9:18-cv-80086-DMM (S.D. Fla)

have violated California's Corporate Securities Law of 1968 (the "Corp. Securities Law," CAL. CORP. CODE § 25000 *et seq*.)

7.     Tommy Garrison is a "senior citizen." By using undue influence and misrepresentations to misappropriate the retirement funds of the elderly Plaintiffs, Defendants have committed financial elder abuse in violation of California Welfare & Institutions Code § 15610.30.

8.     As such, Plaintiffs are entitled to damages, restitution and disgorgement from Defendants, and currently unknown related persons and entities of Defendants in possession, custody, or control of misappropriated funds in the amount of $819,784. Plaintiffs are also entitled to damages for the approximate $41,000 loss they incurred from selling retirement funds at Ringgold's direction to invest in Defendants' scheme. Plaintiffs are also entitled to pre-and post-judgment interest on the $860,784 amount Plaintiffs lost as a direct and proximate result of Defendants' scheme. Finally, pursuant to CAL. CORP. CODE § 25501.5, and WELF. & INST. CODE § 15657.5(a), Plaintiffs are entitled to recover their reasonable attorneys fees and costs of suit.

9.     Plaintiff also seeks interim orders freezing Defendants' assets; requiring an accounting from Defendants; and prohibiting the destruction of documents and Electronically Stored Information.

## II.     JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and under Section 27 of the Securities Exchange Act of 1934 ("Exchange Act," 15 U.S.C. § 78aa).

11.     This Court has supplemental jurisdiction over state law claims pled herein pursuant to 28 U.S.C. § 1367, because such state law claims are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

12.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails or wires in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

13.     Venue is proper in this District pursuant to 15 U.S.C. § 78aa because Defendant Ringgold is an inhabitant and transacts business in this district. Venue is also proper in this District pursuant to 28 U.S.C. §1391(b) because many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District, and because:

(a)     primary defendant Ringgold resides in this district and all Defendants are residents of the state of California; and/or

(b)     Ringgold conducts business itself or through agent(s) in this District.

## III.   **PARTIES**

14.     Plaintiff Tommy Garrison ("Mr. Garrison") is, and at all times relevant hereto was, a resident and citizen of the State of California. Mr. Garrison was over the age of 65 when Plaintiffs tendered funds to Defendants as described herein.

15.     Plaintiff Christine Garrison ("Mrs. Garrison") is, and at all times relevant hereto was, a resident and citizen of the State of California.

16.     Defendant Reginald Buddy Ringgold, III aka Rasool Abdul Rahem El ("Ringgold" or "Defendant"), is a resident of San Diego. Ringgold is a self-described "Financial Markets Investment Coach" and "professor," who claims to have over 17 years of experience in the financial industry as an investment advisor, trader, and investment banker. He also holds himself out, in his online biographies and in his LinkedIn profile, as the principal of various affiliated entities including Blockvest, LLC ("Blockvest") the Blockchain Investment Group LLC ("BIG"), Rosegold Investments LLP ("Rosegold"), Master Investment Group, Inc. ("MIG"), Epicenter Investment Group, Inc. ("EIG"), which are featured as partners.

17.     Since at least 2010, Ringgold has used the alias Rasool Abdul Rahim El in connection with, among other things, opening accounts at several financial institutions. Ringgold uses, *inter alia*, the following websites and email addresses in his scheme: www.reginaldringgold.com, www.rosegoldinvestments.com, seeringgold@gmail.com, info@rosegoldinvestments.com,             darkpool03@gmail.com,             and info@reginaldringgold.com.

18.     Ringgold utilized, *at least*, the following Bitcoin addresses in his scheme: 1Kb385kX4NGQL3UZAXjsHGu9JVqKRgq3Rd, 1N3QvKF4y69k4HbJgMKSaatJg7vXS96zTM, 17M5Nv4FRML7XMg2u3T18kqditYEbHDjWo

19.     Ringgold   utilized, *inter alia*, the following platforms for his scheme: www.Bitmex.com,   https://hitbtc.com,   "exodus   wallet,"   https://gemini.com,   and www.etherdelta.com.

20.     Ringgold has never been registered with the SEC or the CFTC in any capacity under either his name or his alias, nor has he been associated with any registered firms in the securities industry.

21.     **Rosegold   Investments   LLP,** aka   Rosegold   Investments   Trust ("Rosegold"), was formed in Delaware in April 2017 and is based in San Diego. Ringgold claims to be Rosegold's founder, managing partner, and chief investment officer. At times, Ringgold also describes Rosegold as a California trust. Rosegold purports to provide investment banking and advisory services. Rosegold uses the website www.rosegoldinvestments.com. Neither Rosegold nor the related trust is registered with the SEC or CFTC in any capacity.

22.     **Master Investment Group, Inc.** ("MIG") was formed in California in March 2017 and is based in San Diego. Ringgold claims to be MIG's founder and managing partner. Ringgold and Rosegold represented to Plaintiffs that MIG would be the "Fund Auditor" and "Administrator" of Plaintiffs' funds and investments. Ringgold

induced Plaintiffs to pay MIG $15,000 to set up the following LLC, LLP, and Trust in the state of Wyoming: Estatement, LLC, which was previously registered to one Guillermo Jalil, T&C Services, LLP and T&C Trust. MIG purports to provide portfolio management services. MIG uses the website www.masterinvestmentllp.com. MIG is not registered with the SEC or the CFTC in any capacity.

23.     Ringgold is not listed on the company formation or incorporation documents for Rosegold or MIG, but these entities share common personnel and common addresses connecting the entities to Ringgold. The entities all use a San Diego address that Ringgold also uses: 5694 Mission Center Road, Suite 489, San Diego, CA- which is a UPS store.

**RELATED PERSONS AND ENTITIES**

24.     Non-defendant **Blockchain Investment Group LLC** ("BIG") was formed in Wyoming in March 2018 and is based in San Diego. A limited liability partnership with a similar name ("Blockchain Investment Group LLP") was formed at or around the same time. Ringgold claims to be the founding partner of BIG (and the related LLP). BIG is a private company that purports to provide investment banking services to blockchain-related companies. BIG uses the website www.blockchaininvestmentgrp.com. BIG is registered with the Financial Crimes Enforcement Network as a money service business. Neither BIG nor the related LLP is registered with the SEC or the CFTC in any capacity.

25.     Non-defendant **Alesia M. Harper** ("Harper") is "Managing Partner/Chief Communications Officer" at Rosegold,[5] defendant Ringgold's mother, and was a material participant in Ringgold's schemes and artifices to defraud. Harper goes by two different names and acts as two different persons: Alesia Harper and Monique Harper. Plaintiffs are informed and believe that Harper is in possession, custody and/or control of funds or assets traceable to Plaintiffs' investments.

---

[5] https://www.rosegoldinvestments.com/management

26.     Non-defendant **Michael Sheppard** ("Sheppard") is Defendant Rosegold's "Managing Partner/Chief Communications Officer." Ringgold referred to Sheppard as his "go-to-man," and was a material participant in Ringgold's schemes and artifices to defraud. Sheppard was often included on emails from Ringgold to Plaintiffs, and handled paperwork and information for Ringgold.

27.     Non-defendant **Kurtis Frederick** ("Frederick") – a licensed mechanic, and convicted felon in the state of Oregon, worked for Ringgold purportedly through MIG. Frederick handled Plaintiffs' paperwork for Estatement, LLC, T&C Services, LLP and T&C Trust.

## IV.    <u>SUBSTANTIVE ALLEGATIONS</u>

28.     Plaintiffs met Ringgold in approximately September 2016 when he was teaching at the "Online Trading Academy" ("OTA") a franchised investment seminar company selling "a step-by-step approach to trading and investing." Plaintiffs spent over $50,000 with OTA for trading and investing help from Ringgold.

29.     At Online Trading Academy, Ringgold targeted Plaintiffs as vulnerable senior citizens with retirement assets.

30.     In mid-2017, Ringgold began high-pressure tactics to coerce Plaintiffs into entrusting Ringgold with their retirement funds. First, Ringgold advised Plaintiffs to create a Limited Liability Partnership, Limited Liability Corporation and Trust as investment vehicles. Ringgold solicited Plaintiffs to engage Defendant MIG to incorporate these entities, representing MIG to be the best at structuring investment vehicles.

31.     Ringgold, representing himself as "Managing Partner" of defendant MIG, mailed Plaintiffs an MIG brochure, a true and correct copy of which is attached hereto as Exhibit A (the "Brochure"). Through the MIG Brochure, Ringgold represented that MIG (and by extension himself) had offices in the "British Virgin Islands | Bahamas | Cayman Islands[, and] | Los Angeles" and that MIG "is owned and operated by

Equityhub International S.A…. a global financial services company." These representations were false and misleading when made because MIG was operated out of a UPS store P.O. box in San Diego without any other offices, and has been wholly owned and controlled by Defendant Ringgold and his associates described herein.

32.     Through the MIG Brochure, Ringgold represented that MIG (and by extension himself) has "extensive experience forming offshore funds …" and that MIG maintains an "experienced consulting and legal team in each jurisdiction." These representations were false and misleading when made because neither Ringgold nor his associates at MIG had any such experience or qualifications, and have no business presence outside of southern California.

33.     Based on defendant Ringgold's false and misleading representations concerning MIG, and the representations Ringgold made in the MIG brochure, Ringgold induced Plaintiffs to pay $15,000 to MIG for formation of Estatement, LLC, T&C Services, LLP and T&C Trust in September 2017.

34.     To induce Plaintiffs to invest their retirement savings with him, Ringgold represented to Plaintiffs that he is an "investment advisor" and "finance expert" with "extensive background in global economic analysis and alternative investments."

35.     As part of his inducements for Plaintiffs to invest with him, Ringgold represented to Plaintiffs that he could "double or triple" their money "in no time." Ringgold also made representations about his net worth, stating he was worth "millions" from his investment success. Ringgold claimed he was the author of a "best-selling" investment book. Ringgold represented that he was the "Bitgod" and had created an algorithm that would allow him to predict and profit from market fluctuations.

36.     As part of his inducements for Plaintiffs to invest with him, Ringgold directed Plaintiffs to his websites www.reginaldringgold.com and www.rosegoldinvestments.com. On www.reginaldringgold.com, Ringgold claimed he had developed "proprietary indicators" that "allow a trader" to "immediately determine

what's moving" and "provid[e] a quick and effective way for a trader to establish a bearish or bullish bias for all trading timeframes." Ringgold claimed he possessed "proven trading strategies that have created thousands of successful traders." Ringgold claimed he had been "featured in" the such prominent financial press as the Wall Street Journal, Fox, NASDAQ, Entrepreneur Magazine, The Street and CNBC. All of these statements were false and misleading when made, because Ringgold had not developed any *bona fide* "proprietary indicators" or "proven strategies" and had not been "featured in" any of the listed publications.

37.   On the www.rosegoldinvestments.com website, defendant Ringgold represented that he was "an internationally recognized financial industry strategist" and "named as one of the most influential people in banking." Ringgold falsely represented that he had "appeared in many leading publications, including Nasdaq, CNBC, The Wall Street Journal, Financial Times, New York Times, USA Today, Businessweek, Forbes, Fortune, and many others."

38.   These statements, and others as described herein were all false and misleading when made, as neither Ringgold, nor any other defendant has any such talent, skill, experience, registration, recognition or licensure.

39.   Ringgold also used high-pressure tactics to coerce Plaintiffs into entrusting Ringgold with their retirement funds. These tactics included, following Plaintiff to and into their bank to convince Plaintiffs to liquidate their investments, pleading, crying when his requests were not endorsed by Plaintiffs, and yelling and screaming at Plaintiffs.

40.   Ringgold made the above false and misleading statements, orally, in MIG's brochure, in Ringgold's websites, and Ringgold's artifices to defraud, for the purpose of inducing Plaintiffs to purchase membership interests in Rosegold, and for the purpose of inducing Plaintiffs to purchase securities in the Bitconnect ponzi, and for the purpose of inducing Plaintiffs to purchase ICO securities through Ringgold and

Rosegold. Plaintiffs reasonably relied on the above false and misleading statements and artifices to defraud in connection with their to purchase Rosegold membership interests, and Bitconnect ponzi securities, and ICO crypto-securities, trusting Ringgold's representations that he was licensed, qualified and experienced to handle Plaintiffs' retirement funds as described herein.

### A. RINGGOLD INDUCED PLAINTIFFS TO EXCHANGE THEIR $US FOR BITCOIN

41.    When Plaintiffs met Ringgold, their retirement monies were invested in stocks and bonds such as QQQ and SPY. Ringgold induced Plaintiffs to sell their retirement assets and invest in Bitconnect, by promising them extremely high rates of return. Ringgold induced Plaintiffs to sell these investments at steep losses of approximately $41,000.

42.    Once Plaintiffs' retirement funds were in cash, Ringgold induced Plaintiffs to exchange their dollars into bitcoin through a service called www.localbitcoins.com. Plaintiffs purchased their first bitcoin in response from localbitcoins.com at Ringgold's direction in late September 2017. Localbitcoins.com is a peer-to-peer bitcoin transaction platform, that allows users to bypass much more liquid order-matching venues. On information and belief, Ringgold instructed Plaintiffs to use localbitcoins.com for the purpose of concealing the trail of funds into Ringgold's accounts.[6]

43.    Ringgold instructed Plaintiffs to buy ever increasing quantities of bitcoin through localbitcoins.com. To buy these bitcoin in large quantities, Mrs. Garrison had to drive hours to personally meet strangers from the internet. Ringgold asked Mrs. Garrison to buy bitcoin in this manner for his other "clients" as well. In total, Plaintiffs

---

[6] Ringgold made representations to, and demands from Plaintiffs using cell phones, texting, and through Ring Central Meetings.

converted $804,784 into bitcoin through this process, which Defendants used to open various cryptocurrency and crypto-securities accounts.

44.    Between September, 2017 and January 2018, at Ringgold's direction, Plaintiffs paid $113,090 for bitcoin that were thereafter transferred to Ringgold to invest on Plaintiffs' behalf in Bitconnect. At Ringgold's direction, Plaintiffs paid $613,260 for bitcoin that were thereafter transferred to Ringgold to invest on Plaintiffs' behalf in Bitconnect.

45.    Between September, 2017 and January 2018, at Ringgold's direction, Plaintiffs paid $78,434 for bitcoin that was thereafter transferred at Ringgold's direction to accounts at various cryptocurrency and crypto-securities platforms such as Bitmex.com, bitserial.io, Cryptonetix.com, Bitpay.com, coinexchange.io, cashaa.com, cryptoxchanger.io, exodus.io and etherdelta.com to purchase cryptocurrencies and crypto-securities by, and at the direction of Ringgold.

**B.    DEFENDANTS CONDUCTED AN ILLEGAL, UNREGISTERED OFFERING IN DEFENDANT ROSEGOLD UTILIZING MATERIALLY FALSE AND MISLEADING STATEMENTS**

46.    Shortly after Plaintiffs began converting $US to bitcoin at Ringgold's direction, on or about October 14, 2017, Ringgold provided Plaintiffs with a Private Offering Memorandum (the "Offering Memo") "Limited Partnership Offering" in Defendant Rosegold that, on information and belief, was drafted by Ringgold. Defendant Ringgold provided the Offering Memo to Plaintiffs on or about October 14, 2017, a true and correct copy of which is attached hereto as Exhibit B.

47.    In connection with the Offering Memo, defendant Ringgold presented Plaintiffs with a "Subscription Agreement" for "subscribing to ROSEGOLD INVESTMENTS LLP," a true and correct copy of which is attached hereto as Exhibit C.

48.    On or about October 14, 2017, Plaintiffs executed the Subscription Agreement in the manner directed by Defendant Ringgold. Pursuant to the Subscription Agreement and Offering Memo, Plaintiffs entered into an "investment contract" for the purchase of membership interests in defendant Rosegold.

49.    Defendant Ringgold used Plaintiffs' investment into Rosegold as the vehicle to "invest" Plaintiffs monies and bitcoin into the Bitconnect ponzi scheme and ICO's crypto-securities as alleged herein.

50.    Plaintiffs invested monies and bitcoin with defendant Ringgold prior to signing the Rosegold Subscription Agreement with the understanding that Plaintiffs' investment would be later memorialized by a contract with Ringgold's "fund." Plaintiffs continued to invest additional monies and bitcoin with defendants Ringgold and Rosegold after executing the Rosegold Subscription Agreement in reliance on the representations made in the Offering Memo, and other representations made by Ringgold as described herein.

51.    On information and belief, Ringgold drafted the Offering Memo and Subscription Agreement by cutting and pasting from a private placement memorandum he obtained online, and fabricated the information specific to his "fund" and "investment advisory" business as described below.[7]

52.    Through the Offering Memo, Ringgold represented that he "is a **finance expert** with professional background across diverse matters in the finance industry. His experience includes **in-depth knowledge** of **financial markets, currencies, and fundamental data & technical analysis**. He has over 10 years of experience in the financial markets and has been a full time financial trader for several years trading the European, US and Asian markets. He has an **extensive background in global economic analysis and alternative investments**. He is the Managing Partner and Chief

---

[7] *Cf.* Ex. B, at p. 3 ("NEW HEDGE FUND US LP") with https://sampleprivateplacement.org/downloads/22_506(c)_US_Hedge_Fund_LP_PPM.pdf

Investment Officer of Rosegold Investments, **a CFTC registered Commodity Trading Advisor firm**. He **founded Rosegold investments in 2012** to initially invest the assets of his closest clients, friends, and family, **but now the firm manages two funds, The Rosegold Global Growth fund and The Rosegold Real Returns private equity fund**… [¶] In 2006, [Ringgold] went on to serve as **Chief Investment Officer for Epicenter Investment Group, a northern California hedge fund with over $310 million in assets under management.** He served as the firm's **global macroeconomic strategist and was responsible for research and portfolio construction**. [¶] Ringgold is the **best-selling author** of The Billionaire's Business Blueprint. He is an investment expert for the media…" (emphasis added). These representations in the Offering Memo were false and misleading when made because Ringgold is not a "finance expert," has never been CIO of Epicenter Investment Group, Rosegold was founded in February 2017, Ringgold is not a "best selling" author, and Rosegold has not been registered with the SEC, CFTC, the State of California, or any state securities regulator in any capacity.

53.    Through the Offering Memo, Ringgold represented to Plaintiffs that "[Rosegold] is offering manage [*sic*] accounts services to Christine and Tommy Garrison." The Offering Memo represented to Plaintiffs that "[o]nly investors who have a pre-existing relationship with the General Partner or its principals, employees or representatives and are: (i) 'accredited investors' … and (iii) knowledgeable and experienced in management and business matters such that they are capable of evaluating the merits and risks of an investment in the Company will be permitted to invest in the Company." This statement was materially false and misleading when made because, *inter alia*, Plaintiffs are not "accredited investors" or "capable of evaluating the merits and risks of [the] investment," and Defendants did not investigate whether Plaintiffs satisfied these requirements.

54.    Through the Offering Memo, Ringgold represented to Plaintiffs that the offer and sale of securities in Rosegold was made pursuant to "Regulation D Rule

506(b)." The Offering Memo represented to Plaintiffs that the offering was "made in reliance on the exemptions provided for in Section 4(a)(2) of the [Securities] Act [of 1933] and Rule 506(b) of Regulation D." These statements were materially false and misleading when made because, *inter alia,* neither Defendant was registered with the SEC or CFTC in any capacity, and because the offering did not qualify for an exemption from registration with the SEC.

55.     Through the Offering Memo, Ringgold represented to Plaintiffs that Rosegold "is being operated as a private investment fund under Section 3(c)(1) of the Investment Company Act of 1940…" This statement was materially false and misleading when made because, *inter alia,* neither Defendant was registered with the SEC or CFTC in any capacity.

56.     Through the Offering Memo, Defendants represented to Plaintiffs that "the General Partner of [Rosegold] is Rosegold Investments Trust, a 501(d) unincorporated association[.]" This statement was materially false and misleading when made because, *inter alia,* there is no such thing as a "501(d) unincorporated association" and there is no such entity as the "Rosegold Investments Trust," which could not operate as the general partner of Rosegold. Defendant Ringgold acted as "general partner" of Rosegold.

57.     Through the Offering Memo, Defendants represented to Plaintiffs that "[t]he Platform that the capital will be invested in will furnish to each Investors: (i) audited annual financial reports of each investment; (ii) annual descriptive investment information for each investment." These statements were materially false and misleading when made because, *inter alia,* Defendants had no intention to provide reports to Plaintiffs, audited or otherwise, did not have the capabilities or arrangement for financial statements to be audited, and Defendants have made no such disclosures to Plaintiffs since the Offering Memo was signed in October 2017.

58.     Through the Offering Memo, Defendants represented to Plaintiffs that "ROSEGOLD INVESTMENTS TRUST (R.I.T), formed July 2012, R.I.T. is the offshore division of ROSEGOLD INVESTMENTS."  Through the Offering Memo, Defendants also represented to Plaintiffs that "[t]he manager of the Company is ROSEGOLD INVESTMENTS TRUST, a Delaware company."  These statements were materially false and misleading when made because, *inter alia,* there is no such entity as ROSEGOLD INVESTMENTS TRUST, in Delaware or elsewhere, which cannot be "offshore."

59.     Through the Offering Memo, Defendants represented to Plaintiffs that "ROSEGOLD INVESTMENTS TRUST… will serve was the Investment Manager of the Company and provides discretionary investment advisory and portfolio management services to the Company[.]"  These statements were materially false and misleading when made because, *inter alia,* there is no such entity as Rosegold Investments Trust, which was not qualified or registered to provide investment advisory or portfolio management services to defendant Rosegold, and was not registered with the SEC or CFTC in any capacity, or with any state securities regulator.

60.     Through the Offering Memo, Defendants represented to Plaintiffs that "the Investment Manager intends to engage outside registered investment advisors to comply with recent changes to the U.S. Securities Regulations."  This statement was materially false and misleading when made because, *inter alia,* Defendants had no intention to engage registered investment advisors, and has not done so since Plaintiffs signed the Offering Memo in October 2017.

61.     Through the Offering Memo, Ringgold represented to Plaintiffs that "ROSEGOLD INVESTMENTS TRUST … will serve as the Investment Manager of the Company and provides discretionary investment advisory and portfolio management services to the Company[.]" This statement was materially false and misleading when made because, *inter alia,* there is no such entity as the "Rosegold

Investments Trust," which was not registered with the SEC or CFTC in any capacity, or with any state securities regulator.

62.     Through the Offering Memo, Ringgold represented to Plaintiffs that "The Investment manager utilizes a multi-disciplined investment approach, the foundation of which is company specific… analysis with diversified sectors. The Investment Manager concentrates on the growth potential and predictability of revenues, cash flow, and earnings to determine the extent to which a security is undervalued and whether the Company will take a long or short position in the security."  This statement was materially false and misleading when made because, *inter alia,* Defendants had no capability to utilize a "multi-disciplined investment approach," as defendant Ringgold had and has no such capabilities or skills.

63.     Through the Offering Memo, Defendants represented to Plaintiffs that "Pursuant to an Investment Advisory Agreement, the Investment Manager will be paid a performance incentive fee computed at a rate of 20.0% per month of [Plaintiffs'] net profit … to be paid bi-weekly." In a separate section of the Offering Memo, Defendants represented to Plaintiffs that "the Investor will pay the Investment Manager or an affiliate thereof a monthly management fee (the 'Performance Incentive Fee'), funded by each Investor paid by [*sic*] weekly, equal to two percent [*sic*]  (20.0%) of the net profits generated off of the Capital Accounts of the Investors of the Company." These statements were materially false and misleading when made because, *inter alia,* there was no legally cognizable "Investment Advisory Agreement," and Defendants were not legally permitted to charge investment advisory fees.

64.     Through the Offering Memo, Ringgold represented to Plaintiffs that "[Rosegold's] focus is on long-term investing as opposed to short-term trading…" The Offering memo also represented that the "Investment Approach of the Investment Manager" consisted of "Fundamental Research" of "Company Management", "Financial Statement Analysis", "Industry Analysis", "Competitors", "Suppliers and

Customers", as well as "Qualitative Research", including such factors as "Risk Management", "Secular Trends" and "Hedging". These statements were materially false and misleading when made because, *inter alia,* Defendants' "investment" strategy was comprised of investing in Bitconnect ponzi securities and other extremely speculative cryptocurrencies and crypto-securities.

65.     Through the Offering Memo, Defendants represented to Plaintiffs that "Portfolio transactions for the Company … generally will be allocated to brokers on the basis of best execution…"  This statement was materially false and misleading when made because, *inter alia,* Ringgold acted as broker for the account of Plaintiffs at Bitconnect and other crypto order execution platforms that had no processes or procedures to comply with best execution obligations.

66.     Through the Offering Memo, Ringgold represented to Plaintiffs that "[Rosegold] is primarily a long investor on U.S. and foreign equity markets; funds focused on energy and minerals; and U.S. governmental & Infrastructure projects." This statement was materially false and misleading when made because, *inter alia,* Rosegold made no such investments, and instead invested Plaintiffs' funds in highly speculative Bitconnect ponzi securities and other extremely speculative cryptocurrencies and crypto-securities.

67.     Through the Offering Memo, Ringgold represented to Plaintiffs that the "Fund Auditor" and "Administrator" would be "Master Investment Group" at 5694 Mission Center Road, Suite 489, San Diego, CA 92108. These statements were materially false and misleading when made because, *inter alia,* Master Investment Group was a shell company for Defendant Ringgold that provided neither accounting services nor asset administration.

68.     Plaintiffs considered the truth of the statements made by Defendants in paragraphs 30-39, and 46-67 above important.

69.     Plaintiffs reasonably relied on Defendants' statements made in paragraphs 30-39, and 46-67 above in investing monies and bitcoin with Defendants. Plaintiffs would not have invested their monies and bitcoin with Defendants had they known the truth.

### C.     ACTING AS INVESTMENT ADVISOR AND BROKER-DEALER, DEFENDANTS "INVESTED" PLAINTIFFS' RETIREMENT FUNDS IN BITCONNECT SECURITIES

70.     Acting in the capacity of an investment advisor and a broker-dealer, Defendants "invested" Plaintiffs' retirement funds in the Bitconnect Ponzi scheme. For these services, defendant Defendants took between 20%-25% of all funds for himself directly from Plaintiffs' accounts as "Investment Advisory Fees".

71.     Bitconnect launched on or about February 19, 2016. Bitconnect soon thereafter conducted an unregistered securities offering of its own cryptocurrency "BCC." Bitconnect also implemented various investment programs, including the BitConnect Lending Program, the BitConnect Staking Program, and the Referral/Affiliate Program.[8]

72.     Ringgold represented to Plaintiffs that BCC trading was an investment option that capitalized on price fluctuation. In addition to trading BCC, Defendants invested Plaintiffs' funds into the BitConnect Lending Program and the BitConnect Staking Program.

73.     The BitConnect Lending Program claimed to offer up to forty percent (40%) interest per month as well as additional interest on a daily basis. Ringgold represented to Plaintiffs he would "lend" their BCCs to Bitconnect – with no risk – as part of an investment scheme whereby Bitconnect ostensibly used these BCC tokens to fund trading activities using its Volatility Software.

---

[8] https://www.youtube.com/watch?v=lCcwn6bGUtU

FIRST AMENDED COMPLAINT                                3:19-cv-00244-GPC MSB

74.     Defendants also "invested" Plaintiffs' funds into the BitConnect Staking Program that purported to offer "guaranteed" interest paid in BCC. The BitConnect Staking Program promised investors interest of up to ten percent (10%) per month over a specified term through a process called "Proof of Stake Minting." In essence, the BitConnect Staking Program and BCCs in general were sold as interest bearing assets with 120% return per year.

75.     Ringgold also induced Plaintiffs to solicit investment funds from their friends and family through BitConnect's Referral Program. The Referral Program was a run-of-the-mill pyramid scheme.

76.     Ringgold solicited Plaintiffs to enroll their family and friends to entrust their money to Defendants. On behalf of their friends and family, Plaintiffs entrusted to Defendants an additional $613,260 in bitcoin. In total, Plaintiffs tendered bitcoin purchased for $726,350 to Defendants to "invest" through Bitconnect.

77.     Contrary to Ringgold's representations of fantastic investment returns through the power of Bitconnect's proprietary, secret trading Volatility Software and the communal power of the BitConnect Staking Program, BitConnect was actually a Ponzi scheme.

78.     As a direct and proximate result of Defendants' false and misleading statements and artifices to defraud, and Defendants unregistered and unlicensed investment advisory and broker-dealer services, Plaintiffs lost the entirety of their investment.

**D.     ACTING AS INVESTMENT ADVISOR AND BROKER-DEALER, DEFENDANTS "INVESTED" PLAINTIFFS' RETIREMENT FUNDS IN HIGHLY SPECULATIVE CRYPTO-SECURITIES**

79.     Acting in the capacity of an investment advisor and a broker-dealer, Defendants also recommended that Plaintiffs "invest" in other unsuitable, highly speculative cryptocurrencies and crypto-securities.

80.    To get referral fees from unscrupulous crypto-investment platforms, defendant Ringgold sent Plaintiffs "referral links" to such platforms as such as Bitmex.com,[9] bitserial.io, Cryptonetix.com, Bitpay.com, coinexchange.io, cashaa.com, cryptoxchanger.io, exodus.io and etherdelta.com.[10]

81.    At the direction and inducement of Defendants, Plaintiffs opened accounts at crypto trading platforms, and transferred bitcoin purchased with $78,434 to fund such accounts.

82.    Ringgold solicited and induced Plaintiffs to invest into crypto-securities issued in Initial Coin Offerings ("ICO Tokens"). Ringgold misleadingly failed to disclose that ICO Tokens are the crypto-version of penny stocks, but worse. They are highly speculative, illiquid, and unlike penny-stocks, have no claim to equity or assets.

83.    Plaintiffs lost the entirety of $78,434 invested in ICO Tokens, because the platforms collapsed and are no longer accessible to users, and because the ICO Tokens into which Defendants induced Plaintiffs to invest have become worthless.

### E.    AFTER THE BITCONNECT CRASH DEFENDANTS INDUCED PLAINTIFFS TO "GET THEIR MONEY BACK" BY INVESTING IN UNSUITIBLE, HIGHLY SPECULATIVE ICO TOKENS

84.    In mid-January 2018, the Bitconnect Ponzi failed. In the collapse, Plaintiffs lost approximately 95% of their invested funds. But this did not deter Ringgold's scheme to defraud.

85.    After the Bitconnect collapse, Ringgold convinced Plaintiffs to "get back their money." The day after Plaintiffs got their remaining funds out of Bitconnect, Ringgold insisted on meeting Plaintiffs face-to-face to explain an algorithm he claimed to have invented that would make back all the money Plaintiffs lost.

---

[9] Defendants charge Plaintiffs $15,000 to create a Wyoming LLC, LLP and Trust for the purpose of opening a Bitmex account, as certain Bitmex features were not available to individual traders.

[10] Referral fees were paid directly to defendant Ringgold, and his mother Alesia Harper.

86.     Ringgold represented to Plaintiffs that he would "diversify" their funds into *all* ICO Tokens, then exit when they increased in value. That never occurred.

87.     Mr. Garrison has a seizure disorder, which was known to defendant Ringgold. With the stress of losing the entirety of their life savings, Mr. Garrison's illness progressed, with his seizures materially progressing. In late January 2018, Mrs. Garrison was taking Mr. Garrison to the hospital for treatment, when Plaintiffs received a call from defendant Ringgold. Ringgold insisted that Plaintiffs provide him additional funds, and when they refused, Ringgold disappeared.

88.     Whatever Ringgold did with Plaintiffs' money, he has since ceased communication with Plaintiffs. Defendants failed to return even a single penny of the funds invested by Plaintiffs.

89.     Defendant Ringgold misrepresented himself as a qualified, accredited, licensed professional, and that Rosegold was a bona fide investment fund. In truth, Defendant Ringgold is a con man, without any such qualifications, licensure or experience. No actual investment advisor or broker would have invested client monies into a – fairly obvious - ponzi scheme, or ICO tokens which are clearly "unsuitable" for senior citizens, and highly speculative, illiquid investments with no claim to equity or assets.  Ringgold's investments were doomed to fail. Anyone with the qualifications, licensure and experience claimed by Defendant Ringgold and the other Defendants would have appreciated this fact and not invested client funds therein.

### **FIRST COUNT**

**Violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5**
**Device, Scheme, or Artifice to Defraud and Untrue Statements of Material Fact**
**In Connection With Purchase or Sale of Securities**

90.     Plaintiffs hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

91.     Plaintiffs purchased membership interests in Rosegold through the Offering Memo and Subscription Agreement. The Rosegold Subscription Agreement constitutes a "security" pursuant to 15 U.S.C. § 77b(a)(1).

92.     Through Ringgold, Defendants made material misrepresentations to Plaintiffs and omissions in connection with Plaintiffs' purchase of Rosegold securities, the Bitconnect ponzi scheme, and other crypto-securities as described herein. Defendants knew or were reckless in not knowing that these statements were false.

93.     By engaging in the conduct described above, each of the Defendants directly, or indirectly, in connection with the purchase or sale of securities, and by use of the means or instrumentalities of interstate commerce, and of the mails, with scienter, engaged in devices, schemes and artifices to defraud Plaintiffs out of their retirement savings.

94.     By engaging in the conduct described above, each of the Defendants directly, or indirectly, in connection with the purchase or sale of securities, and by use of the means or instrumentalities of interstate commerce, and of the mails, with scienter, made untrue statements of material fact and omitted to state facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading.

95.     By engaging in the conduct described above, each of the Defendants directly, or indirectly, in connection with the purchase or sale of securities, and by use of the means or instrumentalities of interstate commerce, and of the mails, with scienter, engaged in acts, practices, and course of business that operated as a fraud and deceit upon Plaintiffs.

96.     Plaintiffs reasonably relied on each of Defendants' false and misleading statements of material fact, and artifices to defraud, which were important to Plaintiffs' decision to invest their retirement savings with Defendants through Ringgold.

97.    As a direct and proximate result of each of Defendants' false and misleading statements of material fact, and artifices to defraud, Plaintiffs' suffered losses of approximately $41,000 selling their investment securities to invest with Defendants, and $726,350 that Ringgold "invested," or directed Plaintiffs to invest, in the Bitconnect ponzi scheme through, and by means of, Plaintiffs' investment contract in Rosegold membership interests, and $78,434 that Ringgold "invested," or directed Plaintiffs to invest, in ICO'd crypto-securities through, and by means of, Plaintiffs' investment contract in Rosegold membership interests.

98.    By engaging in the conduce described above, each of the Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a)-(c) thereunder, 17 C.F.R. §240.10b-5.

## SECOND COUNT

**Violation of CAL. CORP. CODE §§ 25000, *et seq.* -
Unlawful Conduct of Business as an "Investment Advisor" and "Broker"**

99.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

100.   Defendants' conduct as complained of herein meets the definition of an "investment advisor" under Cal. Corp. Code § 25009, because Defendants engaged in the business of advising Plaintiffs on the value of securities and as to the advisability of investing in and purchasing securities for compensation from Plaintiffs.

101.   Defendants have not registered or applied for registration or licensing as an "investment advisor" in the state of California, and do not qualify for an exemption therefrom. Nor do Defendants meet the qualifications necessary for licensure as an "investment advisor" by the State of California.

102.   Defendants are not registered, licensed or qualified as an "investment advisor" by another state or with the SEC.

103.   Defendants' conduct as complained of herein meets the definition of "broker-dealer" under Cal. Corp. Code § 25004 because Defendants engaged in the business of, and effected transactions of securities in this state for the account of the Plaintiffs.

104.   Defendants have not registered or applied for registration or licensing as a "broker-dealer" in the state of California, and do not qualify for an exemption therefrom. Nor do Defendants meet the qualifications necessary for licensure as a "broker-dealer" by the State of California or the SEC.

105.   Defendants are not registered, licensed or qualified as a "broker-dealer" by another state or with the SEC.

106.   As a direct and proximate result of Defendants violations of the California Corporate Securities Law, Plaintiffs have suffered loss, cost, damage and expense in the amount of $726,350.

### THIRD COUNT

**Violation of CAL. WELF. & INST. CODE §§ 15610, *et seq.* - Financial Abuse of an Elder By Tommy Garrison**

107.   Mr. Garrison hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

108.   Mr. Garrison was 65 years or older at the time of the conduct complained of herein.

109.   Defendants, and each of them, took, hid, appropriated, and retained Mr. Garrison's retirement savings for a wrongful purpose, and with intent to defraud, and utilizing undue influence.

110.   Defendants, and each of them, exercised undue influence because Mr. Garrison has a disability as described herein, Defendant Ringgold falsely represented himself as a "financial expert," and the other defendants as qualified "investment advisors" and registered entities, and through high pressure tactics as described herein.

111.   Defendants' conduct, and each of them, was a substantial factor in causing harm to Mr. Garrison.

112.   Defendants, and each of them, knew or should have known that their conduct was likely to be harmful to Mr. Garrison.

113.   As a direct and proximate result of Defendants elder abuse, Plaintiffs have suffered loss, cost, damage and expense in the amount of $860,784.

## V.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    For an order, in a form consistent with Fed. R. Civ. P. 65, a temporary restraining order and a preliminary injunction freezing the assets of defendants Ringgold, Rosegold, and MIG, requiring accountings from reach of these Defendants, and prohibiting each of the Defendants from destroying documents;

B.    For an order awarding Plaintiffs $860,784 as rescission, restitution, actual damages, and/or disgorgement;

C.    For an order awarding Plaintiffs pre- and post-judgment interest;

D.    For an order awarding attorneys' fees and costs of suit, including expert's witness fees and electronic discovery fees as permitted by law or contract; and

E.    Such other and further relief as this Court may deem just and proper.

/ / /

/ / /

## VI.   **JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury for all of the claims asserted in this Complaint so triable.

DATED: May 28, 2019                          Respectfully submitted,

THE RESTIS LAW FIRM, P.C.

/s/ William R. Restis ____
William R. Restis, Esq.
402 W. Broadway, Suite 1520
San Diego, CA 92101
Tel: +1.619.270.8383
Email: william@restislaw.com

- 26 -

# EXHIBIT A



**MASTER INVESTMENT GROUP LLP**

Sourcing Capital from Investors for Investors

MIG Business Services Limited is a business company registered in the London Wales doing business as MIG Fund Services. MIG, a global investment fund consulting firm.

British Virgin Islands | Bahamas | Cayman Islands | Los Angeles (USA)

*www.masterinvestmentllp.com*



EXHIBIT A
PAGE 3

# Company *Overview*

## AN INNOVATIVE FUND CONSULTANCY FIRM THAT PROVIDES PERSONALIZED SOLUTIONS TO FUND MANAGERS IN ALL ASPECTS OF THE INDUSTRY

MIG Fund Services specialise in providing our clients with professional guidance through all aspects of launching and operating a fund. Our services extend to all stages of the fund formation process — from entity formation and the preparation of full-colour offering documents to advising them on the selection of service providers to marketing the fund.

We work closely with many fund service providers and provide introductions to fund administrators, attorneys, auditors, and custodians.

**Offshore Funds** - We have extensive experience forming offshore funds for managers who expect to attract predominately non-U.S. investors and/or tax-exempt U.S. investors. Our expertise extends to multiple offshore fund jurisdictions, including the British Virgin Islands, Cayman Islands and the Bahamas, where we maintain a presence.

Our services are comprehensive and include:

- incorporating the offshore fund
- memorandum and articles of association
- handling all registration requirements
- preparing the offering memorandum & subscription documents
- prepare the investment management agreement between the fund and the investment manager.

We are able to form offshore stand-alone funds, side-by-side fund structures and master-feeder structures.

**Onshore U.S. Hedge Funds** - We support emerging and seasoned managers in all aspects of the fund formation process, including:

- advising on fund structure
- regulatory and on-going compliance matters
- structuring the management company
- manage regulatory filings, including entity formation filings, blue sky notices, SEC and state investment adviser registrations
- CPO/CTA registrations and exemption filings
- preparing full-colour offering documents custom-made for your fund.

The offering documents include the private placement memorandum, limited partnership agreement (or operating agreement) and subscription documents.

MIG maintains a personalized approach to guiding and educating new and emerging investment fund mangers in structuring both domestic and offshore funds. Our consultants and attorneys have significant fund experience in both the US and offshore.

MIG Fund Services is owned and operated by Equityhub International S.A. Equityhub International is a global financial service company. Our dedicated team of professionals are focused on providing clients with first-class service that they have come to expect.

Specialise in fund formation in the British Virgin Islands, Cayman Island, Bahamas, and the United States

EXHIBIT A
PAGE 4



4

# Products & *Services*

## Fund Formation

Full-service offshore & onshore fund formation in multiple jurisdictions including the British Virgin Islands, Bahamas, Cayman Islands and the United States. Our experienced consulting & legal team in each jurisdiction will oversee the formation.

- Fund structure & entity formation
- Full-colour offering memorandum (PPM)
- Full-colour subscription agreement & investor questionnaire
- Full-colour fund fact sheet
- Fund registration
- Investment manager entity formation & registration

## Corporate Services

We offer general corporate services is a leader in offshore corporate services providing company incorporating services in over 35 jurisdictions.

- Incorporating services in over 35 jurisdictions
- Nominee services including shareholders and directors
- ISIN & CUSIP registration
- Bloomberg Ticker registration
- Financial Instrument Global Identifiers (FIGI) registration
- Licensing services for IRAs and CTAs

## Marketing & Presentation

Our design team specializes in delivering corporate branding, communications, and creative marketing solutions for the financial services and investment sector, including hedge funds, alternative asset management and private equity firms.

- Website Development, Design & Hosting
- Fund Prospectus Design™
- Fund Fact Sheet Design
- Investor Pitchbooks
- Investor Marketing Materials

## Investors Lists

Our Investors databases contain high quality investor information on U.S. single and multi-family offices, International & European family offices, fund of funds, hedge funds, private equity funds, pension & endowment funds, foundations, private wealth managers, advisers and more.

- Over 60,000+ Institutional and private investors
- Full contact information usually including: firm or organization's name, contact name, title, phone, fax, primary email, address, city, state/prov-ince, zip/postal code, country, type, website
- Delivered in Microsoft Excel format or membership access database
- Quarterly updates for Family office lists

EXHIBIT A
PAGE 6







6

# Fund *Jurisdiction*

## The Bahamas

In the Bahamas there are a number of advantages to establishing an investment fund, these include:

- A tax neutral, no capital gains
- A stable political and economic jurisdiction
- A respected legal system under English Common Law
- A dedicated Commercial & Financial Services Court
- No restrictions on investment policies, strategies or on performance and other fee arrangements
- No requirement to appoint local directors, representatives or auditors
- A fast track process available for professional funds licensed through an unrestricted fund administrator
- Relatively low start-up and on-going fees and costs

**Regulatory Body**
Securities Commission of the Bahamas ("SCB").

**Structures**
Bahamas IBC, Limited Partnership, Unit Trust.

**Name Restrictions**
Restrictions on use of certain words in name.

**Director Requirements**
Require two directors. No local director requirement.

## British Virgin Islands

In the British Virgin Islands there are a number of advantages to establishing an investment fund, these include:

- A tax neutral, no capital gains
- A stable political and economic jurisdiction
- A respected legal system under English Common Law
- A dedicated Commercial & Financial Services Court
- No restrictions on investment policies, strategies, or on performance and other fee arrangements
- No requirement to appoint local directors, representatives or auditors
- A fast track process available for professional funds
- Relatively low start-up and on-going fees and costs

**Regulatory Body**
BVI Financial Services Commission (BVIFSC).

**Structures**
BVI Business Company, Limited Partnership, Unit Trust.

**Name Restrictions**
Restrictions on use of certain words in name.

**Director Requirements**
Require two directors. One must be a person. No local director requirement.

## Cayman Islands

In the Cayman Islands there are a number of advantages to establishing an investment fund, these include:

- A tax neutral, no capital gains
- A stable political and economic jurisdiction
- A respected legal system under English Common Law
- No restrictions on investment policies, strategies or on performance and other fee arrangements
- No requirement to appoint local directors, representatives
- Local auditor sign-off required
- A fast track process available for professional funds

**Regulatory Body**
Not subject to registration and licensing.

**Structures**
Exempt Company, Limited Partnership, Unit Trust.

**Name Restrictions**
Can NOT use the words "fund" or "Mutual Fund" in the name.

**Director Requirements**
Require two directors. No local director requirement.

## United States

In Delaware there are a number of advantages to establishing an investment fund, these include:

- Favorable regulatory regime for hedge funds
- Clear and neutral tax domicile
- Favorable implication for the contractual structure, fund performance, risk-taking behavior
- More common understanding about the structure and governance under Delaware law
- Relatively low start-up and on-going fees and costs

**Regulatory Body**
Securities & Exchange Commission (SEC), US Commodity Futures Trading Commission (CFTC, and the state financial commission.

**Structures**
Limited Partnership and Limited Liability Company.

**Name Restrictions**
Restrictions on use of certain words in name. May not be able use the words "fund" in the name.

**Director Requirements**
Require one directors. No local director requirement.



EXHIBIT A
PAGE 9

# *Contact* Us



**Telephone**

**British Virgin Islands**
+1 284 494 3027

**Cayman Islands**
+1 345 749 8399

**Los Angeles (USA)**
+1 800 757 7617

**Winnipeg (CAN)**
+1 204 272 5649

**London (UK)**
+44 203 514 0717

**Online**

Website:
www.masterinvestmentllp.com

E-mail:
info@master
investmentllp.com

Skype:
MIGLimited

Social Media:
twitter.com/MIGservices
facebook.com/MIGFundServices
google.com/+MIGlimited

**British Virgin Islands**

2nd Floor, Yamraj Building
PO Box 3405
Road Town, Tortola
British Virgin Islands
VG1110

**The Bahamas**

Suite 205 A– Saffrey Square
Bay Street
P. O. Box N-9934
Nassau, Bahamas

**Cayman Islands**

27 Hospital Road
Cayman Corporate Centre, 5th Floor
PO Box 1748
George Town, Grand Cayman
KY1-1109

**United States**

Document Processing Office
Valencia, CA 91381
USA



EXHIBIT A
PAGE 10

## Contact

Master Investment Group LLP
25350 Magic Mountain Pkwy
Valencia, CA [91355]
Tel +1 800 757 7617

info@masterinvestmentllp.com
www.masterinvestmentllp.com

# EXHIBIT B

Rosegold **Investments**

# PRIVATE OFFERING MEMORANDUM

### ROSEGOLD INVESTMENTS LLP
(a Delaware Partnership)

Limited Partnership Offering
Regulation D Rule 506(b)
Accredited Investors and up to 35 Non-Accredited Investors

Minimum Investment US$100,000

Dated October 2017

No.: 1 of 1

Prepared for:

Tommy Garrison & Christine Garrison

Tommy & Christine Garrison

EXHIBIT B
PAGE 14

ROSEGOLD INVESTMENTS LLP
1055 West 7th Street
33rd Floor
Los Angeles CA 90017

# Important Notices

THIS CONFIDENTIAL PRIVATE OFFERING MEMORANDUM (THE "MEMORANDUM") HAS BEEN PREPARED SOLELY FOR, AND IS BEING DELIVERED ON A CONFIDENTIAL BASIS TO, PROSPECTIVE INVESTORS CONSIDERING THE PURCHASE OF LIMITED PARTNERSHIPS (THE "PARTNERSHIP") IN ROSEGOLD INVESTMENTS LLP (THE "COMPANY").

ANY REPRODUCTION OR DISTRIBUTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, OR THE DISCLOSURE OF ITS CONTENTS, WITHOUT THE PRIOR WRITTEN CONSENT OF COMPANY'S GENERAL MANAGER, REGINALD RINGGOLD (THE "GENERAL MANAGER"), IS PROHIBITED AND ALL RECIPIENTS AGREE THEY WILL KEEP CONFIDENTIAL ALL INFORMATION CONTAINED HEREIN AND NOT ALREADY IN THE PUBLIC DOMAIN AND WILL USE THIS MEMORANDUM FOR THE SOLE PURPOSE OF EVALUATING A POSSIBLE INVESTMENT IN THE COMPANY. BY ACCEPTING THIS MEMORANDUM, EACH PROSPECTIVE INVESTOR AGREES TO THE FOREGOING.

THE LIMITED PARTNERSHIPS OFFERED HEREBY (THE "PARTNERSHIP") HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS. THEY ARE OFFERED PURSUANT TO EXEMPTIONS FROM SUCH REGISTRATION AND QUALIFICATION. THIS MEMORANDUM (THE "MEMORANDUM") HAS NOT BEEN FILED WITH OR REVIEWED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") AND NEITHER THE SEC NOR ANY STATE SECURITIES ADMINISTRATOR HAS PASSED UPON OR ENDORSED THE MERITS OF AN INVESTMENT IN THE COMPANY OR THE ACCURACY OR THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

* * *

THE PARTNERSHIP OFFERED HEREBY MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF BY AN INVESTOR WITHOUT THE PRIOR WRITTEN CONSENT OF THE MANAGER AND THEN ONLY IF, AMONG OTHER THINGS, IN THE WRITTEN OPINION OF COUNSEL TO OR APPROVED BY THE COMPANY SUCH PROPOSED SALE, TRANSFER OR OTHER DISPOSITION IS CONSISTENT WITH ALL APPLICABLE PROVISIONS OF THE SECURITIES ACT, THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "ACT"), THE RULES AND REGULATIONS PROMULGATED UNDER EACH OF SUCH ACTS AND ANY APPLICABLE STATE "BLUE SKY" OR SECURITIES LAWS. AN INVESTOR THEREFORE CANNOT EXPECT TO LIQUIDATE HIS OR ITS INTEREST IN THE COMPANY OTHER THAN BY WITHDRAWING ALL OR PART OF HIS/HER OR ITS CAPITAL AT THE END OF THE LOCK-UP

PERIOD APPLICABLE TO SUCH INTEREST OR AS OF THE END OF ANY CALENDAR YEAR THEREAFTER, IN EACH CASE UPON NOT LESS THAN 60 DAYS' PRIOR WRITTEN NOTICE.

* * *

THE COMPANY IS NOT REGISTERED AS AN INVESTMENT COMPANY UNDER THE ACT. THE PARTNERSHIP OFFERED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT, OR ANY STATE OR OTHER SECURITIES LAWS. PARTNERSHIP IN THE COMPANY ARE OFFERED AND SOLD FOR INVESTMENT ONLY PURSUANT TO AN EXEMPTION FROM REGISTRATION WITH THE SEC AND IN COMPLIANCE WITH ANY APPLICABLE STATE OR OTHER SECURITIES LAWS. THE PARTNERSHIP ARE BEING OFFERED ONLY TO A LIMITED NUMBER OF PERSONS WHO ARE ACCREDITED INVESTORS WITHIN THE MEANING OF RULE 501 OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT AND QUALIFIED CLIENTS WITHIN THE MEANING OF RULE 205-3 OF THE INVESTMENT ADVISERS ACT OF 1940, AS AMENDED (THE "ADVISERS ACT") AND THE REGULATIONS PROMULGATED THEREUNDER.

THIS MEMORANDUM CONSTITUTES AN OFFER ONLY IF THE NAME OF THE PROSPECTIVE INVESTOR APPEARS ON THE COVER PAGE AND ONLY IF THE COMPANY AUTHORIZES THE DELIVERY OF THIS MEMORANDUM. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH AN OFFER OR SOLICITATION IS NOT LAWFUL OR AUTHORIZED OR IN WHICH THE PERSON MAKING SUCH OFFER OR SOLICITATION IS NOT QUALIFIED TO DO SO. ANY FURTHER DISTRIBUTION OR REPRODUCTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, IS PROHIBITED.

THESE LIMITED PARTNERSHIPS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

AN INVESTMENT IN THE COMPANY INVOLVES RISK FACTORS THAT SHOULD BE REVIEWED CAREFULLY BY POTENTIAL INVESTORS. THERE IS NO ASSURANCE THAT THE COMPANY WILL ACHIEVE ITS INVESTMENT OBJECTIVE, AND INVESTMENT RESULTS MAY VARY SUBSTANTIALLY OVER TIME. INVESTMENT IN THE COMPANY IS THEREFORE SUITABLE FOR SOPHISTICATED INVESTORS WHO ARE ABLE

EXHIBIT B
PAGE 15

TO BEAR THE LOSS OF A SUBSTANTIAL PORTION OR EVEN ALL OF THE MONEY INVESTED IN THE COMPANY.

TRANSACTIONS ON MARKETS LOCATED OUTSIDE OF THE UNITED STATES, INCLUDING MARKETS FORMALLY LINKED TO A UNITED STATES MARKET, MAY BE SUBJECT TO REGULATIONS THAT OFFER DIFFERENT OR DIMINISHED PROTECTION TO THE COMPANY AND ITS INVESTORS. FURTHER, UNITED STATES REGULATORY AUTHORITIES MAY BE UNABLE TO COMPEL THE ENFORCEMENT OF THE RULES OF REGULATORY AUTHORITIES OR MARKETS IN NON-UNITED STATES JURISDICTIONS WHERE TRANSACTIONS FOR THE COMPANY MAY BE EFFECTED.

EACH INVESTOR IN THE PARTNERSHIP OFFERED HEREBY MUST ACQUIRE SUCH PARTNERSHIP SOLELY FOR SUCH INVESTOR'S OWN ACCOUNT, FOR INVESTMENT PURPOSES ONLY AND NOT WITH AN INTENTION OF DISTRIBUTION, TRANSFER OR RESALE, EITHER IN WHOLE OR IN PART.

NO REPRESENTATIONS OR WARRANTIES OF ANY KIND ARE MADE OR INTENDED, AND NONE SHOULD BE INFERRED, WITH RESPECT TO THE ECONOMIC RETURN OR THE TAX CONSEQUENCES FROM AN INVESTMENT IN THE COMPANY. NO ASSURANCE CAN BE GIVEN THAT EXISTING LAWS WILL NOT BE CHANGED OR INTERPRETED ADVERSELY. PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THIS MEMORANDUM AS LEGAL OR TAX ADVICE. EACH INVESTOR SHOULD CONSULT HIS OR ITS OWN COUNSEL AND ACCOUNTANT FOR ADVICE CONCERNING THE VARIOUS LEGAL, TAX, ERISA AND ECONOMIC MATTERS CONCERNING HIS/HER OR ITS INVESTMENT.

NO OFFERING LITERATURE OR ADVERTISING IN ANY FORM SHALL BE EMPLOYED IN THE OFFERING OF THESE LIMITED PARTNERSHIPS EXCEPT FOR THIS MEMORANDUM, THE OPERATING AGREEMENT (THE "OPERATING AGREEMENT") AND THE SUBSCRIPTION DOCUMENTS (THE "SUBSCRIPTION DOCUMENTS") PROVIDED HEREWITH. NO PERSON OTHER THAN THE MANAGER HAS BEEN AUTHORIZED TO MAKE REPRESENTATIONS, OR GIVE ANY INFORMATION, WITH RESPECT TO THESE LIMITED PARTNERSHIPS, EXCEPT THE INFORMATION CONTAINED HEREIN, AND ANY INFORMATION OR REPRESENTATION NOT EXPRESSLY CONTAINED HEREIN OR OTHERWISE SUPPLIED BY THE MANAGER IN WRITING MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY OR ANY OF ITS MEMBERS. ANY FURTHER DISTRIBUTION OR REPRODUCTION OF THIS MEMORANDUM, IN WHOLE OR IN PART, OR THE DIVULGENCE OF ANY OF ITS CONTENTS, IS PROHIBITED.

A PROSPECTIVE INVESTOR SHOULD NOT SUBSCRIBE FOR LIMITED PARTNERSHIPS UNLESS SATISFIED THAT HE/HER AND/OR HIS/SHE OR ITS REPRESENTATIVE HAS ASKED FOR AND RECEIVED ALL INFORMATION THAT WOULD ENABLE HIM OR IT TO EVALUATE THE MERITS AND RISKS OF THE PROPOSED INVESTMENT.

THE COMPANY SHALL MAKE AVAILABLE TO EACH INVESTOR OR HIS OR ITS AGENT, DURING THIS OFFERING AND PRIOR TO THE SALE OF ANY PARTNERSHIP, THE OPPORTUNITY TO ASK QUESTIONS OF AND RECEIVE ANSWERS FROM ANY PERSON AUTHORIZED TO ACT ON BEHALF OF THE COMPANY CONCERNING ANY ASPECT OF THE COMPANY AND ITS PROPOSED BUSINESS AND TO OBTAIN ADDITIONAL INFORMATION, TO THE EXTENT THE COMPANY POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALES MADE HEREUNDER SHALL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE MATTERS DISCUSSED HEREIN SINCE THE DATE HEREOF.

THIS MEMORANDUM HAS BEEN PREPARED IN CONNECTION WITH THE PRIVATE PLACEMENT OF THE PARTNERSHIP OFFERED HEREBY AND DOES NOT CONSTITUTE AN OFFER OR SOLICITATION BY ANYONE IN ANY JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED OR IN WHICH THE MAKING OF SUCH AN OFFER OR SOLICITATION WOULD BE UNLAWFUL.

**FOR FLORIDA RESIDENTS ONLY**

PURSUANT TO THE LAWS OF THE STATE OF FLORIDA, IF SALES ARE MADE TO FIVE (5) OR MORE INVESTORS IN FLORIDA, ANY FLORIDA INVESTOR MAY, AT ITS OPTION, WITHDRAW, UPON WRITTEN (OR TELEGRAPHIC) NOTICE, ANY PURCHASE HEREUNDER WITHIN A PERIOD OF THREE (3) DAYS AFTER (A) THE INVESTOR FIRST TENDERS OR PAYS TO THE COMPANY, AN AGENT OF THE COMPANY OR AN ESCROW AGENT THE CONSIDERATION REQUIRED HEREUNDER, (B) THE INVESTOR DELIVERS ITS EXECUTED SUBSCRIPTION DOCUMENTS, OR (C) THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO SUCH INVESTOR, WHICHEVER OCCURS LATER.

**FOR GEORGIA RESIDENTS ONLY**

THESE SECURITIES HAVE BEEN ISSUED OR SOLD IN RELIANCE ON PARAGRAPH (13) OF CODE SECTION 10-5-9 OF THE "GEORGIA SECURITIES ACT OF 1973" AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SUCH ACT.

**FOR NON-U.S. RESIDENTS**

NO ACTION HAS BEEN OR WILL BE TAKEN IN ANY JURISDICTION OUTSIDE THE UNITED STATES OF AMERICA THAT WOULD PERMIT AN OFFERING OF THE SHARES, OR POSSESSION OR DISTRIBUTION OF OFFERING MATERIAL IN CONNECTION WITH THE ISSUANCE OF THE SHARES, IN ANY COUNTRY OR JURISDICTION WHERE ACTION FOR THAT PURPOSE IS REQUIRED. IT IS THE RESPONSIBILITY OF POTENTIAL INVESTORS TO SATISFY THEMSELVES AS TO FULL OBSERVANCE OF THE LAWS OF ANY RELEVANT TERRITORY OUTSIDE THE UNITED STATES OF AMERICA IN CONNECTION WITH ANY SUCH PURCHASE, INCLUDING OBTAINING ANY REQUIRED GOVERNMENTAL OR OTHER CONSENTS OR OBSERVING ANY OTHER APPLICABLE FORMALITIES.

EXHIBIT B
PAGE 16

# TABLE OF CONTENTS

SUMMARY ........................................................................................................................... 6

DIRECTORY ...................................................................................................................... 11

INTRODUCTION ................................................................................................................ 12

INVESTMENT ACTIVITIES OF THE COMPANY ......................................................... 18

BROKERAGE PRACTICES ............................................................................................... 20

PURCHASE OF "NEW ISSUES" ....................................................................................... 21

MANAGEMENT OF THE COMPANY ............................................................................. 21

THE MANAGER ................................................................................................................. 22

AUDITORS .......................................................................................................................... 23

VALUATION OF THE COMPANY'S ASSETS ................................................................ 23

ANTI-MONEY LAUNDERING CONSIDERATIONS ..................................................... 24

CERTAIN FEDERAL INCOME TAX CONSIDERATIONS ........................................... 25

REPORTS TO MEMBERS ................................................................................................. 35

SUBSCRIPTION PROCEDURE FOR MEMBERSHIP .................................................... 35

RISK FACTORS ................................................................................................................. 37

ADDITIONAL INFORMATION ....................................................................................... 41

NOTICES ............................................................................................................................ 42

ATTACHEMENTS .............................................................................................................. 46

EXHIBIT B
PAGE 17

## SUMMARY

*The following information is presented as a summary of certain terms of the Company and prospective partners should refer to the balance of this memorandum for more complete information and should not rely solely on this information contained in this summary. This summary is qualified in its entirely by the detailed formation appearing elsewhere in this memorandum.*

| | |
|---|---|
| **The Company (Fund)** | ROSEGOLD INVESTMENTS LLP is a Delaware partnership (the "Company") formed on the 7th of June 2017. The Company is being operated as a private investment fund under Section 3(c)(1) of the Investment Company Act of 1940, as amended (the "Act"). |
| **General Partner** | The General Partner of the Company is Rosegold Investments Trust, a 501(d) unincorporated association (the "General Partner"). The General Partner will have exclusive control over day-to-day operations of the Company even if additional General Partners are admitted to the Company in the future. The principal office of the Company and the General Partner is 1055 West 7th Street, 33rd Floor, Los Angeles, CA 90017. |
| **Investment Management Company** | ROSEGOLD INVESTMENTS TRUST, who is also the Company General Partner, will serve as the Investment Manager of Company and provides discretionary investment advisory and portfolio management services to the Company (the "Investment Manager"). The Investment Manager is not currently registered with the Securities and Exchange Commission (SEC). However, the Investment Manager intends to engage registered investment advisors to comply with recent changes to the U.S. Securities Regulations or will complete the registration process if required. |
| **General Investment Philosophy** | The Company is primarily a long investor on U.S. and foreign equity markets; funds focused on energy and minerals; and U.S. governmental & Infrastructure projects. The Company's focus is on long-term investing as opposed to short-term trading, and its primary investment vehicles will be securities of large to small capitalized companies. The Company expects to make investments in securities, other funds, and private equity. The Company's goal is to generate outstanding returns on a rolling 24-36 month time horizon through the use of fundamental research across multiple industry sectors in order to generate an edge of insight or factual information. Once such information is obtained, the Company will determine if the information will put a company or an industry in a position to achieve success. Companies showing strong attributes will be considered for investment. Depending on the market environment, the Company's portfolio may be hedged at times using short sales of stocks and other derivative securities. |

EXHIBIT B
PAGE 18

| | |
|---|---|
| **Suitability** | This offering is not registered under the Securities Act of 1933, as amended (the "Act"), as is being made in reliance on the exemptions provided for in Section 4(a)(2) of the Act and Rule 506(b) of Regulation D, promulgated by the Securities and Exchange Commission thereunder. This Offering is available only to suitable Accredited Investors or up to 35 Non-Accredited Investors as defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933. The Manager may, in its sole discretion, accept or decline to admit any investor. Individual Retirement Account (IRA) investors and other tax-exempt investors should carefully review the section herein entitled "Certain Federal Income Tax Considerations" and consult their own tax advisors.. |
| **Subscriptions** | New Investors that need assistance may subscribe for this platform on the first and fifteenth of any calendar month or at such other times as the General Partner shall permit in its sole discretion. Upon completion of the subscription agreement and the deposit of an investor's capital contribution into one of our platforms, an investor will become an Investor of the Company. |
| | In certain situations, that will benefit the Company, the company may accept tangible assets in lieu of cash subscriptions (such as cryptocurrency). In such situations, the assets will be evaluated on a per basis and discounted at the discretion of the manager. |
| **Transferability of rights** | Partnerships in the Company may not be sold, transferred, pledged or assigned without the prior written consent of the General Partner, provided, that with regard to the assignment by a investor to an affiliate, such consent may not be unreasonably withheld. |
| **Minimum Investment** | The minimum initial investment by each Investor is $100,000 subject to the General Partner's discretion to accept a lesser amount. |
| **Initial Lock-up Period** | "Initial Lock-Up Period" means the Partner may not request redemption of their investment for a period of at least three (4) months from the date their capital contribution. Each capital contribution made by a Investor shall be subject to the Initial Lock-Up Period. (see "Initial Lock-up Period" section). |
| **Management Fee** | The Investment Manager shall charge the Company an annual management fee (the "Management Fee") of two percent (0%) per annum of the net asset value of the Capital Accounts of the Investors of the Company. The Management Fee is payable monthly in advance on the first day of each calendar month based on the net asset value on such day (after considering any contributions on such day). The Management Fee shall be assessed pro |

EXHIBIT B
PAGE 19

rata to each Investor. If a new or existing Investor contributes to the Company on any day other than the beginning of the month, the Advisor shall be entitled to a pro-rated Management Fee at that time. Management fees are nonrefundable. The Investment Manager shall have the right to waive all or a part of the Management Fee with respect to one or more Investors from time to time in its sole discretion. The General Partner may also pay over a portion of the Management Fee to one or more third parties who introduce investors or perform other services for the Company or the General Partner. See "Management Fee."

**Allocation of Profits and Losses**

The profits and losses of the Platform will be provisionally allocated among the capital accounts of the Investor that are under the care and guidance of Rosegold Investments at the end of each fiscal period in proportion to the relative values of such capital accounts at the beginning of such fiscal period. See "Allocation of Profits and Losses".

**Performance Allocation (Carried Interest) and High water mark**

The Carried Interest allocable to the General Partner is equal to twenty percent (20%) of the aggregate net gain allocated monthly to the Partners capital account subject to a "high water mark" limitation, so that no allocation is made to the General Partner with respect to its Carried Interest until prior net losses allocated to a Investor are recouped. The high water mark shall be re-set on an annual basis. The amount of prior period net losses that must be recouped before a Carried Interest allocation is made shall be adjusted to take into account any distributions to or withdrawals by a Investor, with the amount of such prior net losses being reduced in proportion to the distribution or withdrawal. The General Partner may waive all or part of the Performance Allocation with respect to one or more Investors from time to time in its sole discretion. The General Partner may also pay over a portion of the Performance Allocation to one or more third parties who introduce investors or perform other services for the Company or the General Partner.

**ERISA and Other Tax-Exempt Investors**

Since the Company may generate "unrelated business taxable income" within the meaning of the Internal Revenue Code of 1986, as amended (the "Code"), an investment in the Company may not be suitable for pension and other funds subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or other organizations that are generally exempt from income taxation pursuant to Section 501(c)(3) of the Code. The General Partner intends to use commercially reasonable efforts to cause "benefit plan investors" not to own a significant portion of any class of equity interests in the Company, so that the assets of the Company should not be considered "plan assets" for purposes of ERISA and Section 4975 of the Code, although there can be no assurance that non "plan asset" status will be obtained or maintained. Prospective purchasers and subsequent

transferees of Shares may be required to make certain representations regarding compliance with ERISA and Section 4975 of the Code. See "Certain ERISA Considerations."

| | |
|---|---|
| **New Investors; Additional Capital Contributions** | Unless otherwise determined by the General Partner, in its discretion, shall accept each new additional capital contribution to the platform, as of the first day of the calendar month provided that the General Partner timely receives and accepts such person's initial or additional, as applicable, capital contribution and executed Subscription Documents and/or such other documents or agreements as the General Partner may require. This is to keep the MTN's on a time structured schedule. A person shall become a Investor when the General Partner enters such person as a Investor on the books of the Company. Capital contributions must be made in cash unless the General Partner, in its sole discretion, agrees to accept capital contributions in the form of securities. |
| **Partial Withdrawals of Capital** | A Investor may make partial withdrawals of the interest earned on capital minus the 20% performance incentive fee due to the General Partner, without any prior written notice to the General Partner. The Principal capital that is invested into platform can be withdrawn at any time after the end of the Initial 120-day Lock-Up Period, without any prior written notice to the General Partner. The General Partner shall have absolute discretion of the termination of the General Partner's involvement and entire Interest after each Lock-Up period. *If a full or a partial withdrawal is made, after giving effect to such withdrawal, the value of the Partner's capital account would be less than the initial investment and the General Partner may treat any such request for partial withdrawal as a request for termination of the Partner's entire Interest in this agreement.* Distribution of any partial withdrawal generally will be made immediately by the Investor, which is Christine Garrison who will hold the sole discretion of when each withdrawal is made. The Investor may choose to withdrawal the interest payments at their discretion and on their own terms. |
| **Required Withdrawals** | The General Partner may, in its sole discretion, require any Investor to withdraw from the Company, with or without cause, if the General Partner shall determine, in its sole and absolute discretion that such termination and withdrawal shall be in the best interests of the Investor and the Company. The General Partner shall give not less than fifteen (15) days' prior written notice of such termination to such Investor. |
| **Indemnification of the General Investor and the Investment Manager** | The Partnership Agreement provides for limitations on the liability of, and for the indemnification of, the General Partner, any other General Partners and their respective affiliates, except that no such indemnification will relieve any person from liability for fraud, gross negligence, willful |

EXHIBIT B
PAGE 21

misconduct, the violation of Federal or state securities laws or any criminal wrongdoing. The Investment Management Agreement provides for limitations on the liability of, and for the indemnification of, the General Partner and each of its affiliates and each of its and their principals, managers, members, officers, directors, employees, equity holders and representatives, except that no such indemnification will relieve any person from liability for willful misconduct, fraud or gross negligence on the part of such parties in the performance or nonperformance of their respective obligations or duties thereunder.

**Potential Conflict of Interest**   The General Partner, the Investment Manager, and their principal(s) may be affiliated with or render services to other investment entities or accounts including entities and/or accounts with investment goals and strategies similar to those of the General Company. The principal(s) of the General Partner may also be or become related to other service provider who will provide services to the Company in which fees and/or commissions will be paid to the principal(s) of the General Partner, these service providers may include broker-dealers, prime brokerage services, and fund administrative services.

**Risks**   Prospective Investors should note that an investment in bonds and securities involves a significant amount of risk, including the possibility of a total loss of investment. Prospective Investors should carefully consider the risk factors discussed under "Risk Factors." Although your initial capital investment is protected, should the capitalization of any security or Digital Asset Array take a significant hit and drops to low levels it could affect the platforms ability to pay out capital back at the end of term. Investing higher amounts mitigates some of this risk because the interest earned is higher which shorten the time horizon to break-even. As well as the shorter term length before the platform releases your initial capital investment back.

**Reports to Investors**   The Platform that the capital will be invested in will furnish to each Investors: (i) audited annual financial reports of each investment; (ii) annual descriptive investment information for each investment;

**Fiscal Year**   The fiscal year of the Company shall end on December 31 of each calendar year.

DIRECTORY

**Registered Office of the Company:**
ROSEGOLD INVESTMENTS LLP
1055 West 7th Street, 33rd Floor, Los Angeles, CA
90017.
USA
Tel: 800-683-8648
Fax: 213-377-5771
Email: info@rosegoldinvestments.com

**Fund Auditor:**
Master Investment Group
5694 Mission Center Rd.
Suite 489
San Diego, CA 92108
USA
Tel: 800-757-7617
Fax:
Email: info@masterinvestmentllp.com

**Principal Office of the Company:**
ROSEGOLD INVESTMENTS LLP
1055 West 7th Street, 33rd Floor, Los Angeles, CA
90017.
USA
Tel: 800-683-8648
Fax: 213-377-5771
Email: info@rosegoldinvestments.com

**Administrator**
Master Investment Group
5694 Mission Center Rd.
Suite 489
San Diego, CA 92108
USA
Tel: 800-757-7617
Fax:
Email: info@masterinvestmentllp.com

**Fund General Partner:**
REGINALD RINGGOLD
1055 West 7th Street, 33rd Floor, Los Angeles, CA
90017.
USA
Tel: 800-683-8648
Fax: 213-377-5771
Email: info@rosegoldinvestments.com

**Prime Broker:**
Rosegold reserves the right to choose any prime
broker that has respectable excess liquidity levels
and allows us to speculate within the respective
markets we operate in

**Fund Bank**
Name
Address #1
Address #2
City, State,
Country
Tel
Fax
Email

ROSEGOLD INVEST!        | Private Placem

# INTRODUCTION

## Overview

ROSEGOLD INVESTMENTS LLP, a Delaware partnership, (the "Company") formed on the 7th of June 2017 is the onshore arm of ROSEGOLD INVESTMENTS.  ROSEGOLD INVESTMENTS TRUST(R.I.T.), formed July 2012, R.I.T. is the offshore division of ROSEGOLD INVESTMENTS.  The Company will engage primarily in the purchase and sale of long positions in digital asset arrays, publicly traded securities, other investment funds and infrastructure projects, and during certain market environments, may hedge the portfolio using other derivative securities. Its principal investment objective is the achievement of superior investment returns. The Company is being operated as a fund under Section 3(c)(1) of the Investment Company Act of 1940, as amended (the "Act"). As a result, the number of Investors in the Company is limited to 100 persons.

If the Company approaches this 100-person limit, the General Partner intends to convert the Company into a fund that operates under Section 3(c)(7) of the Act. If such a conversion occurs, investors in the Company that are not "qualified Investors" as defined in the Act will have their Interest in the Company exchanged for interests in a new partnership (the "New 3(c)(1) Fund") that is identical to the Company in all material respects, including its investment strategies and objectives, except that investors in the New 3(c)(1) Fund will not be required to be "qualified purchasers." By signing the Company's Subscription Documents and becoming a party to the Partnership Agreement, investors are consenting to, and authorizing the General Partner to take whatever actions are necessary on their behalf to effect such exchange.

Various terms used and not defined in this Memorandum are defined in the Partnership Agreement.

## Management of the Company

The manager of the Company is ROSEGOLD INVESTMENTS TRUST, a Delaware company (the "General Partner"). The General Partner will have exclusive control over day-to-day operations of the Company even if additional General Partners are admitted to the Company in the future. ROSEGOLD INVESTMENTS TRUST is the principal of the General Partner. The principal office of the Company and the Management is 1055 West 7th Street, 33rd Floor, Los Angeles, CA 90017.

ROSEGOLD INVESTMENTS TRUST, who is also the Fund's General Partner, will serve as the Investment Manager of Company and provide discretionary investment advisory and portfolio management services to the Company (the "Investment Manager"). The Investment Manager is NOT registered with the Securities and Exchange Commission (SEC). However, the Investment Manager intends to engage outside registered investment advisors to comply with recent changes to the U.S. Securities Regulations.

ROSEGOLD INVESTMENTS TRUST, the principal of the Investment Manager, has direct and primary responsibility for all investment decisions of the Company. The Investment Manager utilizes a multi-disciplined investment approach, the foundation of which is company specific (or "fundamental") analysis with diversified sectors. The Investment Manager concentrates on the growth potential and predictability of revenues, cash flow, and earnings to determine the extent to which a security is undervalued and whether the Company will take a long or short position in the security. The Investment Manager's objective is to outperform in "bull markets". When market conditions dictate, the Investment Manager may use one or more hedging techniques, including but not limited to the use of derivative securities, as a means of preserving capital.

ROSEGOLD INVESTMENTS LLP | Private Placement Memorandum

EXHIBIT B
PAGE 24

## The Offering

The Company is offering manage accounts services to Christine and Tommy Garrison being referred to herein as a "Investor"). Investment in the platform is not suitable for charitable remainder trusts and might not be suitable for certain other tax-exempt investors. Only investors who have a pre-existing relationship with the General Partner or its principals, employees or representatives and are: (i) "accredited investors" in the meaning of Rule 501(a) of Regulation D under the Securities Act; ii) "qualified clients"; as defined in Rule 205-3 under the Advisers Act; and (iii) knowledgeable and experienced in management and business matters such that they are capable of evaluating the merits and risks of an investment in the Company will be permitted to invest in the Company.

An accredited investor includes natural persons who have a net worth, taken together with the net worth of their spouse, in excess of $1 million or who had individual income of more than $200,000 in each of the prior two calendar years, or joint income with their spouse in excess of $300,000 for each of those years, and who reasonably expect to reach the same income level in the current year; investment Partnerships and other entities consisting of such persons; and of liability companies and Partnerships with assets in excess of $5 million. A qualified client includes persons having at least $750,000 invested with the Company, persons having a net worth (together, in the case of a natural person, with assets held jointly with a spouse) of more than $1,500,000 at the time of their subscription, and qualified purchasers as defined in section 2(a)(51)(A) of the Investment Company Act of 1940.

The minimum initial investment by each Investor is $100,000 subject to the General Partner's discretion to accept a lesser amount. *The General Partner agrees to accept an initial investment of $50,000 with the agreement that a later commitment of the remaining $50,000 will be invested into the platform as soon as the funds become available with the institutions that have placed a temporary hold on them until the funds are cleared.*

## ERISA and Other Tax-Exempt Investors

Since the Company may generate "unrelated business taxable income" within the meaning of the Internal Revenue Code of 1986, as amended (the "Code"), an investment in the Company may not be suitable for pension and other funds subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or other organizations that are generally exempt from income taxation pursuant to Section 501(c)(3) of the Code.

The General Partner intends to use commercially reasonable efforts to cause "benefit plan investors" not to own a significant portion of any class of equity interests in the Company, so that the assets of the Company should not be considered "plan assets" for purposes of ERISA and Section 4975 of the Code, although there can be no assurance that non "plan asset" status will be obtained or maintained. Prospective purchasers and subsequent transferees of Shares may be required to make certain representations regarding compliance with ERISA and Section 4975 of the Code. See "Certain ERISA Considerations."

EACH PROSPECTIVE INVESTOR THAT IS SUBJECT TO ERISA AND/OR SECTION 4975 OF THE CODE IS ADVISED TO CONSULT WITH ITS OWN LEGAL, TAX AND ERISA ADVISERS AS TO THE CONSEQUENCES OF AN INVESTMENT IN THE COMPANY.

## Allocation of Profits and Losses

The profits and losses of this managed digital asset array agreement will be provisionally allocated among the capital accounts of the Investors managed by the General Partner (collectively, the "Investors") at the end of each

EXHIBIT B
PAGE 25

fiscal period in proportion to the relative values of such capital accounts at the beginning of such fiscal period (except for profits and losses attributable to the Company's investments in "new issues," which may be subject to the Company's carve-out arrangement described below).

Then, at the close of each Performance Period (Every two weeks from the start of the day the first investment was made), twenty percent (20%) of the net profits (realized) provisionally allocated to the capital account of the Investor or, in the case of a withdrawal of capital by a Investor other than on the last day of the term when the principal capital investment is released per the Capital Back terms in the Platform, to the withdrawing Investor with respect to the withdrawn Interest, for the Performance Period shall be reallocated and credited to the capital account of the General Partner and debited to the capital accounts of the Investors or the withdrawing Partner, as the case may be. Withdraws will be made The reallocation of net profits to the General Partner described above represents the General Partner's "Carried Interest" in the Platform. The Performance Period is the calendar year; provided, however, that (a) if a Investor is admitted to the Company on any date other than the first day of the year, then the initial Performance Period shall be the period commencing on such date and ending on the last day of the year, (b) upon the withdrawal of capital by a Investor other than at the end of the year, the Performance Period shall be the period commencing on the first day of the year or on the date during the year on which the capital account was established, if other than the first day of the year, and ending on the withdrawal date, and (c) in the event the Company is terminated other than at the end of a year, the final Performance Period shall be the period commencing on the first day of the Company's final fiscal year and ending on the termination date. The General Partner's Carried Interest is not affected by net losses in a subsequent fiscal period.

Profits and losses will be accrued on a monthly basis but generally will be allocated to the capital accounts of the Investors only at the end of each *2-week calendar period* and upon the withdrawal or expulsion of a Investor if such withdrawal or expulsion occurs on a day other than the end of 120 day term.

The profits or losses of the Company for a particular period will be measured in terms of the increase or decrease in the net assets of the Company from the beginning to the end of the period, after giving effect to the expenses of the Company for such period. In calculating profits or losses, securities will be valued on a "marked-to-market" basis, with the result that the profits or losses for a particular period will not necessarily reflect amounts which have been or will be realized or sustained.

## Performance Allocation (Carried Interest); High Water Mark

The Performance Allocation or Carried Interest allocable to the General Partner is equal to twenty-five percent (20%) of the aggregate net gain allocated monthly to the Investors capital account during the Lock-Up Period and subject to a "high water mark" limitation, so that no allocation is made to the General Partner with respect to its Carried Interest until prior net losses allocated to a Investor are recouped within the performance period. The high water mark shall be re-set on an annual basis. The amount of prior period net losses that must be recouped before a Carried Interest allocation is made shall be adjusted to take into account any distributions to or withdrawals by a Investor, with the amount of such prior net losses being reduced in proportion to the distribution or withdrawal. The General Partner may waive all or part of the Performance Allocation with respect to one or more Investors from time to time in its sole discretion. The General Partner may also pay over a portion of the Performance Allocation to one or more third parties who introduce investors or perform other services for the Company or the General Partner.

## New Investments; Additional Capital Contributions

Unless otherwise determined by the General Partner, in its discretion, each new Investment shall be admitted to

the Platform, and each existing Investor may make an additional capital contribution to the platform, as of the first day of the calendar month provided that the General Partner timely receives and accepts such person's initial or additional, as applicable, capital contribution and executed Subscription Documents and/or such other documents or agreements as the General Partner may require. A person shall become an Investor when the General Partner enters such person as an Investor on the books of the Company. Capital contributions must be made in cash unless the General Partner, in its sole discretion, agrees to accept capital contributions in the form of securities.

## Partial Withdrawals of interest profits on Capital

A Investor may make partial withdrawals of interest earned on the principal capital invested. The Principal capital that is invested the into platform can be withdrawn at any time after the end of the Initial 120-day Lock-Up Period, without any prior written notice to the General Partner.  The General Investor shall have absolute discretion to deny or permit a partial withdrawal of the interest earned on the principal capital if, after giving effect to such withdrawal, the value of the Investor's capital account where interest payments held would be less than 20% of the profits earn at the end of that *2-week calendar period.* Distribution of any partial withdrawal generally will be made within fifteen (15) days after the withdrawal date, although ten percent (10%) of any withdrawal that represents more than ninety percent (90%) of a Investor's capital may be withheld until the Company receives its year-end audited financials for the fiscal year during which the withdrawal was made. The General Partner may vary these withdrawal terms, in whole or part, for certain investors, in its sole discretion.

## Initial Lock-Up Period

"Initial Lock-Up Period" means the Investor may not request redemption of their investment for a period of at least twenty-four (4) months from the date their capital contribution. Each capital contribution made by an Investor shall be subject to the Initial Lock-Up Period.

The Initial Lock-Up Period shall be calculated separately for each capital contribution made by an Investor. For these purposes, withdrawals of capital will be processed on a "first-in, first-out" basis, with each withdrawal being made from the earliest available capital contribution.

## Termination of Investment in the Platform

A Investor may withdraw from the Platform entirely at the end of the Initial Lock-Up Period. Distribution of cash or marketable securities (or a combination thereof) having an aggregate value at least equal to ninety percent (90%) of the estimated capital account of a withdrawing Investor, or of a Investor who dies or is adjudicated an incompetent, will be made to such Investor or his or its legal representatives within fifteen (15) days after the withdrawal date, and distribution of the balance of such capital account, as finally determined as of the end of initial Lock-Up term, will be made within fifteen (15) days after the receipt by the Company of its audited financial statements for such year.

The General Partner may not vary these withdrawal terms, in whole or part, for certain investors, as it is not in its sole discretion because digital asset arrays are traded on a blockchain where, once a protocol is written and put onto the Blockchain it cannot be changed or altered in any way from it's original protocol.

## Unexpected Withdrawal Payments; or Establishment of Reserves

The value of an Investor's Interest upon a withdrawal is equal to the amount in such Investor's Closing Capital Account as of the last day of the end of each *2-week calendar period* of determination or other applicable period. Partial or full withdrawals may be paid in any combination of cash and bitcoins or other crypto currencies, in the

Investors sole discretion. Transaction costs involved in a withdrawal may be charged to the withdrawing Investor.

The Investor may request to withhold payment of part of the amount earned in interest by an Investor to establish such reserves for contingencies as the Investor, in its sole discretion, may deem advisable. As long as it does not affect or interrupt the normal payouts to the General Partner every 2 weeks.

Withdrawal notifications must be submitted by email to the General Partner at info@rosegoldinvestments.com, provided within 3 days:

The General Partner will confirm in writing within five (5) Business Days of receipt all notifications that are received in good order. Investors failing to receive such written confirmation from the General Partner within five (5) Business Days should contact the General Partner at 213-999-1701 to obtain the same.

## Required Withdrawals

The General Partner may, in its sole discretion, require any Investor to withdraw from the Platform, with or without cause, if the General Partner shall determine, in its sole and absolute discretion that such termination and withdrawal shall be in the best interests of the Company and the investor. The General Partner shall give not less than fifteen (15) days' before end of the 120-Day Lock-Up period prior written notice of such termination to such Investor.

## Fees and Expenses

The Investor is responsible for all direct costs, fees and expenses incurred by or on behalf of the Investor in connection with their investment and involvement in the platform: (i) all costs, fees and expenses of the Platform directly related to the purchase, sale or retention of securities, commodities, currencies and digital asset arrays by the Investor (including all fees and commissions of brokers and custodians, all fees and disbursements of independent attorneys and accountants, all fees and expenses relating to the registration and qualification for sale of such securities and all transfer taxes); (ii) all Federal, state and local taxes and filing fees payable by the Investor; (iii) all costs, fees and expenses of the Investor relating to Investors' meetings and the preparation to Invest; (iv) all fees and disbursements of the Investor's independent attorneys, accountants and consultants; (v) all filing and recording fees; (vi) all interest expense of the Investor; and (vii) any extraordinary expenses of the Investor. The General Partner will not be burdened with any of the general expenses of the Investor or the Investment Platform (such as exchange rate fees and spreads). All such overhead expenses are for the account of the Investor and must be recouped as applicable before any performance incentive fees are paid to the General Partner.

Pursuant to an Investment Advisory Agreement, the Investment Manager will be paid a performance incentive fee computed at a rate of 20.0% per month of the Investor's net profit attributable to each Investor's capital account, to be paid bi-weekly.

As the Investment Manager will not be obligated to negotiate "execution only" commission rates, the Investor may be deemed to be paying for other services provided by its brokers who are not included in the commission rates they charge the General Partner. Such other services may include (in addition to research), telephone lines, news and quotation equipment, electronic office equipment, account record keeping, on-line financial information, publication, consulting, marketing, legal and accounting services, data processing and other services provided by its brokers or by third parties paid by its brokers and related to research. See "Brokerage Practices" below for a more detailed discussion of the Company's brokerage practices.

EXHIBIT B
PAGE 28

This table describes the fees and expenses that you may pay as an Investor of the Company:

| Investors Fees<br>*(fees paid directly from your investment)* | Classes |
|---|---|
| | **All Classes** |
| Sales Charge (Load) imposed on purchases | 0.00% |
| Redemption Fee within the first 4 months of the Lock-up period<br>(percentage of amount redeemed, if applicable)[1] | 0.00% |
| **Annual Fund Operating Expenses**<br>*(expenses deducted from Fund assets)* | |
| Management Performance Incentive fee | 20.00% |
| Distribution (12b-1) and Investors Servicing Fee | 0.00% |
| Total | 20.00% |

[1] A Redemption Fee of 15.00% will be applied to shares redeemed within first 12 months of purchase and a redemption fee of 10.00% will be applied to shares redeemed within 12 to 24 months of purchase. A redemption fee is not applicable in this circumstance.

## Management Performance Incentive Fee

The Investor will pay the Investment Manager or an affiliate thereof a monthly management fee (the "Performance Incentive Fee"), funded by each Investor paid by weekly, equal to two percent (20.0%) of the net profits generated off of the Capital Accounts of the Investors of the Company. The Management Performance Incentive Fee shall be assessed on a pro rata to each Investment. Management Performance Incentive fees are nonrefundable. The Investment Manager shall have the right to waive all or a part of the Management Performance Incentive Fee with respect to one or more Investors from time to time in its sole discretion. The Investment Manager may also pay over a portion of the Management Performance Incentive Fee to one or more third parties who introduce investors or perform other services for the Company or the General Partner.

## Indemnification of the General Partner and the Investment Manager

The Partnership Agreement provides for limitations on the liability of, and for the indemnification of, the General Partner, any other General Partners and their respective affiliates, except that no such indemnification will relieve any person from liability for fraud, gross negligence, willful misconduct, the violation of Federal or state securities laws or any criminal wrongdoing. The Investment Management Agreement provides for limitations on the liability of, and for the indemnification of, the General Partner and each of its affiliates and each of its and their principals, managers, members, officers, directors, employees, equity holders and representatives, except that no such indemnification will relieve any person from liability for willful misconduct, fraud or gross negligence on the part of such parties in the performance or nonperformance of their respective obligations or duties thereunder.

## Commissions, Etc.

The Investment Manager may pay (to the extent permitted by law) commissions or other compensation to qualified brokers and other persons who introduce prospective investors to the Company. The General Partner may waive or reduce its "Carried Interest" requirement with respect to any such person who is an investor in the Company.

## Privacy Policy

See Exhibit C of the Subscription Documents for a statement of the Company's Privacy Policy, as required under

EXHIBIT B
PAGE 29

federal law.

## Termination of the Company

The Company shall continue until terminated at the election of the General Partner or otherwise by operation of law.

# INVESTMENT ACTIVITIES OF THE COMPANY

## General Investment Philosophy

The Company is primarily a long and short investor on Blockchain Digital Asset Arrays and foreign currency exchange markets; investment funds focused on energy and minerals as well as all other commodities; Infrastructure projects; and private equity through ICO's. The Company's focus is on long-term investing as opposed to short-term trading, and its primary investment vehicles will predominantly be the Digital Asset Arrays of large and small capitalization ICO's. The Company expects to make investments in forex and futures, other funds, and private equity.

The Company's goal is to generate outstanding returns on a rolling 4-8 month time horizon through the use of fundamental research across multiple industry sectors in order to generate an edge of insight or factual information. Once such information is obtained, the Company will determine if the information will put a company or an industry in a position to achieve success. Companies showing strong attributes will be considered for investment. Depending on the market environment, the Company's portfolio may be hedged at times using derivative securities.

## Investment Approach of the Investment Manager

**Idea Generation** – The Investment Manager uses many factors to determine which investments should be considered for further research. In a broad equity market, it is of paramount importance to be able to screen for ideas in a disciplined and efficient manner. A thorough filtering process allows the Investment Manager to focus on what is relevant. In essence, the Investment Manager's process is predicated on having a high success rate on a small set of investments rather than attempting to form an opinion on too large a universe. Accordingly, idea generation is critical and relies on the following sources: company meetings, conferences, experienced peers, survey work, qualitative screens, periodicals, extensive network of contacts, the Company's investors and Wall Street reports.

**Fundamental Research** – Once an idea has been generated, rigorous analysis will be performed to uncover the facts that will lead to an investment decision. Facts and insights are ascertained through the following:

Company Management – The Investment Manager meets with company management to better understand its strategy and to judge the ability and integrity of the people running the business.

The Investment Manager interacts with management on company visits, conference calls and industry conferences. Frequent contact with management helps an astute investor notice changes and trends that drive business dynamics.

Financial Statement Analysis — Historical analysis of a company's income statements and cash flow statements reveals the levels of and trends in corporate profitability. Depending on the company and industry, different variables will be of greater or lesser significance. For companies with high growth rates in revenues and earnings,

EXHIBIT B
PAGE 30

which the Investment Manager believes usually provides superior investment returns, margin trends and predictability of earnings are critical. With more mature companies, cash flow analysis and asset valuation become more important. By analyzing a company's cost structure and margin trends, a better understanding of a company's market position is obtained. The balance sheet is analyzed to uncover a company's current financial position. Levels of cash, debt, and book value are also reviewed. Trends in balance sheet accounts such as cash, inventories and accounts receivable are also scrutinized for deterioration and/or improvement.

Industry Analysis – The success or failure of most companies has a direct correlation to the industry in which they operate. Detailed understanding of industry and secular change is an important part of the Investment Manager's investment process. Some of these insights may be gained through company management. However, the Investment Manager also uses more unbiased methods to complete the industry mosaic. Outside industry consultants and Wall Street industry analysts are a good source of facts and can provide an understanding of secular trends. The Investment Manager monitors industries that supply and buy products from the industry being researched. In many instances, the Investment Manager may uncover clues to the future health of an industry by noticing inflection points in its complementary industries.

Competitors — Competitors are analyzed and contacted in order to substantiate previous facts that were gathered. Competitors will provide insight into the target company's strengths and weaknesses. They will also help highlight different strategies and potential risks to the target company.

Suppliers and Customers – Suppliers and customers are analyzed and contacted for further affirmation of the target company's business trends. Constant monitoring of both will lead to insights about the company under analysis before such information about the company becomes widely known.

**Qualitative Research** – Once all the facts have been gathered, the Investment Manager will evaluate a investment by its risk and reward over a specific time frame. The risk to reward profile is generally determined through an edge in information or insight. Informational edge is fact-based and is generated during the fundamental research process. An edge of insight is more qualitative and comes in many forms. Some examples include:

- a product cycle being bigger or longer than others realize;

- a company having a competitive advantage not well understood by the market;

- an industry or company going through a cyclical downswing that eventually recovers because that industry has a necessary function in the U.S. economy; or

- a company having a profitability profile that is likely to be permanently altered due to structural changes in its business.

The edge of information and insight are then placed within a valuation framework to determine the potential gain and risk. Various valuation techniques are used; however, the Company's primary valuation techniques are cash-based methods, as the Investment Manager believes that strong cash generation leads to increased shareholder value and strong stock performance.

**Risk Management** – While the Company will generally be a long investor with a portfolio, at times the Investment Manager may find it prudent to use various techniques to reduce risk by hedging individual positions and/or portfolio characteristics. This may be accomplished using long and short positions in derivative securities.

**Secular Trends**. Trend analysis starts with a review of basic data which is obtained through a variety of sources. These include government statistics, Federal Reserve bulletins, various periodicals, trade journals, and newspapers. Information is also gathered from the hundreds of companies that are contacted each year. The Investment Manager has direct access to Wall Street analysts, industry experts and economists, and it will utilize a network of contacts from a variety of investment organizations.

**Hedging**. Depending on market conditions, the Company's portfolio may at times be hedged through use of derivative instruments.

**Portfolio Composition**. The Investment Manager will apply no arbitrary criteria with respect to the size, sector or class of the investment in which it will invest. To the extent that significant mispricing between fundamental values and market prices may from time to time be greater in small to medium sized companies (i.e., in "secondary stocks"), or in troubled or "distressed" companies, the Company's portfolio may at times be invested primarily in the securities of such companies. At other times the Company's portfolio may be concentrated in "large capitalization" stocks (i.e., securities of large companies with significant institutional sponsorship).

Although the Company's portfolio will consist primarily of 1 to 20 common stocks (including common stocks of foreign companies), it may also contain futures, warrants to acquire common stocks, commodities, debt securities, or preferred securities of domestic and foreign companies that are convertible into common stocks. The Company may also invest its capital in "restricted securities" (i.e., securities which must be registered under Federal or state securities laws before they may be resold) and other "special situations" investments (including currency situations and various "derivatives"). There will be no arbitrary or ideal "mix" of such investments, as the Investment Manager will endeavor to allocate the Company's capital among those opportunities believed to offer the most attractive risk adjusted potential returns, while always being responsive to changing market conditions.

As the Company's objective is to achieve a high absolute return rather than a relative return, the Company may also invest in treasury securities and other cash equivalents when opportunities for "equity returns" appear to be limited.

The Investment Manager is authorized to invest in any situation if it believes that the profit opportunity is commensurate with the apparent risk presented by the investment, and from time to time the Investment Manager may make investments involving greater risk than the risks perceived with respect to its primary investment thrust.

**Portfolio Turnover**. As the Company is an opportunistic investor, its portfolio turnover may be significant and its transaction costs (i.e., brokerage commissions) as a percentage of its capital can be correspondingly significant.

**Leverage**. The Company may use leverage in its investment program, as deemed appropriate by the Investment Manager and subject to applicable regulations. While the amount of leverage will vary, it will generally be limited to 150% long exposure measured at the time of investment.

## BROKERAGE PRACTICES

Portfolio transactions for the Company and for other accounts and entities which the Investment Manager or its principals may advise or invest for, generally will be allocated to brokers on the basis of best execution and in consideration of such brokers' provision of, or payment of the costs of, certain services and products that are of benefit to the Company, the General Partner, the Investment Manager, and such other accounts and entities. These products and services may take the form of research, special execution capabilities, clearance, settlement, reputation, net price, on-line pricing, block trading and block positioning capabilities, willingness to execute

EXHIBIT B
PAGE 32

related or unrelated difficult transactions in the future, order of call, on-line access to computerized data regarding clients' accounts, performance measurement data, consultations, economic and market information, portfolio strategy advice, industry and company comments, technical data, information technology services, recommendations, general reports, supplies, financial strength and stability, efficiency of execution and error resolution, telephone lines, news and quotation equipment, the availability of stocks to borrow for short trades, referral of prospective investors in the Company, or other accounts and entities which the Investment Manager or its principals may advise or invest for custody, recordkeeping and similar products and services.

## PURCHASE OF "NEW ISSUES"

From time to time the Company may purchase securities which constitute a "new issue" under FINRA Rule 5130 (the "Rule"). The Rule prohibits an FINRA Partner from selling any "new issue" (defined as any initial public offering of an equity security) to an account in which "Restricted Persons" have in the aggregate beneficial interests in excess of 10 percent. Essentially, a "Restricted Person" includes (i) a broker-dealer and its personnel, and (ii) certain persons associated with banks, savings and loan institutions, insurance companies, investment companies, investment advisors, and collective investment accounts such as hedge funds, investment Partnerships, investment corporations and other collective investment vehicles that are engaged primarily in the purchase and sale of securities.

The Company has implemented a "carve-out arrangement" under the Rule pursuant to which Partners who are Restricted Persons under the Rule will not be allocated more than 10 percent of the profits or losses attributable to the Company's participation in "new issues."

## MANAGEMENT OF THE COMPANY

### General

The manager of the Company is ROSEGOLD INVESTMENTS TRUST, a 501 (d) Unincorporated Association (the "General Partner"). The General Partner will have exclusive control over day-to-day operations of the Company even if additional General Partners are admitted to the Company in the future. ROSEGOLD INVESTMENTS TRUST is the principal of the General Partner.

ROSEGOLD INVESTMENTS TRUST, who is also the Fund's General Partner, will serve as the Investment Manager of the Company and provides discretionary investment advisory and portfolio management services to the Company (the "Investment Manager"). The Investment Manager is NOT registered with the Securities and Exchange Commission (SEC). However, the Investment Manager intends to engage registered investment advisors to comply with recent changes to the U.S. Securities Regulations.

### Principal's Background and Experience

ROSEGOLD INVESTMENTS TRUST, **President (CEO), Fund's General Partner, Investment Manager**

#### Reginald Ringgold – Founding Partner / Chief Investment Officer

Reginald Ringgold is a finance expert with a professional background across diverse matters in the finance industry. His expertise includes in-depth knowledge of financial markets, currencies, and fundamental data & technical analysis. He has over 10 years of experience in the financial markets and has been a full time financial trader for several years trading the European, US and Asian markets. He has an extensive background in global economic analysis and alternative investments. He is the Managing Partner and Chief Investment Officer of

Rosegold Investments, a CFTC registered Commodity Trading Advisor firm. He founded Rosegold Investments in 2012 to initially invest the assets of his closest clients, friends, and family, but now the firm manages two funds, The Rosegold Global Growth fund and The Rosegold Real Returns private equity fund, designed to take advantage of our teams best investment ideas.

Mr. Ringgold launched his career with Ameriquest Mortgage in 2002 as a Senior Account Executive. With extensive investment and operating experience in the real estate industry. He has negotiated, packaged and sold over $100MM worth of A, ALT A and subprime mortgages for both residential and commercial clients.

In 2006 he went on to serve as Chief Investment Officer for Epicenter Investment Group, a northern California hedge fund with over $310 million in assets under management. He served as the firm's global macroeconomic strategist and was responsible for research and portfolio construction.

Mr. Ringgold is the best-selling author of The Billionaire's Business Blueprint. He is an investment expert for the media, and has been featured in outlets such as Investment News, Bay Area Daily News, Atlanta Sentinel, Fox 35 Atlanta, NBC Bay Area "KNTV" AM Radio 1440, Power Trading Radio and more. He has been featured on numerous occasions as an expert FOREX panelist at trade shows around the world. In 2012, he was a panelist at The Money Show Conference in Las Vegas hosted by Forex.com.

In addition to investing in the financial markets, Mr. Ringgold's passion is teaching. He has been teaching and mentoring traders to navigate the financial markets effectively since 2010. As a trading instructor he provides a wealth of knowledge and

## Other Activities

Pursuant to the Partnership Agreement, the principals of the General Partner will devote as much time to the business of the Company as they, in their sole discretion, deem advisable. In addition, the General Partner has the right, without the consent of the Partners, to admit additional General Partners at the commencement of any calendar quarter or any other times as the General Partner determines. The Partners do not have any right to participate in the management of the Company and have limited voting rights.

## Potential Conflict of Interest

The General Partner and the Investment Manager and their principal(s) may be affiliated with or render services to other investment entities or accounts including entities and/or accounts with investment goals and strategies similar to those of the Company. The principal(s) of the General Partner may also be or become related to other service provider who will provide services to the Company in which fees and/or commissions will be paid to the principal(s) of the General Partner, these service providers may include broker-dealers, prime brokerage services, and fund administrative services.

## THE MANAGER

ROSEGOLD INVESTMENTS TRUST has been appointed as the Company's General Partner (the "General Partner"). The General Partner provides administrative services to the Company. The General Partner will be responsible for, among other things: (i) maintaining the register of Partners of the Company and generally performing all actions related to the transfer and withdrawal of Partners in the Company; (ii) reviewing and, subject to approval by the General Partner, accepting or rejecting subscriptions and accepting payment therefore; (iii) computing and disseminating the net asset value of the Company and the value of each Partner's capital account in accordance with the Company's Limited Liability Agreement; (iv) keeping the accounts of the Company and such financial books and records as are required by law or otherwise for the proper conduct of the

financial affairs of the Company, and assisting with or procuring the preparation of annual financial statements of the Company and furnishing such statements, as well as monthly net asset value reports, to Partners; (v) communicating with Partners; and (vi) performing all other accounting and clerical services necessary in connection with the administration of the Company.

The General Partner and its directors, officers, employees, agents, servants, delegates and affiliates will not be liable to the Company for any acts or omissions in connection with the services rendered in the absence of gross negligence, willful default or fraud on the part of the General Partner or its directors, officers, employees, agents, servants, delegates or affiliates. In addition, the Company has agreed to indemnify the General Partner and its directors, officers, employees, agents, servants, delegates and affiliates from and against any and all liabilities and expenses arising out of the General Partner's actions, other than liabilities and expenses arising out of the gross negligence, willful default or fraud on the part of the General Partner or its directors, officers, employees, agents, servants, delegates or affiliates.

In connection with the determination of the net asset value of the Company, the General Partner may consult with and is entitled to rely upon the advice of the Company's custodians, brokers, the General Partner or the Investment Manager. In no event and under no circumstances shall the General Partner, the Investment Manager or the General Partner incur any individual liability or responsibility for any determination made or other action taken or omitted by them in good faith. To the extent that the General Partner relies on information supplied by the Investment Manager or any brokers or other financial intermediaries engaged by the Company, the General Partner's liability for the accuracy of its calculations is limited to the accuracy of its computations. The General Partner is not liable for the accuracy of the underlying data provided to it.

## AUDITORS

The Company will retain services from a reputable accounting and advisory firm experienced in fund accounting, as its independent auditors.

## VALUATION OF THE COMPANY'S ASSETS

The profits and losses of the Company shall be calculated on each Company valuation date (generally the last business day of each month) by the General Partner (in consultation with the Investment Manager and the Company's accountants). The profits and losses of the Company shall be determined in accordance with U.S. Generally Accepted Accounting Principles ("U.S. GAAP"), including provisions for accruals and reserves in respect of any amounts constituting Company liabilities.

The calculation of the profits and losses of the Company will take into account the total assets of the Company, including all cash and cash equivalents (valued at cost), accrued interest and dividends, and the market value of all securities and all other assets of the Company and all liabilities of the Company including, but not limited to, accrued legal, accounting, and auditing fees, solicitation fees, research-related expenses, operating fees and organizational expenses, and any extraordinary expenses, determined in accordance with U.S. GAAP applied under the accrual basis of accounting by the General Partner in its sole discretion.

In connection with such valuation, portfolio securities shall be valued as follows:

1. Listed portfolio securities are valued at the last reported sales price on the date of determination on the principal exchange on which such securities are traded or, if not available, at the mean between the exchange listed "bid" and "asked" price;

2.  Over-the-counter securities are valued at the last reported sales price on the date of determination if available through the facilities of a recognized interdealer quotation system (such as securities in the Nasdaq Stock Market List), or if the last reported sales price is not available, over-the-counter securities are valued at the mean between the closing "bid" and "asked" prices on the date of determination;

    a.  Any security in the form of an exchange listed option will be valued at the mean between the closing "bid" and "asked" prices;

    b.  Forward currency exchange contracts will be valued at the current cost of covering or offsetting such contracts; and

3.  All other securities shall be assigned the value that the Investment Manager, in good faith, determines to reflect the fair value thereof

The Investment Manager may use methods of valuing securities other than those set forth herein if it believes the alternate method is preferable in determining the fair value of such securities. To the extent that the General Partner relies on information supplied by the Investment Manager or any brokers or other financial intermediaries engaged by the Company in connection with making any of the aforementioned calculations, the General Partner's liability for the accuracy of such calculations is limited to the accuracy of its computations. The General Partner is not liable for the accuracy of the underlying data provided to it.

The accounts of the Company are maintained in U.S. dollars. Assets and liabilities denominated in other currencies are converted at the rates of exchange in effect at the relevant valuation date and conversion adjustments are reflected in the results of operations. Portfolio transactions and income and expenses are converted at the rates of exchange in effect at the time of each transaction.

Prospective investors should understand that these and other special situations involving uncertainties as to the valuation of portfolio positions could have an impact on the Company's net assets if the Investment Manager's judgments regarding the appropriate valuation should prove to be incorrect.

All values assigned to securities by the Investment Manager shall be final, binding and conclusive on all of the Partners.

## ANTI-MONEY LAUNDERING CONSIDERATIONS

As part of the Company's responsibility for the prevention of money laundering, the Company and the General Partner will require a detailed verification of an investor's identity and the source of the payment from any person delivering completed Subscription Documents to the Company.

In order to comply with proposed regulations aimed at the prevention of money laundering in the United States, the Company is required to verify the identity of all prospective investors and the source of their funds, to the extent required under the USA PATRIOT Act, and to determine if such investors are Prohibited Investors (as defined in the Company's Subscription Documents) identified on various lists maintained by the U.S. Government. If the Company determines that any investor is a Prohibited Investor, the Company may, among other things, freeze that investor's assets in the Company and notify appropriate legal authorities.

The Company and the General Partner reserve the right to request such documentation, as they deem necessary to verify the identity of a prospective investor and to verify the source of the relevant subscription amounts. The

amount of detail required will depend on the circumstances of each application for subscription. By way of example, an individual may be required to produce a copy of a passport or driver's license, together with evidence of his/her address, such as a utility bill or bank statement, and date of birth. For corporate subscribers, the Company may require production of copies of their certificates of incorporation or other formation documents (and any changes of name) and information concerning their principals and/or beneficial owners. Failure to provide the necessary evidence may result in subscription applications being rejected or in delays in the processing of withdrawals.

Pending the provision of satisfactory evidence as to identity, the evidence of title in respect of the Shares may be retained at the absolute discretion of the General Partner. If within a reasonable period of time following a request for verification of identity, the General Partner has not received evidence satisfactory to it as aforesaid, the General Partner and the Company may, in their absolute discretion, refuse to allot the Shares applied for, in which event subscription moneys will be returned without interest to the account from which such moneys were originally debited. The Company, the General Partner, the Investment Manager and any agent of the Company, the General Partner and the Investment Manager will be held harmless and will be fully indemnified by a potential subscriber against any loss arising as a result of a failure to process a subscription or withdrawal request if such information as has been requested by any of them or the General Partner has not been satisfactorily provided by the applicant.

If the Company, the General Partner or the Investment Manager has a suspicion that a payment to the Company (by way of subscription or otherwise) or a payment from the Company (by way of withdrawal or otherwise) contains the proceeds of criminal conduct, the Company, the General Partner or the Investment Manager may report such suspicion to the appropriate authorities. Neither the Company, the General Partner, the Investment Manager, nor any agent of the Company, the General Partner or the Investment Manager will incur any liability for adhering to the Company's responsibilities under its anti-money laundering program, and will be indemnified by the Subscriber for any losses which the Company, the General Partner, the Investment Manager or their respective principals, employees or agents may incur for doing so.

The General Partner and the Company reserve the right to request such information as is necessary to verify the identity of a prospective investor. In the event of delay or failure by a prospective investor to produce any information required for verification purposes, the General Partner may refuse to accept the prospective investor and the subscription monies relating thereto or may refuse to process a withdrawal request until proper information has been provided.

## CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

### U.S. FEDERAL INCOME TAX CONSIDERATIONS

The following discussion is a general summary of certain of the significant United States federal income tax consequences of an investment in the Company. The following discussion does not discuss all the potential tax considerations relevant to the Company or its operations. Moreover, the tax considerations relevant to a specific Partner depend upon its particular circumstances.

Each prospective Partner is urged to consult its own tax advisor concerning the potential tax consequences of an investment in the Company.

The following discussion is based upon the Internal Revenue Code of 1986, as amended (the "Code"), and administrative and judicial interpretations thereof, as of the date hereof, all of which are subject to change

EXHIBIT B
PAGE 37

(possibly on a retroactive basis). No tax rulings have been or are anticipated to be requested from the Internal Revenue Service (the "Service") or other taxing authorities with respect to any of the tax matters discussed herein. Except as specifically noted, the following general discussion assumes that each Partner is a United States resident individual or a domestic corporation that is not tax-exempt and that each Partner holds its Shares in the Company as a capital asset and is the initial holder of such Shares. Except as specifically indicated, the following discussion does not deal with the consequences of the ownership of Shares in the Company by special classes of holders, such as dealers in securities or life insurance companies. Special rules applicable to tax-exempt Partners and non-U.S. Partners are discussed separately below.

**NOTICE PURSUANT TO IRS CIRCULAR 230**

THE DISCUSSION HEREIN IS NOT INTENDED OR WRITTEN BY THE FUND, ITS COUNSEL OR THE PLACEMENT AGENT TO BE USED, AND CANNOT BE USED, BY ANY PERSON FOR THE PURPOSE OF AVOIDING TAX PENALTIES THAT MIGHT BE IMPOSED UNDER U.S. TAX LAWS. THIS DISCUSSION IS PROVIDED TO SUPPORT AN OFFERING OF PARTNERSHIP IN THE FUND, AND ACCORDINGLY IS WRITTEN IN SUPPORT OF THE MARKETING OF THE PARTNERSHIP IN THE FUND. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR CONCERNING THE POTENTIAL TAX CONSEQUENCES OF AN INVESTMENT IN THE FUND.

**U.S. Federal Income Tax Treatment of the Company's Operations**

Treatment as a Partnership. The Company expects to be treated for U.S. federal income tax purposes as a partnership and not as an association (or publicly traded partnership) taxable as a corporation. Such opinion will be based on certain assumptions and representations, including representations relating to the Company's compliance with its Partnership Agreement. However, such opinion is not binding on the Service or the courts.

Taxation of the Partners on Profits or Losses of the Company. The Company will not pay federal income tax. Instead, each Member will be required to report on its federal income tax return its distributive share of the Company's income or gain, whether or not it receives any actual distribution of money or property from the Company during the taxable year. In addition, certain of the investments held by the Company may give rise to taxable dividends or interest, even if there has been no corresponding cash distribution by the Company, by reason of imputed "discount" or "pay-in kind" features, in certain cases where an adjustment is made to the conversion price of a convertible security held by the Company, and possibly by reason of not paying accrued dividends currently. Furthermore, investments by the Company in foreign entities may, in certain circumstances (e.g., pursuant to the controlled foreign corporation ("CFC") or the passive foreign investment company ("PFIC") provisions), cause a Partner to recognize income subject to tax prior to the receipt by the Company of any distributable proceeds (or to pay an interest charge on taxable income that is treated as having been deferred). Accordingly, a Partner's tax liability related to the Company could exceed amounts distributed by the Company to such Partner in a particular year. In addition, Partners may recognize gain or loss as a result of receiving cash distributions upon the admission of additional investors after the Initial Closing.

Other Possible Tax Consequences to Investors. Section 469 of the Code provides that, in general, in the case of an individual, estate and trust, certain types of personal service corporations and certain types of closely held C corporations, for any taxable year the aggregate losses from business activities in which the taxpayer does not materially participate (such business activities are referred to herein as "passive activities") are deductible only to the extent of the aggregate income from passive activities. In the case of certain closely held C corporations, the

EXHIBIT B
PAGE 38

net aggregate loss from passive activities (and the net aggregate credit, in a deduction equivalent sense) may offset net active income, but not portfolio income items (as defined below). It is expected that all or substantially all of the Company's assets will give rise to, or be of a type that gives rise to, gross income from interest or dividends not derived in the ordinary course of a trade or business ("portfolio assets"). As a result, the income from such portfolio assets and gain from the disposition thereof ("portfolio income items") will not be able to be offset by losses of a Partner from other sources that are subject to the limitations on deductibility of passive losses imposed by Section 469 of the Code.

Company deductions allocable to certain Partners may be subject to limits for United States federal income tax purposes. Interest deductions (including interest paid by the Company on any borrowings) claimed by a non-corporate Partner may be subject to rules limiting the deduction of "investment interest." The "passive activity" rules of Section 469 may limit the ability of individuals, certain closely-held corporations and certain other persons to deduct passive losses. The ability of a non-corporate Partner to utilize its distributive share of losses from the Company also may be limited by the "at risk" rules of Section 465 and certain other provisions of the Code. Deductions for management fees and certain other flow-through expenses of the Company may be treated as miscellaneous itemized deductions, which may further the amount a US Partner who is an individual, estate or trust may deduct, including as a result of the two percent (2%) adjusted gross income floor on deductions under Section 67 of the Code, and the limitation on deductions provided for under Section 68, which varies based upon a taxpayer's adjusted gross income.

A transfer of Partnership interests and the distribution of property are subject to certain basis rules that are designed to place limits on the use of partnerships to shift or duplicate losses. These rules effectively make an election under Section 754 of the Code mandatory in certain situations, resulting in an adjustment to the tax basis of the affected partnership's assets.

Prospective investors should also be aware that the Internal Revenue Service may challenge the Company's treatment of items of income, gain, loss, deduction and credit (including, without limitation, various fees and payments payable by the Company or other pass through entities in which the Company invests), or its characterization of the Company's transactions, and that any such challenge, if successful, could result in the imposition of additional taxes, penalties and interest charges.

**Unrelated Business Taxable Income**

The General Partner will use reasonable best efforts not to take any action that would cause any tax-exempt Partner to realize "unrelated business taxable income" within the meaning of Sections 512 and 514 of the Code ("UBTI"), provided that notwithstanding the foregoing standard, the Company will be permitted to make certain borrowings. Thus, notwithstanding such undertaking of the General Partner, it is possible that the Company could realize income which would constitute UBTI and, in that event, each tax-exempt Partner would be subject to U.S. federal income tax on its share of such income. Depending on the character of the income in question, a tax-exempt investor's allocable share of such income could be treated as UBTI.

If a tax-exempt entity's acquisition of an interest in the Company is debt financed (i.e., if the tax-exempt entity incurs debt that is allocated to the acquisition of the Company investment) or if the Company invests in flow through entities that have incurred debt, all or a portion of the income attributed to the "debt-financed property" would be included in UBTI regardless of whether such income would otherwise be excluded as dividends, interest or other similar income. This provision would apply, in the case of ordinary income, only in tax years in which the Company has indebtedness outstanding or, in the case of a sale, if the Company has indebtedness outstanding

at any time during the twelve-month period prior to the sale. The Company has the ability to borrow funds and thus may hold debt-financed property that may produce UBTI.

**Excise Tax on Certain Tax-Exempt Entities Entering into Prohibited Tax Shelter Transactions**

Section 4965 of the Code imposes an excise tax on certain tax-exempt entities (and their managers) that become a "party" to a "prohibited tax shelter transaction". The Service has recently issued guidance that narrows the circumstances in which a tax-exempt entity could be considered a "party" to a prohibited tax shelter transaction, and under currently issued guidance, an investment by a tax-exempt entity in the Company should not result in such tax-exempt entity being considered a "party" to a prohibited tax shelter transaction for purposes of Section 4965 of the Code. However, there can be no assurance that future guidance would not give rise to circumstances in which an investment in the Company could cause a tax-exempt investor to be considered a "party" to a prohibited tax shelter transaction. Each tax-exempt entity should consult its own tax advisor regarding an investment in the Company.

**Investment by Non-U.S. Persons**

The Company has reserved the right to sell Shares to non-U.S. corporations, trusts and estates and individuals who are neither citizens nor residents of the United States ("foreign investors"). The U.S. federal income tax treatment of a foreign investor investing as a Partner in the Company is complex and will vary depending upon the circumstances of each foreign investor and the activities of the Company and the General Partner. Each foreign investor is urged to consult with its own tax adviser regarding the federal, state, local and foreign tax treatment of its investment in the Company.

In general, the tax treatment of a foreign investor will depend on whether the Company is deemed to be engaged in a U.S. trade or business. Given the investment nature of the activities of the Company, the General Partner believes that the Company should not be deemed to be engaged in a U.S. trade or business. In that event, the Company would generally not be required to withhold tax on gain from the sale of portfolio securities and is not required to withhold tax on portfolio interest. However, the Company would be required to withhold tax at the rate of thirty percent (30%) (or lower treaty rate, if applicable) on other interest, dividends and income, and special rules apply with respect to dispositions of "United States real property interests," which can include stock in a corporation.

The General Partner will use reasonable best efforts not to (i) take any action that would result in any Partner (or any direct or indirect beneficial owner of a Partner) to recognize any income that is effectively connected with a United States trade or business, (ii) acquire an Operating Company Investment that the General Partner reasonably believes at the time of acquisition is, or is likely to become, a "United States real property interest" within the meaning of Section 897(c) of the Code, or (iii) take any action that would cause any non-U.S. Partner to which Section 892 of the Code applies to be considered or deemed to be engaged in a commercial activity for purposes of Section 892 of the Code, provided, however, that notwithstanding the foregoing, the reduction of Management Fees will be permitted. If the Company were determined to be engaged in a U.S. trade or business, the income effectively connected with such trade or business would be subject to U.S. taxation. In such a case, each foreign investor would be obligated to file a U.S. income tax return reporting such income. Foreign investors are urged to consult their own tax advisors about other potential consequences of being considered engaged in business in the United States.

**Tax Shelter Reporting Rules**

EXHIBIT B
PAGE 40

The Company may engage in transactions or make investments that would subject the Company, its Partners that are obliged to file U.S. tax returns and/or its advisers to special rules requiring such transactions or investments by the Company, or investments in the Company, to be reported and/or otherwise disclosed to the Service, including to the Service's Office of Tax Shelter Analysis (the "Tax Shelter Rules"). A transaction may be subject to reporting or disclosure if it is described in any of several categories of transactions, which include, among others, (i) transactions that result in the incurrence of a loss or losses exceeding certain thresholds (including foreign currency losses), (ii) transactions that result in large tax credits from assets held for 45 days or less, or (iii) transactions that are offered under conditions of confidentiality. Although the Company does not expect to engage in transactions solely or principally for the purpose of achieving a particular tax consequence, there can be no assurance that the Company will not engage in transactions that trigger the Tax Shelter Rules. In addition, a Partner may have disclosure obligations with respect to its interest in the Company if the Partner (or the Company in certain cases) participates in a reportable transaction.

**Non-U.S. Taxes**

The Company may be subject to withholding and other taxes imposed by, and Partners might be subject to taxation and reporting requirements in, non-U.S. jurisdictions in which the Company makes investments. It is possible that tax conventions between such countries and the United States (or another jurisdiction in which a non-U.S. Partner is a resident) might reduce or eliminate certain of such taxes. It is also possible that in some cases taxable Partners might be entitled to claim foreign tax credits or deductions with respect to such taxes, subject to certain limitations under applicable law. The Company will treat any such tax withheld from or otherwise payable with respect to income allocable to the Company as cash received by the Company and will treat each Partner as receiving as a distribution the portion of such tax that is attributable to such Partner. Similar provisions would apply in the case of taxes required to be withheld by the Company.

**Possible Legislative or Other Actions Affecting Tax Aspects**

The present federal income tax treatment of an investment in the Company may be modified by legislative, judicial or administrative action at any time, and any such action may affect investments and commitments previously made. The rules dealing with federal income taxation are constantly under review by persons involved in the legislative process and by the Service and the Treasury Department, resulting in revisions of Treasury regulations and revised interpretations of established concepts as well as statutory changes. Revisions in federal tax laws and interpretations thereof could adversely affect the tax aspects of an investment in the Company. Congress is currently scrutinizing the federal income tax treatment of private equity funds and hedge funds and there can be no assurance that legislation will not be enacted that has an unfavorable effect on a Partner's investment in the Company.

**State and Local Tax Considerations**

Partners may become subject to state and local income or franchise taxes in the jurisdictions in which the Company acquires real estate or otherwise is considered to be engaged in a trade or business and may be required to file appropriate returns. Moreover, although not subject to federal income tax, the Company may, by reason of ownership of real estate or otherwise engaging in a trade or business, become subject to state or local income or similar taxes imposed on partnerships themselves (e.g., the New York City Unincorporated Business Tax and the Illinois Personal Property Tax Replacement Income Tax) or may be required to withhold state taxes on income allocable to Partners not residing in such state.

PROSPECTIVE INVESTORS SHOULD CONSULT THEIR OWN TAX ADVISORS FOR FURTHER INFORMATION ABOUT THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF PURCHASING AND HOLDING PARTNERSHIP IN THE FUND.

## CERTAIN CONSIDERATIONS APPLICABLE TO ERISA, GOVERNMENTAL AND OTHER PLAN INVESTORS

Employee benefit plans that are subject to the fiduciary provisions of ERISA (including, without limitation, pension and profit-sharing plans), plans that are subject to Section 4975 of the Code (including, without limitation, individual retirement accounts ("IRAs") and Keogh plans) and entities deemed to hold "plan assets" of any of the foregoing (each, a "Benefit Plan Investor"), as well as governmental plans, foreign plans and other employee benefit plans, accounts or arrangements that are not subject to the fiduciary provisions of ERISA or Section 4975 of the Code, and trusts or other entities supporting or holding the assets of any of the foregoing (collectively, with Benefit Plan Investors, referred to as "Plans"), may generally invest in the Company, subject to the following considerations.

*General Fiduciary Considerations for Investment in the Company by Plan Investors.* The fiduciary provisions of ERISA, and the fiduciary provisions of pension codes applicable to governmental, foreign or other employee benefit plans or retirement arrangements that are not subject to ERISA may impose limitations on investment in the Company. Fiduciaries of Plans, in consultation with their advisors, should consider, to the extent applicable, the impact of such fiduciary rules and regulations on an investment in the Company. Among other considerations, the fiduciary of a Plan should take into account the composition of the Plan's portfolio with respect to diversification; the cash flow needs of the Plan and the effects thereon of the illiquidity of the investment; the economic terms of the Plan's investment in the Company; the Plan's funding objectives; the tax effects of the investment and the tax and other risks described in the sections of this Memorandum discussing tax considerations and risk factors; the fact that the investors in the Company are expected to consist of a diverse group of investors (including taxable, tax-exempt, domestic and foreign entities) and the fact that the management of the Company will not take the particular objectives of any investors or class of investors into account.

Plan fiduciaries should also take into account the fact that, while the General Partner will have certain general fiduciary duties to the Company, the General Partner will not have any direct fiduciary relationship with or duty to any investor, either with respect to its investment in interests or with respect to the management and investment of the assets of the Company. Similarly, it is intended that the assets of the Company will not be considered plan assets of any Plan or be subject to any fiduciary or investment restrictions that may exist under pension codes specifically applicable to such Plans. Each Plan will be required to acknowledge and agree in connection with its investment in interests to the foregoing status of the Company, and the General Partner and that there is no rule, regulation or requirement applicable to such investor that is inconsistent with the foregoing description of the Company, and the General Partner.

Plan fiduciaries may be required to determine and report annually the fair market value of the assets of the Plan. Since it is expected that there will not be any public market for the interests, there may not be an independent basis for the Plan fiduciary to determine the fair market value of such interests.

*ERISA and Other Benefit Plan Investors.* A fiduciary acting on behalf of a Benefit Plan Investor, in addition to the matters described above, should take into account the following considerations in connection with an investment in the Company.

EXHIBIT B
PAGE 42

*ERISA Restrictions if the Company Holds Plan Assets.* If the Company is deemed to hold plan assets of the investors that are Benefit Plan Investors, the investment in the Company by each such Benefit Plan Investor could constitute an improper delegation of investment authority by the fiduciary of such Benefit Plan Investor. In addition, any transaction the Company enters into would be treated as a transaction with each such Benefit Plan Investor and any such transaction (such as a property lease, acquisition, sale or financing) with certain "parties in interest" (as defined in ERISA) or "disqualified persons" (as defined in Section 4975 of the Code) with respect to a Benefit Plan Investor could be a "prohibited transaction" under ERISA or Section 4975 of the Code. If the Company were subject to ERISA, certain aspects of the structure and terms of the Company could also violate ERISA.

*ERISA Plan Assets.* Under ERISA and regulations issued thereunder by the U.S. Department of Labor (the "Regulation"), generally, a Benefit Plan Investor's assets would be deemed to include an undivided interest in each of the underlying assets of the Company unless investment in the Company by Benefit Plan Investors is not "significant" or another exception from holding plan assets is available.

*Significant Investment by Benefit Plan Investors.* Investment by Benefit Plan Investors would not be "significant" if less than 25% of the value of each class of equity interests in the Company (excluding the interests of the General Partner, the General Partner and any other person who has discretionary authority or control, or provides investment advice for a fee (direct or indirect) with respect to the assets of the Company, and affiliates (other than a Benefit Plan Investor) of any of the foregoing persons (a "Management Affiliate"), is held by Benefit Plan Investors. A commingled vehicle that is subject to ERISA will generally count as a Benefit Plan Investor for this purpose only to the extent of investment in such entity by Benefit Plan Investors. The General Partner currently intends to limit investment in the Company by Benefit Plan Investors so that participation by such investors is not "significant" with respect to any class of the Company's equity interests. However, if there is no other exception available from holding plan assets, the General Partner reserves the right to allow unlimited investment by Benefit Plan Investors in the future, provided that the General Partner, in consultation with the investors subject to ERISA or Section 4975 of the Code, will make the necessary amendments to the Company documents and take such other actions as may be necessary to comply with ERISA and Section 4975 of the Code.

Each investor and each transferee will be required to represent and warrant whether it is a Benefit Plan Investor or a Management Affiliate, and the General Partner reserves the right to reject subscriptions in whole or in part for any reason, including that the investor is a Benefit Plan Investor. The General Partner also has the authority to restrict transfers of Shares, and may require a full or partial withdrawal of any Benefit Plan Investor to the extent it deems appropriate to avoid having the assets of the Company be deemed to be plan assets of any Benefit Plan Investor – see discussion in the sections in this Memorandum on transfers and withdrawals. In addition, the General Partner has broad authority to take any action to maintain the no plan asset status of the Company or remedy a plan asset problem.

*Prohibited Transaction Considerations.* Fiduciaries of Benefit Plan Investors should also consider whether an investment in the Company could involve a direct or indirect transaction with a "party in interest" or "disqualified person" as defined in ERISA and Section 4975 of the Code, and if so, whether such prohibited transaction may be covered by an exemption. ERISA contains a statutory exemption that permits a Benefit Plan Investor to enter into a transaction with a person who is a party in interest or disqualified person solely by reason of being a service provider or affiliated with a service provider to the Benefit Plan Investor, provided that the transaction is for "adequate consideration." There are also a number of administrative prohibited transaction exemptions that may be available to certain fiduciaries acting on behalf of a Benefit Plan Investor. Fiduciaries of Benefit Plan Investors

EXHIBIT B
PAGE 43

should also consider whether investment in the Company could involve a conflict of interest. In particular, a prohibited conflict of interest could arise if the fiduciary acting on behalf of the Benefit Plan Investor has any interest in or affiliation with the Company, the General Partner or the General Partner.

*Governmental Plans.* Government sponsored plans are not subject to the fiduciary provisions of ERISA, and are also not subject to the prohibited transaction provisions under Section 4975 of the Code. However, federal, state or local laws or regulations governing the investment and management of the assets of such plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code discussed above and may include other limitations on permissible investments. Accordingly, fiduciaries of governmental plans, in consultation with their advisors, should consider the requirements of their respective pension codes with respect to investments in the Company, as well as the general fiduciary considerations discussed above.

The fiduciary of each prospective investor that is a governmental plan will be required to represent and warrant that investment in the Company is permissible, complies in all respects with applicable law and has been duly authorized.

*Individuals Investing With IRA Assets.* Shares sold by the Company may be purchased or owned by investors who are investing assets of their IRAs. The Company's acceptance of an investment by an IRA should not be considered to be a determination or representation by the General Partner or any of its respective affiliates that such an investment is appropriate for an IRA. In consultation with its advisors, each prospective investor that is an IRA should carefully consider whether an investment in the Company is appropriate for, and permissible under the terms of its IRA governing documents. Investors that are IRAs should consider in particular that the Shares will be illiquid and that it is not expected that a significant market will exist for the resale of the Shares, as well as the other general fiduciary considerations described above.

Although IRAs are not generally subject to ERISA, they are subject to the provisions of Section 4975 of the Code, prohibiting transactions with "disqualified persons" and investments and transactions involving fiduciary conflicts. A prohibited transaction or conflict of interest could arise if the fiduciary making the decision to invest has a personal interest in or affiliation with the Company, the General Partner, the General Partner or any of their respective affiliates. In the case of an IRA, a prohibited transaction or conflict of interest that involves the beneficiary of the IRA could result in disqualification of the IRA. A fiduciary for an IRA who has any personal interest in or affiliation with the Company, the General Partner, the General Partner or any of their respective affiliates, should consult with his or her tax and legal advisors regarding the impact such interest or affiliation may have on an investment in Shares with assets of the IRA.

Investors that are IRAs should consult with their counsel and advisors as to the prohibited transaction, conflict of interest and other provisions of the Code applicable to an investment in the Company.

ACCEPTANCE OF SUBSCRIPTIONS OF ANY PLAN IS IN NO RESPECT A REPRESENTATION BY THE FUND, THE MANAGER, THE MANAGER OR ANY OTHER PARTY THAT SUCH INVESTMENT MEETS THE RELEVANT LEGAL REQUIREMENTS WITH RESPECT TO THAT PLAN OR THAT THE INVESTMENT IS APPROPRIATE FOR SUCH PLAN. EACH PLAN FIDUCIARY SHOULD CONSULT WITH HIS OR HER OWN LEGAL ADVISORS AS TO THE PROPRIETY OF AN INVESTMENT IN THE FUND IN LIGHT OF THE SPECIFIC REQUIREMENTS APPLICABLE TO THAT PLAN.

**SECURITIES LAWS**

EXHIBIT B
PAGE 44

On June 22, 2015, the SEC repealed the private adviser registration exemption which previously exempted advisers with fewer than 15 clients who did not hold themselves out to the public as advisers. The SEC replaced the private adviser registration exemption with a new exemption (Under new Rule 203(m) of the Adviser's Act) from registration for advisers solely to private funds[1] with less than $150 million under management (an "Exempt Reporting Adviser"). In the event the General Manager loses its status as an Exempt Reporting Adviser and is required to be registered with the SEC, the General Manager will be subject to a variety of additional regulatory filing, record-keeping, and governance rules

**Securities Act of 1933**. The Shares in the Company will not be registered under the Securities Act or any other securities law. The Shares will be offered without registration in reliance upon the exemption contained in Section 4(a)(2) of the Securities Act or regulations of the Securities and Exchange Commission for transactions not involving a public offering. Each prospective investor must be an accredited investor (as defined in Regulation D promulgated under the Securities Act) and will be required to represent, among other customary private placement representations, that it is acquiring Shares in the Company for investment purposes only and not with a view to resale or distribution. Further, each investor must be prepared to bear the economic risk of the investment for an indefinite period, because Shares in the Company can be resold only pursuant to an offering registered under the Securities Act or an exclusion from such registration requirement. It is extremely unlikely that Shares in the Company will ever be registered under the Securities Act.

**Securities Exchange Act of 1934**. In connection with any acquisition or beneficial ownership by the Company of more than five percent (5%) of any class of the equity securities of a company registered under the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Company may be required to make certain filings with the Securities and Exchange Commission. Generally, these filings require disclosure of the identity and background of the purchaser, the source and amount of funds used to acquire the securities, the purpose of the transaction, the purchaser's interest in the securities, and any contracts, arrangements or undertakings regarding the securities. In certain circumstances, the Company may be required to aggregate its investment position in a given Operating Company with the beneficial ownership of that company's securities by or on behalf of the General Partner and its affiliates, which could require the Company, together with such other parties, to make certain disclosure filings or otherwise restrict the Company's activities with respect to such Operating Company securities. In addition, if the Company becomes the beneficial owner of more than ten percent (10%) of any class of the equity securities of a company registered under the Exchange Act or places a director on the board of directors of such a company, the Company may be subject to certain additional reporting requirements and to liability for short-swing profits under Section 16 of the Exchange Act. The Company intends to manage its investments so as to avoid the short-swing profit liability provisions of Section 16 of the Exchange Act.

**Investment Company Act of 1940**. The Company will not be registered as an "investment company" under the Investment Company Act in reliance upon Section 3(c)(7) thereof. Accordingly, Partners will not receive the protections afforded by the Investment Company Act to investors in a registered investment company. Section 3(c)(7) excludes from the definition of investment company any issuer whose outstanding securities are owned exclusively by "qualified purchasers," provided that the issuer is not making, and does not propose to make, a public offering of such securities. Qualified purchaser generally means (i) a natural person (or a company owned by two or more family members or foundations, charitable organizations or trusts established by or for the benefit

---

[1] A private fund is defined as any issuer that would be an investment company but for Sections 3(c)1 or 3(c)7 of the Advisers Act

EXHIBIT B
PAGE 45

of such persons) who owns at least $5 million in investments (as defined in the Rule 2a51-1 promulgated under the Investment Company Act) or (ii) any person or entity acting for its own account or for the accounts of other qualified purchasers who in the aggregate owns or invests on a discretionary basis not less than $25 million in investments (as defined in Rule 2a51-1 promulgated under the Investment Company Act). The Partnership Agreement and the subscription agreements by which the Partners will invest in the Company will contain certain representations, undertakings and restrictions on transfer designed to assure that the conditions of Section 3(c)(7) will be met.

In connection with any subscription for, or proposed transfer of, Shares in the Company, the General Partner is authorized to ask for and obtain such information from the prospective investor or the proposed transferor and transferee, as applicable, in order that it may be able to determine whether the proposed subscription or transfer, as applicable, would allow the Company to retain its exclusion from registration as an investment company. In addition, a company may be deemed to be an investment company if it owns "investment securities" with a value exceeding 40% of its total assets (excluding government securities and cash items) or if more than 45% of its total assets consists of, or more than 45% of its income/loss is derived from, securities of companies it does not control. Any Company is not required to register as an investment company under the Investment Company Act because it is primarily engaged in the businesses of its controlled Operating Companies rather than the business of investing and reinvesting in investment securities. Any Company currently intends to continue to conduct its investment and other activities, including its investment activities through the Company, so as not to be deemed an investment company under the Investment Company Act. As a result, the aggregate amount of investments in Operating Companies that Any Company or the Company does not control will be limited to the extent set forth above. Any Company, however, does not believe that such limitations will impede the ability of the Company to pursue its investment strategy.

***Investment Advisers Act of 1940***. Having its principal place of business in the state of California, the General Partner is currently licensed and registered as an investment adviser in California and regulated by the State's Department of Commerce and Consumer Affairs. California law imposes a variety of regulations on the General Partner including standards relating to minimum net worth, examination, bonding, and record keeping. In regard registration with the Securities and Exchange Commission ("SEC"), the General Partner is likely to remain exempt from registration at the federal level until such time as the General Partner advises private funds with more than $150 million in assets under management pursuant to new rules adopted by the SEC as outlined above.

***Non-U.S. Securities Laws***. The Shares in the Company have not been registered or qualified for public distribution under the securities laws of any jurisdiction. The Shares will be offered without registration and without the filing of a prospectus in reliance upon exemptions available under applicable law. Each prospective investor resident outside the United States must be, and will be required to represent that it is, entitled to acquire Shares in the Company in reliance upon an exemption from the registration or prospectus requirements of applicable securities laws of its jurisdiction of residence. Further, each investor must be prepared to bear the economic risk of the investment for an indefinite period, because Shares in the Company can be resold only pursuant to an offering registered under the securities laws of such jurisdiction or an exclusion from such registration requirement. It is extremely unlikely that Shares in the Company will ever be registered under the securities laws of any jurisdiction. In connection with any acquisition or beneficial ownership by the Company of more than a specified percentage of any class of the equity securities of a company that is subject to public reporting obligations under applicable securities laws, the Company may be required to make certain filings with relevant securities authorities. Generally, these filings require disclosure of the identity and background of the purchaser, the source and amount of funds used to acquire the securities, the purpose of the transaction, the purchaser's interest in the securities and

EXHIBIT B
PAGE 46

any contracts, arrangements or undertakings regarding the securities. In certain circumstances, the Company may be required to aggregate its investment position in a given Operating Company with the beneficial ownership of that company's securities by or on behalf of the General Partner and its affiliates, which could require the Company, together with such other parties, to make certain disclosure filings or otherwise restrict the Company's activities with respect to such Operating Company securities.

<p style="text-align:center">* * *</p>

The foregoing summary is not intended as a substitute for professional tax advice, nor does it purport to be a complete discussion of all tax consequences that could apply to this investment. The foregoing summary also does not discuss any of the U.S. federal income or estate tax considerations relevant to foreign persons. Each Partner must consult its own tax advisor as to the tax consequences of this investment.

## REPORTS TO MEMBERS

The Platform will furnish to each Investor: (i) audited annual financial reports of the account(s); (ii) annual descriptive investment information for each investment (v) from time to time the General Partner will provide unaudited periodic reports at the discretion of the General Partner, but no less often than quarterly.

## SUBSCRIPTION PROCEDURE FOR MEMBERSHIP

To become a Partner, a prospective investor should: (i) complete and execute a copy of the subscription agreement and investor questionnaire inserting the amount of the capital contribution agreed to be made, the prospective Partner's personal information and taxpayer identification if dealing with an entity; (ii) provide copies of documents confirming the investors identification, such as a passport or drivers license; and (iii) return all such executed copies to the General Partner.

Unless waived by the General Partner, all capital contributions must be made by opening all applicable accounts and wallets with various Bitcoin Brokers and exchanges. Copies of the subscription agreement and investor questionnaire are contained in the materials accompanying this Memorandum.

In order to comply with United States and international laws aimed at the prevention of money laundering and terrorist financing, each prospective Partner that is an individual will be required to represent in the subscription agreement that, among other things, he is not, nor is any person or entity controlling, controlled by or under common control with the prospective Partner, a "Prohibited Person" as defined in the subscription agreement (generally, a person involved in money laundering or terrorist activities, including those persons or entities that are included on any relevant lists maintained by the U.S. Treasury Department's Office of Foreign Assets Control, any senior foreign political figures, their immediate family members and close associates, and any foreign shell bank). Further, each prospective Partner which is an entity will be required to represent in the subscription agreement that, among other things, (i) it has carried out thorough due diligence to establish the identities of its beneficial owners, (ii) it reasonably believes that no beneficial owner is a "Prohibited Person", (iii) it holds the evidence of such identities and status and will maintain such information for at least five years from the date of its complete withdrawal from the Company, and (iv) it will make available such information and any additional information that the Company may require upon request that is required under applicable regulations.

The General Partner reserves the right to request such further information as it considers necessary to verify the identity of a prospective Partner. In the event of delay or failure by the prospective Partner to produce any information required for verification purposes, the General Partner may refuse to accept a capital contribution

until proper information has been provided and any funds received will be returned without interest to the account from which the moneys were originally debited.

The General Partner will notify each new Partner of the date by which, and address to which, he/she will be required to transmit the amount of his/her capital contribution agreed to be made under the Subscription Agreement. Shortly thereafter, the General Partner will return to each Partner his/her copy of the subscription agreement and investor questionnaire (as executed by the General Partner). The General Partner may pay fees to persons (whether or not affiliated with the General Partner) who are instrumental in the sale of interests in the Company. Any such fees will in no event be payable by or chargeable to the Company or any Partner or prospective Partner.

In making an investment decision, prospective Partners must rely on their own examination of the Company and the terms of this offering, including the merits and significant risks involved. Each prospective Partner should consult the Partner's own counsel, accountant and other professional advisor as to investment, legal, tax and other related matters concerning the Partner's proposed investment.

EXHIBIT B
PAGE 48

## RISK FACTORS

AN INVESTMENT IN THE COMPANY IS SPECULATIVE, INVOLVES A HIGH DEGREE OF RISK AND IS SUITABLE ONLY FOR PERSONS WHO ARE ABLE TO ASSUME THE RISK OF LOSING THEIR ENTIRE INVESTMENT. PROSPECTIVE PURCHASERS OF PARTNERSHIP SHOULD CAREFULLY READ THE ENTIRE MEMORANDUM. BECAUSE THE INVESTMENT PROGRAM INVOLVES SUBSTANTIAL RISKS, AN INVESTMENT IN THE PARTNERSHIP SHOULD BE MADE ONLY AFTER CONSULTING WITH INDEPENDENT QUALIFIED SOURCES OF INVESTMENT AND TAX ADVICE. PROSPECTIVE INVESTORS SHOULD CAREFULLY CONSIDER THE FOLLOWING RISKS, AMONG OTHERS, BEFORE SUBSCRIBING FOR PARTNERSHIP.

Prospective investors should carefully consider the risks involved in an investment in the Company, including but not limited to those discussed below. Many of these risks are discussed more fully elsewhere in this Memorandum. Prospective investors should consult their own legal, tax, and financial advisers as to all these risks and an investment in the Company generally.

**General**

**Reliance on the Investment Manager**. The success of the Company depends on the ability of the Investment Manager to develop and implement investment strategies to achieve the Company's investment objectives. The Company's investment performance could be materially adversely affected if Reginald Ringgold ceases to be involved in the active management of the Company's portfolio. The Investment Manager has wide latitude in making investment decisions and investors have no right or power to take part in such decisions.

**Operating Deficits**. The expenses of operating the Company could exceed its income. This would require that the difference be paid out of the Company's capital, reducing the Company's investments and potential for profitability.

**Limited Operating History**. The Company, ROSEGOLD INVESTMENTS LLP, has no operating and investing history upon which potential investors may evaluate past performance. The past investment performance of the Investment Manager and its principal and affiliates is not indicative of the future investment results of the Company. There can be no assurance that the Company will achieve its investment objectives.

**Investment Risks**

All securities investing and trading activities risk the loss of capital. While the Investment Manager will attempt to moderate these risks, there can be no assurance that the Company's investment activities will be successful or that Partners will not suffer losses. An investment in the Company is suitable only for persons who have adequate means of providing for their current needs and personal contingencies and have no need for liquidity in their investments. An investment in the Company should not be made by any person who (i) cannot afford a total loss of

principal, or (ii) has not (either alone or in conjunction with a financial advisor) carefully read or does not understand, this Memorandum, including (but not limited to) the portions concerning the risks and the income tax consequences of an investment in the Company. The following discussion describes some of the more significant risks associated with the Company's proposed activities.

**Overall Investment Risk**. All securities investments risk the loss of capital. The nature of the securities to be purchased and traded by the Company and the investment techniques and strategies to be employed by the Investment Manager may increase this risk. While the Investment Manager will devote its best efforts to the management of the Company's portfolio, there can be no assurance that the Company will not incur losses. Many unforeseeable events, including actions by various government agencies, and domestic and international economic and political developments, may cause sharp market fluctuations that could adversely affect the Company's portfolio and performance.

**Transactions in Securities**. There is no assurance that the Investment Manager will correctly evaluate the nature and magnitude of the various factors that could affect the prospects of the securities in which the Company invests. The Company may lose its entire investment or may be required to accept cash or securities with a value less than the Company's original investment. Under such circumstances, the returns generated from the Company's investments may not compensate the Partners adequately for the risks assumed.

**Concentration of Investments**. The Company is not limited with respect to the amount of capital which may be committed to any one investment. Accordingly, the Company may from time to time hold a few (or even one), relatively large (in relation to its capital) securities positions, with the result that a loss in any one position could have a more material adverse impact on the Company's capital than would a loss position in a more diversified portfolio.

**Leverage**. Leverage is the use of borrowed funds for investment. To the extent the Company purchases securities with borrowed funds, its net assets will tend to increase or decrease at a greater rate than if borrowed funds are not used. If the interest expense on borrowings were to exceed the net return on the portfolio securities purchased with borrowed funds, the Company's use of leverage would result in a lower rate of return than if the Company were not leveraged. If the amount of borrowings which the Company may have outstanding at any one time is large in relation to its capital, fluctuations in the market value of the Company's portfolio will have a disproportionately large effect in relation to its capital and the possibilities for profit and the risk of loss will therefore be increased. Any investment gains made with the additional monies borrowed will generally cause the value of the Company's assets to rise more rapidly than would otherwise be the case. Conversely, if the investment performance of the additional monies fails to cover their cost to the Company, the value of the Company's assets will generally decline faster than would otherwise be the case. This is the speculative factor known

EXHIBIT B
PAGE 49

as "leverage."

The amount of any borrowing may also be limited by regulations imposed by the Federal Reserve Board or by the availability and cost of credit. If, due to market fluctuations or other reasons, the value of the Company's assets should fall below required regulatory levels, the Company will be required to reduce its debt by selling securities in its long portfolio.

**Short Selling**. Short selling involves the sale of a security that the Company does not own and must borrow in order to make delivery in the hope of purchasing the same security at a later date at a lower price.

Short sales can, in certain circumstances, substantially increase the impact of adverse price movements on the Company's portfolio. A short sale involves the risk of a theoretically unlimited increase in the market price of the particular investment sold short, which could result in an inability to cover the short position and a theoretically unlimited loss. Additionally, there can be no assurance that securities necessary to cover a short position will be available for purchase.

If the Company "shorts" securities of companies which are not deteriorating to the extent the Investment Manager believes them to be, or if the market advances or continues to advance generally, the Company is likely to experience losses from its short sales that can increase rapidly and without effective limit. Moreover, short selling is limited to securities which can be borrowed, and it may be necessary to cover short positions at an undesirable time and at high prices because stocks which were shorted can no longer be borrowed.

**Illiquid Securities**. A portion of the Company's assets, up to 10% or more, may from time to time be invested in securities and other financial instruments or obligations for which no market exists and/or which are restricted as to their transferability under Federal or state securities laws. Due to the absence of any trading market for these investments, the Company may take longer to liquidate these positions than would be the case for publicly traded securities. Although these securities may be resold in privately negotiated transactions, the prices realized on these sales could be less than those originally paid by the Company. Further, companies whose securities are not publicly traded may not be subject to public disclosure and other investor protection requirements applicable to publicly traded securities.

**Hedging Transactions**. The Investment Manager is not required to attempt to hedge portfolio positions in the Company and, for various reasons, may determine not to do so. Furthermore, the Investment Manager may not anticipate a particular risk so as to hedge against it. The Company may utilize financial instruments, both for investment purposes and for risk management purposes in order to seek to: (i) protect against possible changes in the market value of the Company's investment portfolios resulting from fluctuations in the securities markets and changes in interest rates, (ii) protect the Company's unrealized gains in the value of the Company's investment portfolios, (iii) facilitate the sale of any such investments, (iv) enhance or preserve returns, spreads or gains on any investment in the Company's portfolios, (v) hedge the interest rate or currency exchange rate on any of the Company's liabilities or assets, (vi) protect against any increase in the price of any securities the Company anticipates purchasing at a later day or (vii) for any other reason that the Investment Manager deems appropriate.

The success of any hedging strategy that the Company may employ will be subject to the Investment Manager's ability to correctly access the degree of correlation between the performance of the instruments used in the hedging strategy and the performance of the investments in the portfolio being hedged. Since the characteristics of many securities change as markets change or time passes, the success of the Company's hedging strategy will also be subject to the Investment Manager's ability to continually recalculate, readjust and execute hedges in an efficient and timely manner. While the Company may enter into hedging transactions to seek to reduce risk, such transactions may result in a poorer overall performance for the Company than if it had not engaged in any such hedging transactions. For a variety of reasons, the Investment Manager may not seek to establish a perfect correlation between such hedging instruments and the portfolio holdings being hedged. Such imperfect correlation may prevent the Company from achieving its intended hedge or expose the Company to risk of loss. The successful utilization of hedging and risk management transactions requires skills complementary to those needed in the selection of the Company's portfolio holdings.

**Foreign Securities**. The Company reserves the right to invest a portion of its assets in securities of companies domiciled or operating in one or more non-U.S. countries, although at present the Company intends to invest primarily in U.S. markets. Investing in non-U.S. securities involves considerations and possible risks not typically involved in investing in securities of companies domiciled and operating in the United States, including instability of some governments, the possibility of expropriation, limitations on the use or removal of funds or other assets, changes in governmental administration or economic or monetary policy (in the United States or abroad) or changed circumstances in dealings between nations. The application of local tax laws (e.g., the imposition of withholding taxes on dividend or interest payments) or confiscatory taxation may also affect investment in non-U.S. securities. Higher expenses may result from investment in non-U.S. securities than would from investment in domestic securities because of the costs that must be incurred in connection with conversions between various currencies and brokerage commissions that may be higher than in the United States. Non-U.S. securities markets also may be less liquid, more volatile and less subject to governmental supervision than in the United States. Such investments could be affected by other factors not present in the United States, including lack of uniform accounting, auditing and financial reporting standards and potential difficulties in enforcing contractual obligations.

In addition, the Company's investments that are denominated in currencies other than the U.S. dollar are subject to the risk that the value of a particular currency will change in relation to one or more other currencies. Among the factors that may affect currency values are trade balances, the level of short-term interest rates, differences in relative values of similar assets in different currencies, long-term opportunities for investment and capital appreciation and political developments. The Company may seek to hedge these risks by investing in currencies, but

EXHIBIT B
PAGE 50

there can be no assurance that such strategies will be effective.

**Currency and Exchange Rate Risks**. The Company's assets may be invested in securities of companies denominated in currencies other than the U.S. dollar. Accordingly, a portion of the income received directly or indirectly (through the companies in which the Company will invest or by their sale) by the Company may be denominated in non-U.S. currencies. The Company nevertheless will compute and distribute its income in U.S. dollars. Since the Company may invest in securities denominated or quoted in currencies other than the U.S. dollar, changes in currency exchange rates may affect the value of the Company's portfolio and the unrealized appreciation or depreciation of investments. Further, the Company may incur costs in connection with conversions between various currencies.

The Company may enter into futures or forward contracts on currencies in U.S. and non-U.S. markets for hedging purposes. There is no certainty that instruments suitable for hedging currency shifts will be available at the time when the Company wishes to use them.

**Trading Limitations**. For all securities listed on public exchanges, the exchange generally has the right to suspend or limit trading under certain circumstances. Such suspensions or limits could subject the Company to a loss.

**Small Companies**. The Company may invest a substantial portion of its assets in small and/or less well-established companies. While smaller companies generally have potential for rapid growth, they often involve higher risks because they may lack the management experience, financial resources, product diversification, and competitive strength of larger corporations. In addition, in many instances, the frequency and volume of their trading is substantially less than is typical of larger companies. As a result, the securities of smaller companies may be subject to wider price fluctuations. When making large sales, the Company may have to sell portfolio holdings at discounts from quoted prices or may have to make a series of small sales over an extended period of time due to the trading volume of smaller company securities.

**Loans of Portfolio Securities**. The Company may from time to time lend securities from its portfolio to brokers, dealers and financial institutions and receive collateral in cash or securities believed by the Investment Manager to be equivalent to securities rated investment grade by any nationally recognized rating organization which, while the loan is outstanding, will be maintained at all times in an amount equal to at least 100% of the current market value of the loaned securities, including any accrued interest or dividend receivable. Any cash collateral received by the Company will be invested in short-term securities. The Company will retain all rights of beneficial ownership as to the loaned portfolio securities, including voting rights and rights to interest or other distributions, and will have the right to regain record ownership of loaned securities to exercise such beneficial rights. Such loans will be terminable at any time. The Company may pay finders', administrative and custodial fees to persons unaffiliated with the Company in connection with the arranging of such loans.

**Fixed-Income Investments**. The value of the fixed-income securities in which the Company may invest will generally change as the general

levels of interest rates fluctuate. Generally, when interest rates decline, the value of the Company's long fixed-income portfolio can be expected to rise while that of its short fixed-income portfolio can be expected to decline.

Conversely, when interest rates rise, the value of a long fixed-income portfolio can be expected to decline while that of a short fixed-income portfolio can be expected to rise.

**Purchases of Securities and other Obligations of Financially Distressed Companies**. The Company may purchase securities and other obligations of companies that are experiencing significant financial or business distress, including companies involved in bankruptcy, or other reorganization and liquidation proceedings. Acquired investments may include senior or subordinated debt securities, bank loans, promissory notes and other evidences of indebtedness, as well as payables to trade creditors. Although such purchases may result in significant returns to the Company, they involve a substantial degree of risk and may not show any return for a considerable period of time. In fact, many of these securities and investments ordinarily remain unpaid unless and until the company reorganizes and/or emerges from bankruptcy proceedings, and as a result may have to be held for an extended period of time. The level of analytical sophistication, both financial and legal, necessary for successful investment in companies experiencing significant business and financial distress is unusually high. There is no assurance that the Investment Manager will correctly evaluate the nature and magnitude of the various factors that could affect the prospects for a successful reorganization or similar action. In any reorganization or liquidation proceeding relating to a company in which the Company invests, the Company may lose its entire investment or may be required to accept cash or securities with a value less than the Company's original investment. Under such circumstances, the returns generated from the Company's investments may not compensate the Partners adequately for the risks assumed.

**Portfolio Turnover**. The Company's annual portfolio turnover rate may vary, depending on market conditions, and at times the Company will engage in substantial short-term trading. Accordingly, the Company's annual portfolio turnover rate may range from 10% to 200% or more. (An annual portfolio turnover rate of 100% would occur, for example, if all of the investments in the Company's portfolio were replaced in a period of one year). The Company has not placed any limit on the rate of portfolio turnover and portfolio securities may be sold without regard to the time they have been held when, in the opinion of the Investment Manager, investment considerations warrant such action. A high rate of portfolio turnover involves correspondingly greater expenses than a lower rate.

**Newly Created Securities; Initial Public Offerings**. The Company may invest in securities sold pursuant to initial public offerings (so-called "new issues") or securities created as a result of spin-offs, split-offs, recapitalizations or other significant corporate events. The risk of loss associated with new issues is greater than that in connection with general securities trading. While the Investment Manager believes that new issues offer significant potential for gain, the prices of newly issued securities may not increase as expected, and in fact may decline to a

significant extent. Securities created as a result of spin-offs, split-offs, recapitalizations or other corporate events have no public market prior to their initial offering or creation and there is no assurance that (i) an active public market in such securities will develop or continue after commencement of trading or (ii) that the initial public offering price or initial trading level of such securities will be indicative of the market price for such securities on a "fully-distributed" basis.

**Index-Based Trading**. Trading in index-based unit investment trusts and exchange-traded funds generally involves risks similar to other securities trading. Additionally, these instruments may not move in tandem with the indices upon which they are based.

**Failure of Brokers and Other Depositories**. There is the possibility that the institutions, including brokerage firms and banks, with which the Company will do business, or with whom securities may be entrusted for custodial purposes, will encounter financial difficulties that may impair the operational capabilities or the capital position of the Company. The Company may maintain a substantial portion of its assets in clearing accounts pursuant to clearing agreements with foreign clearing firms (including banks and brokers) and foreign affiliates of United States broker-dealers. Foreign clearing firms are generally not subject to United States laws and regulations and foreign markets may be subject to less regulation and supervision than in the United States. Transaction costs of investing in non-U.S. securities in foreign markets may be higher than in the United States and clearance procedures may be less efficient.

**Company Risks**

**Transferability and Withdrawal Restrictions**. Shares are subject to restrictions with respect to redemption, withdrawal, assignment and transfer under the Partnership Agreement. Partners may redeem their Shares in the Company on an annual basis following the Initial Lock-Up Period, but their rights of redemption may be suspended or delayed in certain circumstances as described herein. Partners will not have the right to liquidate their investment in the Company in the event of an emergency or for any other reason. The General Partner has the sole discretion to permit a withdrawal at a time other than at the end of a calendar year following the applicable lock-up period. An investment in the Company therefore provides limited liquidity.

**Limited Rights of Partners**. Partners, other than the General Partner, cannot exercise any management or control functions with respect to the Company's operations, although they have limited rights and duties as set forth in the Partnership Agreement.

**Reserves May Affect Withdrawals**. The General Partner may find it necessary, from time to time, to establish a reserve for contingent liabilities. Such reserve would be an asset of the Company but would diminish the amount of capital available to Company redemptions and withdrawals.

**Illiquidity of Shares**. The Shares may be acquired for investment purposes only and not with a view to their resale or other distribution. The Shares will not be registered under the Securities Act in reliance on an exemption under Section 4(a)(2) of the Securities Act and

**Regulation D promulgated thereunder**. The Partnership Agreement substantially restricts the transferability or assignability of the Shares or redemption from the Company. The General Partner's consent is a condition to any transfer or assignment, and such consent is within its sole discretion. If, as a result of some change in circumstances, arising from an event not presently contemplated, a Partner wishes to transfer all or part of its Interest, and even if all conditions to such a transfer are met, such Partner may find no transferee for its Interest due to market conditions or the general illiquidity of the Shares.

**Limitations on the Obligations of the Principals of the General Partner**. The principals of the General Partner will devote only such time to Company matters as they, in their sole discretion, deem appropriate. The General Partner will have the sole right to conduct the operations of the Company in such manner, as it deems proper. The other Partners will have no such authority and will be dependent upon the judgment and skill of the General Partner.

**Risks Associated With the Carried Interest**. The General Partner is an associate of the Investment Manager. The Carried Interest could encourage the Investment Manager to make investments on behalf of the Company that are riskier or more speculative than it would if the General Partner were receiving only a flat fee. Further, the General Partner will receive the Carried Interest as to unrealized gains that may never be realized and will not return a Carried Interest allocated for a period in which there is a profit, even if in a subsequent period the Company does not earn a profit or suffers a loss. As a result, the Carried Interest may be greater than it would be if it were based solely on realized gains.

**Effect of Substantial Withdrawals**. Substantial withdrawals by Partners within a short period of time could require the Company to liquidate positions more rapidly than would otherwise be desirable, possibly reducing the value of the Company's assets and/or disrupting the Investment Manager's investment strategy. Reducing the size of the Company could make it more difficult to generate a positive return or to recoup losses due to, among other things, reductions in the Company's ability to take advantage of particular investment opportunities or decreases in the ratio of its income to its expenses.

**Potential Mandatory Withdrawal**. The General Partner may, in its sole discretion at any time on written notice, require a Partner to withdraw all or a portion of its Interest(s). Such mandatory redemption could result in adverse tax and/or economic consequences to such Partner.

**Other Risks**

**Tax Risks**. For a discussion of income tax risks associated with an investment in the Company, see the discussion below under "Certain Federal Income Tax Considerations."

**Tax Exempt Investors; Limitations on Investments**. Certain prospective Partners may be subject to Federal and state laws, rules and regulations which may regulate their participation in the Company, or their engaging directly, or indirectly through an investment in the Company, in investment strategies of the types which the Company may utilize from time to time. While the Company believes its investment program is generally appropriate for tax-exempt organizations for which

EXHIBIT B
PAGE 52

an investment in the Company would otherwise be suitable, each type of exempt organization may be subject to different laws, rules and regulations, and prospective Partners should consult with their own advisers as to the advisability and tax consequences of an investment in the Company. In particular, exempt organizations should consider the applicability to them of the provisions relating to "unrelated business taxable income." Investments in the Company by entities subject to ERISA, and other tax-exempt entities require special consideration.

**Regulatory Matters.**

**Investment Company Regulation.** Section 3(c)(1) of the Act excludes from regulation issuers (i) whose outstanding securities are beneficially owned by not more than 100 persons, and (ii) who are not making and do not presently propose to make a public offering of their securities. The General Partner believes that, by virtue of section 3(c)(1) of the Act the Company should not be deemed to be an "investment company" and, accordingly, should not be required to register as such under the Act.

Should private investment company exclusions cease to be available to the Company, the Company and the General Partner could be subject to legal action by the SEC and others, possibly resulting in financial losses to the Company and the termination of the Company's business.

**Private Offering Exemption.** The Company intends to offer Shares on a continuing basis without registration under any securities laws in reliance on an exemption for "transactions by an issuer not involving any public offering." While the General Partner believes reliance on such exemption is justified, there can be no assurance that factors such as the manner in which offers and sales are made, concurrent offerings by other companies, the scope of disclosure provided, failures to make notice filings, or changes in applicable laws, regulations, or interpretations will not cause the Company to fail to qualify for such exemption under Federal or one or more states' laws. Failure to so qualify could result in the rescission of sales of Shares at prices higher than the current value of those Shares, potentially materially and adversely affecting the Company's performance and business. Further, even non-meritorious claims that offers and sales of Shares were not made in compliance with applicable securities laws could materially and adversely affect the General Partner's ability to conduct the Company's business.

**Compliance with ERISA.** If the assets of the Company were to become "plan assets" subject to ERISA and Section 4975 of the Code, certain investments made or to be made by the Company in the normal course of its operations might result in non-exempt prohibited transactions and might have to be rescinded (see "Certain ERISA Considerations"). If at any time the General Partner determines that assets of the Company may be deemed to be "plan assets" subject to ERISA and Section 4975 of the Code, the General Partner may take certain actions it may determine to be necessary or appropriate, including requiring one or more investors to redeem or otherwise dispose of all or part of their Shares in the Company or terminating and liquidating the Company.

**Other.** The Company and the General Partner will be subject to various other securities and similar laws and regulations that could limit some aspects of the Company's operations or subject the Company or the General Partner to the risk of sanctions for noncompliance.

THE FOREGOING LISTS OF RISK FACTORS DO NOT PURPORT TO BE A COMPLETE EXPLANATION OF THE RISKS INVOLVED IN THIS OFFERING. POTENTIAL INVESTORS MUST READ THE ENTIRE MEMORANDUM, THE OPERATING AGREEMENT AND THE SUBSCRIPTION DOCUMENTS BEFORE DETERMINING WHETHER TO INVEST IN THE COMPANY. ALL POTENTIAL INVESTORS MUST OBTAIN PROFESSIONAL GUIDANCE FROM THEIR TAX AND LEGAL ADVISERS IN EVALUATING ALL OF THE TAX IMPLICATIONS AND RISKS INVOLVED IN INVESTING IN THE COMPANY.

**IRS Circular 230 Notice.** To ensure compliance with requirements imposed by the IRS, we are required to inform you that any U.S. federal tax advice contained in this document is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter that is contained in this document.

## ADDITIONAL INFORMATION

Each offeree and/or his or its advisor(s) will be offered an opportunity, prior to the consummation of a sale of an Interest to such offeree, to ask questions of, and receive answers from, the General Partner concerning the terms and conditions of this offering and to obtain any additional information, to the extent the General Partner possesses such information or can acquire it without unreasonable effort or expense, necessary to verify the accuracy of the information set forth herein

EXHIBIT B
PAGE 53

NOTICES

## NOTICES FOR U.S. INVESTORS

**JURISDICTIONAL NOTICES**

The National Securities Markets Improvement Act ("NSMIA") amended Section 18 of the Securities Act of 1933 to exempt from state regulation any offer or sale of covered securities exempt from registration pursuant to Commission rules or Regulations issued under Section 4(2) and 4(6) of the Securities Act of 1933. The Company claims qualification pursuant to Section 18(b)(4)(d) and/or Section 18(b)(3) of the Federal Securities Act of 1933, as amended (the "Act") and, as such, these securities are considered to be "covered securities" pursuant to the Act.

**NASAA UNIFORM LEGEND**

In making an investment decision, investors must rely on their own examination of the person or entity creating the securities and the terms of this offering, including the merits and risks involved. These securities have not been recommended by federal or state securities commissions or regulatory authorities. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this document. Any representation to the contrary is a criminal offense. These securities are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the securities act, and the applicable state securities laws pursuant to registration or exemption therefrom. Investors should be aware that they will be required to bear the financial risks of this investment for an indefinite period of time.

**BLUE SKY NOTICES**

It is anticipated that the securities described herein may be offered for sale in several states. The securities blue sky laws of some of those states require that certain conditions and restrictions relating to the offering be disclosed. A description of the relevant conditions and restrictions required by the states in which the company may offer its securities for sale is set forth below, or attached.

## STATE NOTICE REQUIREMENTS

**NOTICE REQUIREMENTS IN STATES WHERE SHARES MAY BE SOLD ARE AS FOLLOWS:**

1. For Alabama residents: these securities are offered pursuant to a claim of exemption under the Alabama securities act. A registration statement relating to these securities has not been filed with the Alabama securities commission. The commission does not recommend or endorse the purchase of any securities, nor does it pass upon the accuracy or completeness of any private placement memorandum. Any representation to the contrary is a criminal offense. The purchase price of the interest acquired by a non-accredited investor residing in the state of Alabama may not exceed 20% of the purchaser's net worth.

2. For Alaska residents: the securities offered have not been registered with the administrator of securities of the state of Alaska under provisions of 3 AAC 08.500-3 AAC 08,506. The investor is advised that the administrator will make only a cursory review of the registration statement and has not reviewed this document since the document is not required to be filed with the administrator. The fact of registration does not mean that the administrator has passed in any way upon the merits, recommended, or approved the securities. Any representation to the contrary is a violation of a. S. 45.55.170. The investor must rely on the investor's own examination of the person or entity creating the securities and the terms of the offering, including the merits and risks involved, in making an investment decision on these securities.

3. For Arizona residents: the securities offered have not been registered under the securities act of Arizona, as amended, and are offered in reliance upon an exemption from registration pursuant to A.R.S. section 44-1844(1). The securities cannot be resold unless registered under the act or pursuant to an exemption from registration.

4. For Arkansas residents: these securities are offered pursuant to a claim of exemption under section 14(b)(14) of the Arkansas securities act and section 4(2) of the securities act of 1933. A registration statement relating to these securities has not been filed with the Arkansas securities department or with the Securities and Exchange Commission. Neither the department nor the commission has passed upon the value of these securities, made any recommendations as to their purchase, approved or disapproved the offering, or passed upon the adequacy or accuracy of this memorandum. Any representation to the contrary is unlawful. The purchase price of the interest acquired by an unaccredited investor residing in the state of Arkansas may not exceed 20% of the purchaser's net worth.

5. For California residents: these securities have not been registered under the securities act of 1933, as amended, or the California corporations code, by reason of specific exemptions thereunder relating to the limited availability of the offering. These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available.

6. For Colorado residents: these securities have not been registered under the securities act of 1933, as amended, or the Colorado securities act of 1981, by reason of specific exemptions thereunder relating to the limited availability of the offering. These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available.

**EXHIBIT B
PAGE 54**

7.  For Connecticut residents:  these securities have not been registered under section 36-485 of the Connecticut uniform securities act and therefore cannot be resold unless they are registered under such act or unless an exemption from registration is available. Connecticut has adopted the accredited investor exemption. A single form must be filed within 15 days after the first sale in the state.

8.  For Wyoming residents:  these securities have not been registered under the Wyoming securities act and are offered pursuant to a claim of exemption under section 7309(b)(9) of the Wyoming securities act and rule 9(b)(9)(11) thereunder. These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered under the act or an exemption is available.

9.  For District of Columbia residents:  these securities have not been registered under the District of Columbia securities act since such act does not require registration of securities issues. These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available.

10. For Florida residents:  these securities have not been registered under the securities act of 1933, as amended, or the Florida securities act, by reason of specific exemptions thereunder relating to the limited availability of the offering. These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or exemption from registration is available.

The securities referred to herein will be sold to, and acquired by, the holder in a transaction exempt under section 517.061 of the Florida securities act. The Shares have not been registered under said act in the state of Florida. In addition, all Florida residents shall have the privilege of voiding the purchase within three (3) days after the first tender of consideration is made by such purchaser to the issuer, an agent of the issuer, or an escrow agent or within three (3) days after the availability of that privilege is communicated to said purchaser, whichever occurs later.

11. For Georgia residents:  these securities have not been registered under securities act of 1933, as amended, or section 10-5-5 of the Georgia securities act of 1973 and are being sold in reliance upon exemption s therefrom. These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available. The investment is suitable if it does not exceed 20% of the investor's net worth.

12. For Hawaii residents:  these securities have not been registered under the securities act of 1933, as amended, or the Hawaii uniform securities act (modified), by reason of specific exemptions thereunder relating to the limited availability of the offering. These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available.

13. For Idaho residents:  these securities have not been registered under the Idaho securities act (the "act") and may be transferred or resold by residents of Idaho only if registered pursuant to the provisions of the act or if an exemption from registration is available. The investment is suitable if it does not exceed 10% of the investor's net worth.

14. For Illinois residents:  these securities have not been approved or disapproved by the secretary of state of Illinois or the state of Illinois, nor has the secretary of state of Illinois or the state of Illinois passed upon the accuracy or adequacy of this memorandum. Any representation to the contrary is a criminal offense.

15. For Indiana residents:  these securities have not been registered under section 3 of the Indiana blue sky law and are offered pursuant to an exemption pursuant to section 23-2-1-2(b)(10) thereof and may be transferred or resold only if subsequently registered or if an exemption from registration is available. Investors should be aware that they will be required to bear the financial risks of this investment for an indefinite period of time. Indiana requires investor suitably standards of a net worth (exclusive of home, furnishings, and automobiles) of three times the investment but not less than $75,000 or a net worth (exclusive of home, furnishings, and automobiles) of twice the investment but not less than $30,000 and gross income of $30,000.

16. For Iowa residents:  these securities have not been registered under the Iowa uniform securities act (the "act") and are offered pursuant to a claim of exemption under section 502.203(9) of the act requiring sales to accredited investors only. These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available. Investors should be aware that they will be required to bear the financial risks of this investment for an indefinite period of time.

17. For Kansas residents:  these securities have not been registered under the securities act of 1933, as amended, or the Kansas securities act, by reason of specific exemptions thereunder relating to the limited availability of the offering. These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available.

18. For Kentucky residents:  these securities have not been registered under the securities act of 1933, as amended, or the securities act of Kentucky, by reason of specific exemptions thereunder relating to an exemption for accredited investors. These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available.

19. For Louisiana residents:  these securities have not been registered under the securities act of 1933, as amended, or the Louisiana securities law, by reason of specific exemptions thereunder relating to the limited availability of the offering. These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available. The investment is suitable if it does not exceed 25% of the investor's net worth.

20. For Maine residents:  these securities are being sold pursuant to an exemption from registration with the bank superintendent of the state of Maine under section 10502(2)(r) of title 32 of the Maine revised statutes. These securities may be deemed restricted securities and as such the holder may not be able to resell the securities unless pursuant to exemption under state or federal securities laws or unless an exemption under such laws exists.

21. For Maryland residents:  these securities have not been registered under the securities act of 1933, as amended, or the Maryland securities act, by reason of specific exemptions thereunder relating to an exemption for accredited investors. These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available.

22. For Massachusetts residents:  these securities have not been registered under the securities act of 1933, as amended, or the Massachusetts uniform securities act, by reason of specific exemptions thereunder relating to the limited availability of the offering. These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available.

23.  For Michigan residents:  these securities have not been registered under section 451.701 of the Michigan uniform securities act (the "act") and may be transferred or resold by residents of Michigan only if registered pursuant to the provisions of the act or if an exemption from registration is available.  The investment is suitable if it does not exceed 10% of the investor's net worth.

24.  For Minnesota residents:  the securities represented by this memorandum have not been registered under chapter 80a of the Minnesota securities laws and may not be sold, transferred, or not otherwise disposed of except pursuant to registration or an exemption therefrom.

25.  For Mississippi residents:  the securities, if offered, must be offered pursuant to a certificate of registration issued by the secretary of state of Mississippi pursuant to rule 477, which provides a limited registration procedure for certain offerings.  The secretary of state does not recommend or endorse the purchase of any securities, nor does the secretary of state pass upon the truth, merits, or completeness of any offering memorandum filed with the secretary of state, any representation to the contrary is a criminal offense.

26.  For Missouri residents:  these securities have not been registered under the securities act of 1933, as amended, or the Missouri uniform securities act, by reason of specific exemptions thereunder relating to the limited availability of the offering.  These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available.

27.  For Montana residents:  these securities have not been registered under the securities act of 1933, as amended, or the securities act of Montana, by reason of specific exemptions thereunder relating to the limited availability of the offering.  These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available.

28.  For Nebraska residents:  these securities have not been registered under the securities act of 1933, as amended, or the securities act of Nebraska, by reason of specific exemptions thereunder relating to the limited availability of the offering.  These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available.

29.  For Nevada residents:  these securities have not been registered under the securities act of 1933, as amended, or the Nevada securities act, by reason of specific exemptions thereunder relating to the limited availability of the offering.  These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available.

30.  For New Hampshire residents:  these securities have not been registered under the securities act of 1933, as amended, or the New Hampshire uniform securities act, by reason of specific exemptions thereunder relating to the limited availability of the offering.  These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available.  The investment is suitable if it does not exceed 10% of the investor's net worth.

31.  For New Jersey residents:  the attorney general of the state of New Jersey has not passed on or endorsed the merits of this offering.  Nor has this document reflecting the within offering been filed with the bureau of securities or the department of law and public safety of the state of New Jersey.  Any representation to the contrary is unlawful.

32.  For New Mexico residents:  these securities have not been approved or disapproved by the securities bureau of the New Mexico department of

regulation and licensing, nor has the securities bureau passed upon the accuracy or adequacy of this memorandum, any representation to the contrary is a criminal offense.

33.  For New York residents:  these securities have not been registered under the securities act of 1933, as amended, or the New York fraudulent practices ("martin") act, by reason of specific exemptions thereunder relating to the limited availability, or otherwise disposed of to any person or entity unless subsequently registered under the securities act of 1933, as amended, or the New York fraudulent practices ("martin") act, if such registration is required.  This private offering memorandum has not been filed with or reviewed by the attorney general prior to its issuance and use.  The attorney general of the state of New York has not passed on or endorsed the merits of this offering.  Any representation to the contrary is unlawful.  Purchase of these securities involves a high degree of risk.  This private offering memorandum does not contain an untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; it contains a fair summary of the material terms of documents purported to be summarized herein.

34.  For North Carolina residents:  these securities have not been approved or disapproved by the Securities and Exchange Commission nor has the Securities and Exchange Commission or any state securities commission passed on the accuracy or adequacy of this memorandum.  Any representation to the contrary is a criminal offense. In making an investment decision, investors must rely on their own examination of the issuer and the terms of the offering, including merits and risks involved.  The securities have not been recommended by any federal or state securities commission or regulatory authority.  Furthermore, the foregoing authorities have not confirmed the accuracy or adequacy of this document.  Any representation to the contrary is a criminal offense.  The securities are subject to restrictions on transferability and resale and may not be transferred or sold except as permitted under the securities act of 1933, as amended, and the applicable statute securities laws, pursuant to registration or exemption therefrom.  Investors should be aware that they will be required to bear the financial risks of this investment for an indefinite period of time.  All purchasers must be purchasing for investment.

35.  For North Dakota residents:  these securities have not been approved or disapproved by the securities commissioner of the state of North Dakota nor has the commissioner passed upon the accuracy or adequacy of this memorandum.  Any representation to the contrary is a criminal offense.

36.  For Ohio residents:  these securities have not been registered under the securities act of 1933, as amended, or the Ohio securities act, by reason of specific exemptions thereunder relating limitations in who may purchase those securities offering.  These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available.

37.  For Oklahoma residents:  the securities represented by this certificate have not been registered under the securities act of 1933, as amended, or the Oklahoma securities act.  The securities have been acquired for investment and may not be sold or transferred for value in the absence of an effective registration of them under the securities act of 1933, as amended, and/or the Oklahoma securities act, or an opinion of counsel satisfactory to the issuer that such registration is not required under such act or acts.

38.  For Oregon residents:  the securities offered have not been registered with the corporation commissioner of the state of Oregon under provisions of oar 815 divisions 36.  This document is not required to be filed with the commissioner. The investor must rely on the investor's own examination of the company creating the securities and the terms of the offering, including the merits and risks involved in making an investment decision on these securities.

EXHIBIT B
PAGE 56

39.  For Pennsylvania residents:  the Shares offered hereby have not been registered under section 201 of the Pennsylvania securities act of 1972 (the "act") and may be resold by residents of Pennsylvania only if registered pursuant to the provisions of that act or if an exemption from registration is available. Each person who accepts an offer to purchase securities exempted from registration by section 203(d),(f),(p), or (r), directly from an issuer or affiliate of an issuer, shall have the right to withdraw his acceptance without incurring any liability to the seller, underwriter (if any), or any other person within two business days from the date of receipt by the issuer of his written binding contract of purchase or, in the case of a transaction in which there is no written binding contract of purchase, within two business days after he/she makes the initial payment for the securities being offered. Neither the Pennsylvania securities commission nor any other agency has passed on or endorsed the merits of this offering, and any representation to the contrary is unlawful.

40.  For Rhode Island residents:  these securities have not been registered under the securities act of 1933, as amended, or the blue sky law of Rhode Island, by reason of specific exemptions thereunder relating to the limited availability of the offering.  These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available.

41.  For South Carolina residents:  in making an investment decision, investors must rely on their own examinations of the person or entity creating the securities and terms of the offering, including the merits and risks involved. These securities have not been recommended by any federal or state securities commission or regulatory authority.  Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this document. Any representation to the contrary is a criminal offense.  These securities are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the securities act of 1933, as amended, and the applicable state securities laws, pursuant to registration or exemption therefrom.  Investors should be aware that they will be required to bear the financial risks of this investment for an indefinite period of time.

42.  For South Dakota residents:  these securities have not been registered under chapter 47-31 of the South Dakota securities laws and may not be sold, transferred, or otherwise disposed of for value except pursuant to registration, exemption therefrom, or operation of law. Each South Dakota resident purchasing one or more Shares must warrant that he has either (1) minimum net worth (exclusive of home, furnishings and automobiles) of $30,000 and a minimum annual gross income of $30,000 or (2) a minimum net worth (exclusive of home, furnishings and automobiles) of $75,000.  Additionally, each investor who is not an accredited investor or who is an accredited investor solely by reason of his net worth, income or amount of investment, shall not make an investment in the program in excess of 20% of his net worth (exclusive of home, furnishings and automobiles).

43.  For Tennessee residents:  these securities have not been registered under the securities act of 1933, as amended, or the Tennessee securities act of 1980, by reason of specific exemptions thereunder relating to the limited availability of the offering.  These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available.

44.  For Texas residents:  these securities have not been registered under the securities act of 1933, as amended, or the Texas securities act, by reason of specific exemptions thereunder relating to the limited availability of the offering.  These securities cannot be sold, transferred, or otherwise disposed of

to any person or entity unless they are subsequently registered or an exemption from registration is available. The investment is suitable if it does not exceed 10% of the investor's net worth.

45.  For Utah residents:  these securities have not been registered under the securities act of 1933, as amended, or the Utah uniform securities act, by reason of specific exemptions thereunder relating to the limited liability of the offering. These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available.

46.  For Vermont residents:  these securities have not been registered under the securities act of 1933, as amended, or the Vermont securities act, by reason of specific exemptions hereunder relating to the limited availability of the offering.  These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available.

47.  For Virginia residents:  these securities have not been registered under the securities act of 1933, as amended, or the Virginia securities act, by reason of specific exemptions thereunder relating to the limited availability of the offering.  These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available.

48.  For Washington residents:  this offering has not been reviewed or approved by the Washington securities administrator, and the securities offered have not been registered under the securities act (the "act") of Washington chapter 21.20 RCW and may be transferred or resold by residents of Washington only if registered pursuant to the provisions of the act or if an exemption from registration is available. The investor must rely on the investor's own examination of the person or entity creating the securities and the terms of the offering, including the merits and risks involved, in making an investment decision on these securities.

49.  For west Virginia residents:  these securities have not been registered under the securities act of 1933, as amended, or the west Virginia uniform securities act, by reason of specific exemptions thereunder relating to the limited availability of the offering.  These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available.

50.  For Wisconsin residents:  these securities have not been registered under the securities act of 1933, as amended, or the Wisconsin uniform securities law, by reason of specific exemptions thereunder relating to the limited availability of the offering.  These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available.

51.  For Wyoming residents:  these securities have not been registered under the securities act of 1933, as amended, or the Wyoming uniform securities act, by reason of specific exemptions thereunder relating to the limited availability of the offering.  These securities cannot be sold, transferred, or otherwise disposed of to any person or entity unless they are subsequently registered or an exemption from registration is available. Wyoming requires investor suitability standards of $250,000 net worth (exclusive of home, furnishings, and automobiles), and an investment that does not exceed 20% of the investor's net worth.

EXHIBIT B
PAGE 57

ATTACHEMENTS

Subscription Agreement

Partnership Agreement (available upon request)

EXHIBIT B
PAGE 58

SUBSCRIPTION AGREEMENT

_Fund Manager Signature_

Investor Signature
Date 10/14/2017

Investor Signature

EXHIBIT B
PAGE 59

# EXHIBIT C

EXHIBIT C
PAGE 60



# SUBSCRIPTION DOCUMENTS

Subscription Agreement & Investor Questionnaire
for the subscribing to ROSEGOLD INVESTMENTS LLP

Rosegold **Investments**

### ACCREDITED INVESTORS ONLY
### OR UP TO 35 NON-ACCREDITED INVESTORS

CONTENTS                                                           PAGE

SUBSCRIPTION INSTRUCTIONS ............................................................. 2
SUBSCRIPTION AGREEMENT ................................................................. 3
ACCREDITED INVESTOR CERTIFICATION.............................................. 9
QUALIFIED CLIENT CERTIFICATION ..................................................... 10
ERISA QUESTIONNAIRE ......................................................................... 11
QUESTIONNAIRE FOR INDIVIDUAL SUBSCRIBERS................................ 13
QUESTIONNAIRE FOR ENTITY SUBSCRIBERS ...................................... 14
NEW ISSUES QUESTIONNAIRE ............................................................... 15
NEW ISSUES QUESTIONNAIRE FOR INDIVIDUAL INVESTORS ............... 16
NEW ISSUES QUESTIONNAIRE FOR ENTITY INVESTORS ...................... 17
REGISTRATION INFORMATION (ALL) ..................................................... 19
WIRE INSTRUCTIONS ............................................................................. 19
WIRE TRANSFER PAYMENTS (ALL) ........................................................ 20
APPENDIX 1 Definitions for New Issues Questionnaire for Individual Partners ...... 24
APPENDIX 2 Definitions for New Issues Questionnaire for Entities ............. 25
APPENDIX 3 Definitions for Anti-Money Laundering ............................... 26
APPENDIX 4 Bank Letter for Wire Payment ........................................... 27
APPENDIX 5 Documents Required ......................................................... 28
EXHIBIT A Anti-Money Laundering Certification Form ............................ 29
EXHIBIT B Instructions for Substitute Form W-9 ................................... 30
EXHIBIT C Privacy Policy ..................................................................... 32
SCHEDULE I Description of Assets ........................................................ 33

No.: _____

OCTOBER 2017

EXHIBIT C
PAGE 61

## SUBSCRIPTION INSTRUCTIONS

A.  **Completion of Subscription Documents.**

❑  <u>Subscription Agreement.</u> Read carefully pages 3 to 8 and Appendix 3 (page 26) for Anti-Money Laundering Definitions.

❑  <u>Accredited Investor Certification.</u> Complete page 9.

❑  <u>Qualified Client Certification.</u> Complete page 10.

❑  <u>ERISA Questionnaire.</u> Complete page 11.

❑  <u>Informational Questionnaire:</u> Complete as applicable.

- <u>Individuals.</u> Pages 13.

- <u>Entities.</u> Pages 14.

❑  <u>New Issues Questionnaire.</u> Complete pages 15.

- <u>Individuals.</u> Pages 16.

- <u>Entities.</u> Pages 17 and 18.

❑  <u>Registration Information.</u> Complete all information on page 19.

❑  <u>Wire Transfer Page.</u> Pages 19 and 20.

❑  <u>Signature Pages.</u> Complete and sign pages 21 and 22.

❑  <u>Existing Investors Subscription Form.</u> Page 23.

❑  <u>Letter From Your Bank.</u> See Section B below and Appendix 4 (Page 27).

❑  <u>Substitute Form W-9.</u> All Subscribers should complete Exhibit B (Page 30).

❑  <u>Completion Instructions for Existing Partners.</u> If you are an existing Member adding to your investment and, if all information previously provided remains accurate, you only have to complete the form entitled "Existing Investors Subscription Request" (on page 23) instead of pages 3 to 22 and then follow the payment and delivery instructions below.

B.  **Payment.** Your subscription payment should be made at the time you deliver the completed Subscription Documents. All subscription payments must be by wire transfer. Please see the wire transfer instructions on page 18; and ask your paying bank to either complete the letter set out in Appendix 4, or provide the same information set out in the letter in a different form and return it to the General Partner by facsimile at the same time as it remits subscription funds to the Company.

C.  **Documents Required.** Please refer to Appendix 5 (Page 28) for the documentation required of all subscribers.

D.  **Delivery of Subscription Agreement.** All documents can be emailed to the General Partner at: info@rosegoldinvestments.com.

The original of all documents should then be sent by courier:

ROSEGOLD INVESTMENTS LLP
c/o Master Investment Group
5694 Mission Center Rd.
Suite 489
San Diego, CA 92108
Tel: 800-757-7617
Fax:
Skype:
info@rosegoldinvestments.com
www.rosegoldinvestments.com

EXHIBIT C
PAGE 62

# SUBSCRIPTION AGREEMENT

Recognizing that NEW HEDGE FUND US LP, a Delaware Partnership (the "Company") and INVESTMENT MANAGER LLC (the "General Partner") rely on the information set forth herein, and that all such information shall be continuing and shall survive the execution of this Subscription Agreement, each of the undersigned subscriber(s) (each a "Subscriber") makes the following statements which shall constitute representations and warranties of the Subscriber. Each Subscriber also agrees to notify the Company and the General Partner if any such statement becomes incomplete or inaccurate. Terms used in this Subscription Agreement but not defined herein shall have the meanings assigned to them in the Company's e Offering Memorandum dated MAY 2015, as the same may be amended or supplemented from time to time, and in the Company's Partnership Agreement (the "Company Agreement", and together with the Private Offering Memorandum (the "Memorandum"). Subscribers to the Partnerships must complete all relevant sections of this Subscription Agreement. Failure to do so may result in delay of acceptance of a Subscriber's subscription until a properly completed Subscription Agreement has been received, processed and approved.

## SUBSCRIBER DECLARATIONS

1. **Application.** The undersigned subscriber ("Subscriber") hereby applies for the Membership Interest ("Membership") issued by the Company, to reflect the subscription amount set forth below under "Registration Information." Funds in the amount of the subscription accompany this Subscription Agreement or will be provided in a form and at a time acceptable to the General Partner. The Subscriber acknowledges that unless the General Partner in its discretion agrees otherwise, the Company will hold subscription proceeds that are not received in a timely manner in the Company's subscription account until the next subscription acceptance date.

2. **Memorandum.** The Subscriber declares that he/she/it has carefully read, understands, and agrees to abide by the terms and conditions set forth in the Memorandum.

3. **Information Available.** The Subscriber confirms that the Company has made available to the Subscriber the opportunity to ask questions of, and receive answers from, the Company concerning the Memberships and the terms and conditions of this offering, and to obtain any additional non-proprietary information which the Company has in its possession or was able to acquire without unreasonable effort or expense that was necessary to verify the accuracy of the information in the Memorandum.

4. **Legal Requirements.** All legal requirements necessary or appropriate in connection with the purchase of the Membership have been complied with and each person signing this Subscription Agreement has full legal authority, capacity and power to do so and the Subscriber is not precluded by law, contract or otherwise from purchasing a Membership.

5. **Subscriptions.** The Subscriber understands that this subscription, once made, is irrevocable by the Subscriber, and that the General Partner (the "Management Company") will advise the Subscriber as soon as practicable whether this Subscription

Agreement, together with all or a portion of the subscription amount, has been accepted or rejected. Subscriptions may be rejected in whole or in part by the General Partner in its sole and absolute discretion.

6. **Payments.** The Subscriber understands that any wire transfers sent to a financial institution pursuant to the Subscriber's requested instruction will constitute payment to the Subscriber and relieve the Company of any further obligation to the Subscriber with respect to the amounts so paid, and the Subscriber releases the Company from any further obligation with respect thereto. The Subscriber understands that the Company may impose such procedures as it deems appropriate before it will act upon any payment instructions from the Subscriber.

7. **Reliance on Information Provided.** The Subscriber acknowledges that in deciding to invest in the Company, the Subscriber has relied solely upon the information in the Memorandum and nothing else. The Subscriber acknowledges that no person is authorized to give any information or to make any statement not contained in the Memorandum, and that any information or statement not contained in the Memorandum must not be relied upon as having been authorized by the Company.

8. **Securities Act of 1933 and Blue Sky Laws.** The Subscriber understands that the offering and sale of Memberships are intended to be exempt from registration or qualification under the Securities Act of 1933, as amended (the "1933 Act") and any applicable state or other securities laws and that the Company and the offering of the Memberships have not been approved, disapproved, or passed on by any federal or state agency or commission or by any exchange or other self-regulatory organization. The Subscriber has a pre-existing relationship with the General Partner, its members, or its principals, employees, agents or affiliates.

9. **Investment Company Act of 1940.** The Subscriber understands and agrees that the Company is intended to

EXHIBIT C
PAGE 63

be exempt from registration, and will not register, under the Investment Company Act of 1940, as amended (the "1940 Act"). Accordingly, the Subscriber represents and warrants, except to the extent otherwise previously specifically disclosed to the General Partner in writing by the Subscriber, that (a) it is, and the Membership to be held by the Subscriber in the Company will be considered to be beneficially owned by, "one person" for purposes of Section 3(c)(1) of the 1940 Act, (b) it is holding the Membership for its own account and not for the account of any other person, (c) it does not invest more than 40% of its total assets in any single entity, including the Company, which is excluded from the definition of an investment company solely by reason of Section 3(c)(1) of the 1940 Act, and (d) if an entity, the Subscriber further represents and warrants that: (i) the Subscriber was not formed for the purpose of investing in the Company or to permit the Company to avoid classification as an investment company under the 1940 Act; (ii) the Subscriber (as opposed to its beneficial owners) is not making this investment with a principal purpose of enabling the Company to satisfy the 100 person "safe-harbor" for avoiding "publicly traded" Company status under the Internal Revenue Code; (iii) the Subscriber is not an "investment company" within the meaning of the 1940 Act and would not be an investment company but for the exceptions to the definitions of investment company provided by Sections 3(c)(1) or 3(c)(7) thereof; (iv) the holders of beneficial Memberships in the Subscriber are not able to decide individually whether to participate, or the extent of their participation in the Subscriber's investment in the Company; (v) the Subscriber is not a defined contribution plan which allows participants to determine whether or how much will be invested in investments on their behalf; (vi) to the best of the Subscriber's knowledge, the Subscriber does not control, is not under common control with, or controlled by, any other investor in the Company; and (vii) no persons other than the Subscriber will have a beneficial interest in the Membership to be acquired hereunder (other than as a beneficial owner of an equity interest in the Subscriber). The Subscriber hereby consents to the treatment of the Company as a Qualified Purchaser under Section 2(a)(51)(A) of the 1940 Act with respect to any investments by the Company in other funds, and hereby represents and warrants that it has obtained the consent to such treatment of the Company from each of its beneficial owners as required under Section 2(a)(51)(C) of the 1940 Act and Rule 2(a)(51)-2(a) and (c)-(e) promulgated thereunder.

10. **Consent to Conversion of Company to a 3(c)(7) Fund.** The Company is being operated as a fund under Section 3(c)(1) of the 1940 Act. As a result, the number of members in the Company is limited to 100 persons. The Subscriber understands that if the Company approaches this 100-person limit, the General Partner intends to convert the Company into a fund that operates under Section 3(c)(7) of the 1940 Act. The Subscriber hereby consents to such a conversion and, if at the time such a conversion occurs it is not a "qualified purchaser" as defined in the 1940 Act, it agrees to have its Membership in the Company exchanged for Memberships in a new limited liability company (the "New 3(c)(1) Fund") that is identical to the Company in all material respects, including its investment strategies and objectives, except that investors in the New 3(c)(1) Fund will not be required to be "qualified purchasers." The Subscriber hereby further consents to, and authorizes the General Partner to take whatever actions and grants to the General Partner whatever rights are necessary, on its behalf, to effect such a conversion and exchange.

11. **Disposition.** The Subscriber understands and agrees that the Membership may not be offered for sale, sold, pledged, hypothecated, transferred, assigned, or otherwise disposed of (collectively "Dispose"), and the Subscriber will not Dispose or attempt to Dispose of its Membership without the prior written consent of the General Partner, which consent may be granted or withheld in the General Partner's sole and absolute discretion. The Subscriber also understands that the Membership may not be resold unless subsequently registered or unless an exemption from registration is available, and that the Subscriber does not have the right to require such registration. The Subscriber further understands that Rule 144 under the 1933 Act will not be available to permit resale of the Membership and that there is and will be no public market for the Membership.

12. **Suitability.** The Subscriber represents and warrants that (a) the Subscriber meets the suitability requirements set forth in the Memorandum, (b) the purchase of the Membership represents risk capital, (c) the Subscriber is able to afford a Membership in a speculative venture having the risks and objectives of the Membership and can sustain a loss of this entire investment, (d) the Subscriber is not precluded by law, contract or otherwise from purchasing the Membership, (e) the Subscriber, either alone or with its financial advisor(s), is experienced in investments of this kind, is capable of evaluating the merits and risks of this investment, and has not relied upon a Purchaser Representative in determining whether to invest in the Company, and (f) the Subscriber, or any person controlling, controlled by, or under common control with the Subscriber or any person having a beneficial interest in the Subscriber, is not a "Prohibited Investor" as such term is defined in Appendix 3, and the Subscriber is not investing and will not invest in the Company on behalf of or for the benefit of any "Prohibited Investor."

EXHIBIT C
PAGE 64

13. **Fiduciary Capacity.** If the Subscriber is purchasing a Membership in a fiduciary capacity, all statements made herein relate to the person or entity for whom the Subscriber is acting.

14. **Information Provided.** The information provided by the Subscriber under "Registration Information," the Accredited Investor Certification, Qualified Client Certification, ERISA Questionnaire, "New Issues" Questionnaire, and each other required Questionnaire is true and correct and may be relied upon conclusively by the Company and its agents. The Subscriber hereby confirms that the Company and the General Partner are each authorized and instructed to accept and execute any instructions given by the Subscriber by facsimile or e-mail. If instructions are given by the Subscriber by facsimile or e-mail, the Subscriber undertakes to forward the original immediately by post to the General Partner and agrees to keep each of the Company, General Partner, the Management Company and the General Partner indemnified against any loss of any nature whatsoever arising to any of them as a result of any of them acting upon facsimile or e-mail instructions. The General Partner, the Company, the General Partner, and the Management Company may rely conclusively upon and shall incur no liability in respect of any action taken upon any notice, consent, request, instructions or other instrument believed in good faith to be genuine or to be signed by properly authorized persons.

15. **Other Documentation.** The Subscriber understands that the Company may require other documentation in addition to this Subscription Agreement prior to deciding whether to accept this subscription, and Subscriber agrees to provide it, if reasonably requested.

16. **Taxpayer Certification Concerning Status as a U.S. Person.** The Subscriber certifies that the information provided in Exhibit B is true and complete in all respects. The Subscribers who are U.S. citizens or residents and who fail to provide their correct Social Security or taxpayer identification numbers could be subject to United States withholding tax on a portion of their distributive shares of the Company's income.

17. **Company Status.** The Subscriber shall not become a Member until the Subscriber's name is entered as a Member on the books and records of the Company.

18. **Powers of Attorney.**

    (a) Appointment of General Partner for Administration Matters. The Subscriber hereby irrevocably constitutes and appoints the General Partner the true and lawful attorney-in-fact of the Subscriber in the Subscriber's name, place and stead to make, execute, sign, acknowledge, swear to, record, deliver and file any of the following documents: (i) the Company Agreement

and all documents permitted to be executed thereunder, and (ii) to the extent consistent with the provisions of the Company Agreement (A) all amendments and/or restatements of the Company Agreement adopted in accordance with the provisions thereof, (B) all documents that may be required to effect the dissolution and termination of the Company pursuant to the Company Agreement and the cancellation of the Certificate of Limited liability company, and (C) otherwise to take any such further action as may be necessary in connection with any aspect of the operations of the Company by giving the General Partner full power and authority to do and perform each and every act and thing whatever requisite and necessary to be done in and about the foregoing as fully as the undersigned might or could do if personally present, and by hereby ratifying and confirming all that the General Partner shall lawfully do or cause to be done by virtue thereof.

(b) Appointment of General Partner for Investment and Trading. The Subscriber hereby authorizes the General Partner, as its true and lawful agent and attorney-in-fact, with full power and discretionary authority to act in the Company's name, place and stead, to buy, sell (including short sales), hold and trade in securities on margin or otherwise, and to make all of the Company's trading and investment decisions, for the Company's account and risk, and to vote all proxies held by the Company.

(c) Coupled With a Membership. These foregoing powers of attorney are coupled with a Membership, are irrevocable and shall survive and be unaffected by any subsequent disability, or incapacity of the Subscriber (or if the Subscriber is an entity, by the dissolution or termination thereof).

19. **Liability and Indemnification.**

    (a) Liability. The Subscriber agrees that neither the Company, nor the General Partner, the Management Company or any of their respective principals, members, directors, officers or employees, shall incur any liability (i) in respect of any action taken upon any information provided to the Company by The Subscriber or for relying on any notice, consent, request, instructions, or other instrument believed in good faith to be genuine or to be signed by properly authorized persons on behalf of The Subscriber, including any document transmitted by facsimile or e-mail, or (ii) for adhering to Anti-Money Laundering Obligations set out in Declaration 21 or otherwise, or for adhering to any other legal requirement whether now or hereinafter in effect.

    (b) Indemnification. The Subscriber agrees that it will indemnify and hold harmless the Company, the General Partner, the Management Company, the

EXHIBIT C
PAGE 65

General Partner and each of their respective principals, members, directors, officers and employees from and against any and all direct and consequential loss, damage, liability, cost or expense (including reasonable attorneys' and accountants' fees, whether incurred in an action between the parties hereto or otherwise) (each, a "Loss") which the Company or any one of them may incur by reason of or in connection with (i) any misrepresentation made by the Subscriber or any of the Subscriber's agents, any breach of any representation or warranty of the Subscriber or the failure by the Subscriber to fulfill any of its covenants or agreements in this Subscription Agreement or in any other document delivered by the undersigned to the Company, (ii) the assertion of the Subscriber's lack of proper authorization from the Beneficial Owner(s) (as defined in Declaration 21) to execute and perform the obligations under this Subscription Agreement, and (iii) Declaration 21, or complying with any law, whether now or hereafter in effect, which is designed to combat international terrorism or to detect criminal activity.

20. **Anti-Money Laundering.**[*]

(a) <u>General.</u> the Subscriber acknowledges that due to anti-money laundering requirements operating in the United States, as well as the Company's own internal anti-money laundering policies, the Company may require further identification of the Subscriber and the source of subscription funds before this Subscription Agreement can be processed, subscription monies accepted, or a withdrawal request can be processed. The Company, the General Partner, the Management Company and each of their respective principals, members, directors, officers, and employees shall be held harmless and indemnified against any Loss arising as a result of a failure to process this Subscription Agreement or a withdrawal application if any information that has been required by an indemnified party has not been satisfactorily provided by the Subscriber. The Subscriber further acknowledges that all subscription payments transferred to the Company must originate directly from a bank or brokerage account in the name of the Subscriber. The Subscriber represents and warrants that it is not involved in any money laundering scheme and that acceptance by the Company of this application to subscribe for a Membership in the Company, together with acceptance of the appropriate remittance, will not breach any applicable rules and regulations designed to avoid money laundering, including the provisions of the Bank Secrecy Act

* See Appendix 3 for definitions of terms used in this Declaration, as amended. Specifically, the Subscriber

represents and warrants that all evidence of identity provided is genuine and all related information furnished and to be furnished is accurate. In order to comply with the anti-money laundering regulations applicable to the Company and the General Partner, the sample bank letter attached hereto as Appendix 4 should be completed by the financial institution which will be remitting the subscription monies on behalf of the subscriber.

(b) <u>Beneficial Ownership.</u>

(i) The Subscriber represents and warrants that it is subscribing for a Membership for the Subscriber's own account and own risk, and unless (A) the Subscriber advises the Company to the contrary in writing and (B) identifies with specificity supplementally each beneficial owner on whose behalf the Subscriber is acting, the Subscriber represents that it is not acting as a nominee for any other person or entity, and no other person or entity will have a beneficial or economic interest in the Subscriber's Membership. The Subscriber also represents that it does not have the intention or obligation to sell, distribute or transfer the Membership, directly or indirectly, to any other person or entity or to any nominee account.

(ii) If the Subscriber is (A) acting as trustee, agent, representative or disclosed nominee for another person or entity, or (B) an entity investing on behalf of underlying investors (including a Fund-of-Funds), other than a publicly traded company listed on an organized exchange (or a subsidiary or a pension fund of such a company) based in a Financial Action Task Force ("FATF") Compliant Jurisdiction (the persons, entities and underlying investors referred to in (A) and (B) being referred to collectively as the "Beneficial Owners"), the Subscriber represents and warrants that:

(1) the Subscriber understands and acknowledges the representations, warranties and agreements made herein are made by the Subscriber (a) with respect to the Subscriber, and (b) with respect to the Beneficial Owners;

(2) the Subscriber has all requisite power and authority from the Beneficial Owners to execute and perform the obligations under this Subscription Agreement;

(3) the Subscriber has adopted and implemented anti-money laundering policies, procedures and controls that comply with, and will continue to comply in all respects with, the

EXHIBIT C
PAGE 66

requirements of applicable anti-money laundering laws and regulations; and

(4) the Subscriber has verified the identity of or has access to the identity of all Beneficial Owners and their source of funds, holds evidence of or has access to such information, and (a) will make such information available to the Company upon request, or (b) will provide a written certificate of a senior officer of the Subscriber with respect to the Subscriber's compliance with the anti-money laundering policies, procedures and controls in the form of Exhibit A and Appendix 3 hereto, and, in either case, has procedures in place to ensure that no Beneficial Owner is a Prohibited Investor.

(iii) the Subscriber further represents and warrants that, to the best of its knowledge and belief, neither the Beneficial Owners nor any person controlling, controlled by, or under common control with the Beneficial Owners, nor any person having a beneficial or economic interest in the Beneficial Owners, is a Prohibited Investor or, unless disclosed to the Company in writing, a Senior Foreign Political Figure or a member of the Immediate Family or a Close Associate of a Senior Foreign Political Figure, and the Subscriber is not investing and will not invest in the Company on behalf or for the benefit of any Prohibited Investor. The Subscriber agrees promptly to notify the Company of any change in information affecting the representations and warranties in this Declaration 21.

21. **Source of Funds.** The Subscriber represents and warrants that the funds being used to make this investment are not derived from any unlawful or criminal activities, and that the Subscriber has accurately and fully answered all questions directed to the Subscriber, either orally or in writing, with respect to the source of funds being used to make this investment.

22. **Misstatements, Suspicious Activity, and Prohibited Investor Sanctions.** The Subscriber acknowledges that: (a) any misstatement will result in an immediate withdrawal of the Subscriber's Membership(s), (b) if the Company or its agents has a suspicion that a payment to the Company (by way of subscription or otherwise) or a payment from the Company (by way of withdrawal or otherwise) contains the proceeds of criminal conduct, that person may report such suspicion to the proper legal authorities, and (c) if the Company or its agents believe that the Subscriber or a Beneficial Owner of the Subscriber is a Prohibited Investor, the Company may

be obligated to freeze the Subscriber's investment, decline the Subscriber's withdrawal requests or segregate the assets constituting the Subscriber's investment with the Company's Membership in accordance with applicable law.

23. **Miscellaneous.**

(a) Entire Agreement. This Subscription Agreement and the Company Agreement represent the entire agreement of the parties with respect to the subject matter hereof and may not be changed or terminated, except in a writing signed by the Subscriber and the General Partner, or in the case of the Company Agreement, in accordance with procedures for amendments as set forth therein.

(b) Waivers. No waiver by any party of any breach of any term of this Subscription Agreement shall be construed as a waiver of any subsequent breach of that term or any other term of the same or of a different nature.

(c) Electronic Receipt of Important Documents. The Subscriber agrees to the receipt of important documents from the General Partner, the Management Company, and the General Partner by e-mail at the e-mail address that the Subscriber shall provide in the "Registration Information" section below. Such important documents include, but are not limited to, Part II of the Management Company's Form ADV, the Company's annual financial statements, and any other periodic reports or disclosure documents provided by the General Partner, the Management Company, and the General Partner. If the Subscriber changes its e-mail address, the Subscriber must promptly provide written notice to: NEW HEDGE FUND US LP, Neither the Company, the General Partner, the Management Company nor the General Partner will be held responsible for any failure of receipt of important documents delivered by e-mail in accordance with this section.

(d) Soft Dollars. The Subscriber acknowledges and agrees to the use of the research products and services by the General Partner, as discussed in the Memorandum, even if such use is not within the "safe harbor" of Section 28(e) of the U.S. Securities Exchange Act of 1934, as amended.

(e) Binding Nature. This Subscription Agreement and the rights, powers, and duties set forth herein shall bind and inure to the benefit of the heirs, executors, Managers, legal representatives, successors, and assigns of the parties hereto.

(f) Counterparts. This Subscription Agreement may be executed in one or more counterparts, each of which shall be an original and all of which taken together shall constitute one and the same instrument.

EXHIBIT C
PAGE 67

(g) <u>Governing Law.</u> This Subscription Agreement shall be deemed to have been made under, and shall be governed by, and construed in accordance with, the internal laws of the State of Delaware (excluding the law thereof which requires the application of or reference to the law of any other jurisdiction).

(h) <u>Arbitration.</u> Any claim for money damages between the parties in connection with this Subscription Agreement and/or in connection with the Company shall be resolved by binding arbitration on an expedited basis in the State of Pennsylvania in accordance with the then prevailing securities rules of the American Arbitration Association ("AAA") and any judgment may be entered into any court having jurisdiction thereof. In any such arbitration, to the extent permissible under AAA rules, (i) arbitrators shall be knowledgeable in industry standards and practices, (ii) the authority of the arbitrators shall be limited to construing and enforcing the express terms of this Subscription Agreement and the Company Agreement, and (iii) the arbitrators shall state the reasons for the award in a written opinion. If for any reason it is determined by a court of competent jurisdiction or the AAA, that the AAA is not the appropriate arbitration forum to resolve the claim, the claim shall be resolved before such other arbitration forum as the General Partner shall select.

(i) <u>Joint and Several Undertaking.</u> If more than one person is signing this Subscription Agreement as the Subscriber, each undertaking, declaration, representation, warranty, affirmation or appointment herein shall be a joint and several undertaking, declaration, representation, warranty, affirmation or appointment of all such persons. Actions of any one joint the Subscriber pursuant to this Subscription Agreement shall bind all the Subscribers. A subscription in joint names creates a joint tenancy with right of survivorship.

(j) <u>Swap or Derivative Transactions.</u> The Subscriber represents and warrants that the Subscriber has not entered into and will not enter into, in connection with the purchase of a Membership, whether directly or indirectly, a swap, variable insurance or annuity contract, structured note, option or other derivative instrument, the return or value of which is or will be based in whole or in part on the return of the Company and/or the Membership, in any such instance, unless the Subscriber has disclosed the same in writing to the Company and provided any additional information required by the Company.

**PLEASE TURN TO NEXT PAGE**

EXHIBIT C
PAGE 68

## ACCREDITED INVESTOR CERTIFICATION

**This Subscription is only available to suitable "Accredited Investors" or up to 35 Non-Accredited Investors as defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933. The Subscriber hereby represents and warrants that the Subscriber is an Accredited Investor because the Subscriber is:  (4 ☐check as applicable)**

(a)  ☐ An individual Subscriber who has; or an Individual Retirement Account (IRA); or a Keogh Plan covering only a self-employed individual; or a self-directed account of a one member retirement plan whose beneficial owner has, a net worth or joint net worth with that person's spouse at the time of his purchase in excess of $1,000,000 (excluding residence, furniture and automobiles).

(b)  ☐ An individual Subscriber who has; or an IRA; or a Keogh Plan covering only a self-employed individual; or a self-directed account of a one member retirement plan whose beneficial owner had, an income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and who reasonably expects an income of the same income level in the current year.

(c)  ☐ A corporation, a partnership, Massachusetts or similar business trust, a limited liability company or similar organization not formed for the specific purpose of making this investment, with total assets in excess of $5,000,000.

(d)  ☐ An entity in which all of the equity owners are Accredited Investors under Rule 501 of Regulation D under the 1933 Act ("Regulation D").

(e)  ☐ A trust with total assets in excess of $5,000,000, not formed for the specific purpose of making this investment, the investments of which are directed by a person with knowledge and expertise in financial and business matters, as described in Rule 506(b)(2)(ii) of Regulation D.

(f)  ☐ A bank, savings and loan association, broker, dealer, insurance company, investment company, business development company, licensed small business investment company or private business development company (as such terms are defined under applicable sections of the 1933 Act, the Securities Exchange Act of 1934, the 1940 Act, the Investment Advisers Act of 1940 (the "Advisers Act"), or the Small Business Investment Act of 1958).

(g)  ☐ An employee benefit plan within the meaning of ERISA if the investment decision is made by a Plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company or registered investment adviser.

(h)  ☐ An employee benefit plan within the meaning of ERISA or a plan established and maintained by a state or its political subdivisions or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, in each case with total assets in excess of $5,000,000.

(i)  ☐ An employee benefit plan which is completely self-directed and whose investment decisions are made by a person who is an "Accredited Investor" under Regulation D. If so, please explain.

_____

(j)  ☐ An organization described in Section 501(c)(3) of the Internal Revenue Code ("Code"), not formed for the specific purpose of making this investment, with total assets in excess of $5,000,000.

(k)  ☐ The General Partner, or an executive officer or director of the General Partner.

(1)  ☐ Other (please explain). _____

(m)  ☐ I am not an Accredited Investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933.

EXHIBIT C

PAGE 69

## QUALIFIED CLIENT CERTIFICATION

1.    The Subscriber hereby represents and warrants that it is (4 check one):

□   an individual or the individual participant of an IRA or employee benefit plan covering only one individual (an "Individual Participant");

□   a corporation, Company, limited liability company, association, joint-stock company, trust, an employee benefit plan or church plan within the meaning of ERISA, or any organized group of persons, whether incorporated or not, which does not rely on Section 3(c)(1) of the 1940 Act to avoid being deemed an investment company, is not a small business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, and is not registered or required to be registered as an investment company under the 1940 Act; or

□   a corporation, Company, limited liability company, association, joint-stock company, trust, or any organized group of persons, whether incorporated or not, which does rely on Section 3(c)(1) of the 1940 Act to avoid being deemed an investment company, is a small business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, or is registered or required to be registered as an investment company under the 1940 Act.

**IF YOU CHECKED BOXES (a) OR (b) TO QUESTION 1, PLEASE COMPLETE QUESTION 3 BELOW. IF YOU CHECKED BOX (c) IN QUESTION 1, PLEASE COMPLETE QUESTION 2 BELOW.**

2.    COMPLETE ONLY IF YOU CHECKED BOX (c) OF QUESTION 1 ABOVE. The Subscriber hereby represents and warrants that (4 check one):

□   each of its equity owners (i) has a net worth (which, for a natural person, can include assets held jointly with a spouse) which exceeds $1,500,000; or (ii) has an investment of at least $750,000 in the Company; or (iii) is a qualified purchaser within the meaning of Section 2(a)(51)(A) of the 1940 Act; or

□   it has the ability to, and does, allocate charges for performance fees so that its equity owners which do not meet 2(a)(i), (ii) or (iii) above are not charged a performance fee.

3.    COMPLETE ONLY IF YOU CHECKED BOX (a) OR (b) OF QUESTION 1 ABOVE. The Subscriber (or Individual Participant) hereby represents and warrants that (4 check applicable boxes):

□   the Subscriber's (or Individual Participant's) net worth (which, for a natural person, can include assets held jointly with a spouse) exceeds $1,500,000; or

□   the Subscriber (or Individual Participant) has invested, or is obligating itself hereby to invest, at least $750,000 in the Company; or

□   the Subscriber (or Individual Participant) is a qualified purchaser within the meaning of Section 2(a)(51)(A) of the 1940 Act.

**PLEASE TURN TO THE NEXT PAGE**

## ERISA QUESTIONNAIRE

### *(To be completed by all Subscribers)*

a)  Is the Subscriber, or is the Subscriber acting on behalf of:

    (i)    an **"Employee Benefit Plan"** which is subject to the fiduciary rules of ERISA: any plan, fund or program established or maintained by an employer or employee organization for the purpose of providing pension, welfare or similar benefits (i.e., deferred compensation arrangements) to employees, which is subject to the fiduciary rules of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"),

    (ii)    a **"Plan":** an individual retirement account ("IRA"), a Keogh plan or any other plan subject to Section 4975 of the Internal Revenue Code, as amended (the "Code") or

    (iii)    an entity which is deemed to hold the assets of any such Employee Benefit Plan or Plan (e.g., an entity of which 25% or more of any class of equity securities is held by entities described in (i), (ii) or (iii) of this Question 1(a), an insurance company separate account holding "plan assets") (any entity described in (i), (ii) or (iii) above, a "Benefit Plan Investor")?

❑  YES ❑ NO

    If the Subscriber is, or is acting on behalf of, a Benefit Plan Investor, please indicate the percentage of the Subscriber's units that will be held by Benefit Plan Investors on the Subscription Date: _____%

b)  Is the Subscriber a life insurance company using the assets of its general account?

❑  YES ❑ NO    If **"Yes,"** please complete the following:

    _____% of the assets of such general account represent the assets of Benefit Plan Investors within the meaning of the Plan Asset Regulation and the decision in John Hancock Mutual Life Insurance Company v. Harris Trust and Savings Bank, 510 U.S. 86 (1993).

c)  Is the Subscriber (i) a person who has discretionary authority or Control with respect to the assets of the Company or provides investment advice to the Company for a fee, direct or indirect, with respect to such assets or (ii) any Affiliate of any such person (a "Controlling Person").

❑  YES ❑ NO

**IF SUBSCRIBER ANSWERED 'NO' TO ALL OF QUESTIONS 1(a) THROUGH 1(d) ABOVE, PLEASE TURN TO THE APPROPRIATE INFORMATIONAL QUESTIONNAIRE:**

|  |  |
| --- | --- |
| **Individuals:** | **Page 13** |
| **Entities:** | **Page 14** |

**IF SUBSCRIBER ANSWERED `YES' TO ANY OF QUESTIONS 1(a) THROUGH 1(d),**

**PLEASE TURN TO THE FOLLOWING PAGE.**

EXHIBIT C
PAGE 71

With respect to a person other than an individual, **"Control"** means the power to exercise a controlling influence over the management or policies of such person.

1. An "Affiliate" of a person includes any person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the person.

2. If the Subscriber answered "Yes" to any of questions 1(a) through 1(d) above, the Subscriber's **"Fiduciary" (i.e.,** the trustee(s), custodian or plan investment committee, or in the case of IRAs and other self-directed plans, the individual participant), hereby represents and warrants the following on behalf of the Subscriber:

    (a)  all the obligations and requirements of ERISA, including prudence and diversification, with respect to the investment of "plan assets" have been considered.

    (b)  the Subscriber represents that neither the General Partner nor any of its affiliates: (i) has exercised any investment discretion or control with respect to the Subscriber's purchase of any Membership; (ii) has authority, responsibility to give, or has given individualized investment advice with respect to the Subscriber's purchase of any Membership; or (iii) are employers maintaining or contributing to such Plan.

    (c)  this investment conforms in all respects to the governing documents of the Subscriber.

    (d)  the person executing this Subscription Agreement on behalf of the Subscriber is a "fiduciary" of such plan and trust and/or custodial account (within the meaning of Section 3(21)(A) of ERISA and/or Section 4975(e)(3) of the Code) and is authorized to execute this Subscription Agreement; the execution and delivery of this Subscription Agreement with respect to the Subscriber and the trust and/or custodial account have been duly authorized in accordance with the provisions of the Subscriber's governing documents; this investment conforms in all respects to laws applicable to the Subscriber and conforms to, and is permitted by, the Subscriber's governing documents; and, in making this investment, the Subscriber is aware of, and has taken into consideration, among other things, risk return factors and the anticipated effect of this investment on the diversification, liquidity and cash flow needs of the Subscriber and the projected effect of the investment in meeting the Subscriber's funding objectives and has concluded that this investment is a prudent one.

    (e)  the Subscriber's governing documents do not prohibit the Company from investing in specific securities, financial instruments or issues, including, but not limited to, securities and financial instruments which would be deemed to be "employer securities" with respect to the Subscriber as defined in Section 407 of ERISA.

The Subscriber has been informed of and understands the Company's investment objectives, policies and strategies and the decision to subscribe for a Membership (i) was made with appropriate consideration of relevant investment factors with regard to the Subscriber and (ii) is consistent with the duties and responsibilities imposed upon fiduciaries under ERISA with regard to investment decisions made for or on behalf of the Subscriber.

The purchase, ownership and disposition of a Membership will not result in or constitute a "prohibited transaction" under Section 406 of ERISA or Section 4975 of the Code (or in the case of a governmental or church plan, any similar federal, state or local law) for which an exemption is not available.

    (h)  the Subscriber has carefully read the Memorandum and fully understands the fees, tax and ERISA considerations and risks of an investment in the Company.

3. The Subscriber understands and agrees that the information supplied above will be utilized to determine whether Benefit Plan Investors own less than 25% of the value of the Memberships, as determined under the Plan Asset Regulation, both upon the original issuance of

the Memberships and upon subsequent transfer or withdrawal of Memberships. Accordingly, the Subscriber undertakes:

    (a)  to inform the Company, the General Partner and the General Partner immediately of any change in the information provided in this Questionnaire,

    (b)  to provide to the Company, the General Partner and the General Partner such information as the General Partner may reasonably request from time to time to enable the General Partner to make a determination with respect to the portion of the Memberships that may be held by or for the benefit of Benefit Plan Investors,

    (c)  to inform the Company, the General Partner and the General Partner immediately of any change in the status of the Subscriber which results in the Subscriber becoming a Benefit Plan Investor or a Controlling Person,

    (d)  to promptly dispose of the Subscriber's Membership if the Subscriber is becoming a Benefit Plan Investor or a Controlling Person and is notified that the Subscriber's ownership of the Membership would result in 25% or more, as determined under the Plan Asset Regulation, of the value of the Membership being held by Benefit Plan Investors, and

    (e)  to report in writing to the General Partner and the General Partner at least seven (7) days prior to the end of each month any change in the percentage of the Subscriber's Memberships that are expected to be held by Benefit Plan Investors as of the beginning of the next month.

**PLEASE TURN TO THE APPROPRIATE QUESTIONNAIRE.**

**Individuals:**   **Page 13**
**Entities:**   **Page 14**

EXHIBIT C

PAGE 72

## QUESTIONNAIRE FOR INDIVIDUAL SUBSCRIBERS

1.  Name of Subscriber: _____

2.  Social Security Number: _____

3.  Date of Birth:_____

4.  Occupation: _____

5.  Citizenship: _____

    If you are not a U.S. Citizen, are you a permanent U.S. resident?               ❑ YES ❑ NO

6.  Do you and each other Subscriber (if any) make your own investment decisions?    ❑ YES ❑ NO

    If **"Yes,"** additional information may be required.

    If not, who does: _____

7.  Do you and each other Subscriber (if any) have prior experience in investing in private placements of restricted securities?               ❑ YES ❑ NO

8.  Is the aggregate investment in the Memberships over 10% of your and each other Subscriber's (if any) combined net worth (exclusive of home, home furnishings and automobiles)?         ❑ YES ❑ NO

    If **"Yes,"** state the approximate percentage: _____%

9.  Are you or any other Subscriber (if any) subject to any civil, criminal, regulatory or other constraint or are you aware of any impediment or other reasons which may preclude or limit your participation in any Company investment?
    ❑ YES ❑ NO

    If **"Yes,"** please explain: _____

10. Provide additional information which would be helpful in evaluating each Subscriber's knowledge and experience in financial and business matters.

    _____

11. Is the Membership being purchased as joint tenants?                    ❑ YES ❑ NO

    If **"Yes"**, are the Subscribers husband and wife?                    ❑ YES ❑ NO

12. Please describe with particularity the source or sources of the funds being used to make this investment:

    _____

13. Are you willing to provide additional information, if requested, in order to help the Company comply with the U.S. Government's anti-terrorism policy as set out in the recently adopted USA PATRIOT Act?

    ❑ YES ❑ NO

14. Are you subscribing, directly or indirectly, for the account of a (a) Prohibited Investor, (b) Senior Foreign Political Figure, or (c) a member of the Immediate Family or a Close Associate of a Senior Foreign Political Figure (as such terms are defined in Appendix 3)?

    ❑ YES ❑ NO

**PLEASE TURN TO PAGE 15**

## QUESTIONNAIRE FOR ENTITY SUBSCRIBERS

1.  Name of Subscriber: _____

2.  Taxpayer EIN Number: _____

3.  Subscriber's Primary Business: _____

4.  Subscriber is (check appropriate type and provide requested information):

    ❑   Corporation (Date and Place of Incorporation): _____

    ❑   Limited liability company or limited liability company (State where formed and date of Organization): _____

    ❑   Trust (Date and Place of Formation): _____

    ❑   Other (Describe): _____

5.  Is the Subscriber's principal place of business located in the state of its formation?     ❑ YES ❑ NO

    If "No", state where the Subscriber's principal place of business is located: _____

6.  Is the Subscriber subject to any legal constraints, or is the individual executing this Questionnaire on behalf of the Subscriber, aware of any reason which may preclude or limit Subscriber's participation in any potential investment by the Company?     ❑ YES ❑ NO

    If "**Yes**" please explain:
    _____

7.  Does the Subscriber have prior experience with private placements of restricted securities?     ❑ YES ❑ NO

8.  Does this investment constitute over 40% of the Subscriber's assets or committed capital?     ❑ YES ❑ NO

9.  Was the Subscriber organized for the specific purpose of acquiring a Membership in the Company?   ❑ YES ❑ NO

10.  Do the Subscriber's organizational documents permit the Subscriber to make this investment?     ❑ YES ❑ NO

11.  Are you prepared to provide the Company with a copy of the Subscriber's organizational documents upon request?
     ❑ YES ❑ NO

12.  Provide additional information which would be helpful in evaluating the Subscriber's knowledge and experience in financial and business matters:
     _____

13.  Please describe with particularity the source or sources of the funds used to make this investment:
     _____

14.  What investment goals do you intend to achieve by investing in the Company?
     _____

15.  Are you willing to provide additional information, if requested, in order to help the Company comply with the U.S. Government's anti-terrorism policy as set out in the USA PATRIOT Act (as defined in Appendix 3)?
     ❑ YES ❑ NO

16.  Are you subscribing, directly or indirectly, for the account of a (a) Prohibited Investor, (b) Senior Foreign Political Figure, or (c) member of the Immediate Family or a Close Associate of a Senior Foreign Political Figure (as such terms are defined in Appendix 3)?     ❑ YES ❑ NO

17.  Is the Subscriber a charitable remainder trust exempt from tax under Section 664 of the Internal Revenue Code of 1986, as amended?     ❑ YES ❑ NO

**PLEASE TURN TO NEXT PAGE**

## NEW ISSUES QUESTIONNAIRE

This Questionnaire is designed to determine whether you are a Restricted Person under FINRA Rule 5130 having a "Beneficial Interest" in "New Issues" that may be purchased, directly or indirectly, by the Company. Additional information or documentation to support your responses to this Questionnaire may be required.

**INDIVIDUAL INVESTORS, GRANTORS OF REVOCABLE TRUSTS AND INDIVIDUAL RETIREMENT FUND INVESTORS THAT ARE IRAS OR OTHER SINGLE MEMBER PLANS**: If you are an individual, the grantor of a revocable trust, an IRA or a single member plan (including a Keogh Plan covering only a self-employed individual), please complete the New Issues Questionnaire for Individual Investors by answering questions 1-9 on **page 15**. Questions answered for an IRA or other single member plan should be answered with respect to the beneficial owner of the plan. If the response to any question is "Yes," you are a Restricted Person.

**ENTITY INVESTORS (INCLUDING ERISA PLANS, NON-ERISA PLANS, INDIVIDUAL RETIREMENT FUNDS THAT ARE NOT SINGLE MEMBER PLANS AND PLAN ASSET ENTITIES)**: If you are an entity, including an ERISA Plan, a Non-ERISA Plan, an Individual Retirement Fund that is not a single member plan or a Plan Asset Entity, please complete the New Issues Questionnaire for Entity Investors by answering the appropriate questions on **pages 17 to 18**.

If you are a revocable trust, please complete the New Issues Questionnaire for Entity Investors with respect to the trust and the New Issues Questionnaire for Individual Investors with respect to the grantor of the trust.

## NEW ISSUES QUESTIONNAIRE FOR INDIVIDUAL INVESTORS

This Questionnaire is designed to determine whether you are a Restricted Person under FINRA Rule 5130 having a Beneficial Interest in New Issues that may be purchased indirectly by the Company. Additional information or documentation to support your responses to this Questionnaire may be required.

If subscriber is an individual, the grantor of a revocable trust, or an IRA or a single member plan (including a Keogh Plan covering only a self-employed individual), please answer questions 1-9. Questions answered for IRA and other single member plans should be answered with respect to the beneficial owner of the plan. If the response "Yes" to any question, you are a Restricted Person.

**QUESTIONS: All capitalized terms used herein are defined in Appendix 2 on page24.**

Yes ❑   No ❑   1.   Is the Subscriber an officer, director, manager, associated person, or employee of a broker-dealer (other than a Limited Business Broker-Dealer)?

Yes ❑   No ❑   2.   Is the Subscriber an agent of a broker-dealer (other than a Limited Business Broker-Dealer) and engaged in the investment banking or securities business?

Yes ❑   No ❑   3.   Is the Subscriber an Immediate Family Member of a person specified in Question 1 or 2 above (a) living in the same household as that person, or (b) providing Material Support to that person, or receiving Material Support from that person?

Yes ❑   No ❑   4.   Is the Subscriber an Immediate Family Member of a person specified in Question 1 or 2 above who (a) is employed by or associated with a broker-dealer (or an affiliate of a broker-dealer) that sells New Issues, or (b) otherwise has an ability to control the allocation of New Issues?

Yes ❑   No ❑   5.   Is the Subscriber a Finder or Fiduciary or an Immediate Family Member of a Finder or Fiduciary who provides Material Support to the Subscriber, or receives Material Support from the Subscriber?

Yes ❑   No ❑   6.   Is the Subscriber a Portfolio General Partner or an Immediate Family Member of a Portfolio General Partner who provides Material Support to the Subscriber or receives Material Support from the Subscriber?

Yes ❑   No ❑   7.   Is the Subscriber a Person Owning a Broker-Dealer (other than a JBO Broker-Dealer with a Carve-Out Arrangement or a Limited Business Broker-Dealer).

Yes ❑   No ❑   8.   Is the Subscriber an Immediate Family Member of a Person Owning a Broker-Dealer (other than a JBO Broker-Dealer with a Carve-Out Arrangement or a Limited Business Broker-Dealer) who provides Material Support to the Subscriber, or receives Material Support from the Subscriber?

Yes ❑   No ❑   9.   Is the Subscriber an Immediate Family Member of a Person Owning a Broker-Dealer (other than a JBO Broker-Dealer with a Carve-Out Arrangement or a Limited Business Broker-Dealer) who (a) owns a broker-dealer (or an affiliate of a broker-dealer) that sells New Issues, or (b) otherwise has an ability to control the allocation of New Issues?

**PLEASE TURN TO PAGE 19**

Rosegold Investments LLP  |  Subscription Agreement

EXHIBIT C
PAGE 76

## NEW ISSUES QUESTIONNAIRE FOR
## ENTITY INVESTORS

This Questionnaire is designed to determine whether the Subscriber is a Restricted Person under FINRA Rule 5130 having a "Beneficial Interest" in New Issues that may be purchased, directly or indirectly, by the Company. Additional information or documentation to support your responses to this Questionnaire may be required.

**INSTRUCTIONS:**
If the Subscriber is a revocable trust, please complete this New Issues Questionnaire for Entity Investors with respect to the trust and the New Issues Questionnaire for Individual Investors on page 18 with respect to the grantor of the trust. If the Subscriber is an irrevocable trust, please complete this New Issues Questionnaire for Entity Subscribers with respect to the trust only.

If the Subscriber is an IRA or a single member plan (including a Keogh Plan covering only a self-employed individual), please complete the Questionnaire for Individual Subscribers.

1. Collective Investment Accounts and Similar Accounts or Entities.

    (a) Is the Subscriber a Collective Investment Account, Investment Club, Family Investment Vehicle, or similar account or entity e.g., a trust or operating company other than a publicly traded entity, whether or not the primary purpose of the account or entity is the purchase or sale of securities?     Yes ❑   No ❑

    If "**No**" you may skip questions 1(b) and 1(c).

    (b) Do Restricted Persons hold any Beneficial Interests in the account or entity?     Yes ❑   No ❑

    If "**Yes**" please specify the percentage owned by Restricted Persons (_____%).

    If "**No**" you may **STOP** here—the Subscriber is exempt from the Rule.

        If the percentage specified in question 1(b) is *equal to* or *less than* 10%, you may **STOP** here - the Subscriber is exempt from the Rule.

        If the percentage specified in question 1(b) is *greater than* 10%, please continue to question 1(c).

    (c) Has the Subscriber established a Carve-Out Arrangement for the purchase of New Issues?     Yes ❑ No ❑

    If "**Yes**" you may **STOP** here—the Subscriber is exempt from the Rule.

    If "**No**" unless the Subscriber answers "**YES**" to one of questions 2 to 10 below, the Subscriber is a Restricted Person.

2. Registered Investment Companies. Is the Subscriber an investment company registered under the Investment Company Act of 1940?     Yes ❑   No ❑

3. Common Trust Funds. Is the Subscriber a common trust fund or similar fund (as described in Section 3(a)(12)(A)(iii) of the Securities Exchange Act of 1934) that (a) has investments from 1,000 or more accounts, and (b) does not limit Beneficial Interests in the fund principally to trust accounts of Restricted Persons?     Yes ❑   No ❑

4. Insurance Company Accounts. Is the Subscriber an insurance company general, separate or investment account that (a) is funded by premiums from 1,000 or more policyholders, or, if a general account, has 1,000 or more policyholders, and (b) does not limit the policyholders whose premiums are used to fund the account principally to Restricted Persons, or, if a general account, that does not limit its policyholders principally to Restricted Persons?     Yes ❑   No ❑

5. Publicly Traded Entities. Is the Subscriber a publicly traded entity (other than a broker-dealer, or an affiliate thereof, that is authorized to engage in the public offering of New Issues either as a selling group member or underwriter) that is (a) listed on a national securities exchange, (b) traded on the Nasdaq Stock Market, or (c) a foreign issuer whose securities meet the quantitative designation criteria for listing on a national securities exchange or for trading on the Nasdaq Stock Market?     Yes ❑   No ❑

6. Foreign Investment Companies. Is the Subscriber an investment company organized under the laws of a foreign jurisdiction that (a) is listed on a foreign exchange or authorized for sale to the public by a foreign regulatory authority, and (b) no person owning more than 5% of the shares of the investment company is a Restricted Person?     Yes ❑   No ❑

7. Employee Benefit Plans. Is the Subscriber an employee benefit plan within the meaning of ERISA that is qualified under Section 401(a) of the Internal Revenue Code and that is *not* sponsored *solely* by a broker-dealer? If the Subscriber is an

employee benefit plan within the meaning of ERISA that is qualified under <u>Section 401(a)</u> of the Internal Revenue Code and is sponsored solely by a broker-dealer, it *is* a Restricted Person and you must answer "No".   Yes ❑   No ❑

8.   <u>Government Plans.</u> Is the Subscriber a state or municipal government benefits plan that is subject to state and/or municipal regulation?   Yes ❑   No ❑

9.   <u>501(c)(3) Entities.</u> Is the Subscriber a tax-exempt organization under Section 501(c)(3) of the Internal Revenue Code?   Yes ❑   No ❑

10.   <u>Church Plans.</u> Is the Subscriber a church plan under <u>Section 414(e)</u> of the Internal Revenue Code? Yes ❑   No ❑

**IF YOU ANSWERED "NO" TO QUESTION 1(B), OR ANSWERED "<u>YES</u>" TO QUESTION 1(C) OR ANY OTHER QUESTION IN PART A ABOVE, YOU MAY STOP HERE -- THE SUBSCRIBER IS EXEMPT FROM THE RULE. OTHERWISE, PLEASE ANSWER ALL QUESTIONS IN PART B BELOW.**

**PART B: RESTRICTED PERSON CATEGORIES**

Yes ❑   No ❑   1. Is the Subscriber a broker-dealer (other than a JBO Broker-Dealer with a Carve- Out Arrangement)?

Yes ❑   No ❑   2. Is the Subscriber a General Partner or associated person of a broker-dealer (other than a Limited Business Broker-Dealer)?

Yes ❑   No ❑   3. Is the Subscriber an agent of a broker-dealer (other than a Limited Business Broker-Dealer) and engaged in the investment banking or securities business?

Yes ❑   No ❑   4. Is the Subscriber a Finder or Fiduciary?

Yes ❑   No ❑   5. Is the Subscriber a Portfolio General Partner?"

Yes ❑   No ❑   6. Is the Subscriber a Person Owning A Broker-Dealer (other than a JBO Broker- Dealer with a Carve-Out Arrangement or a Limited Business Broker-Dealer)?

Yes ❑   No ❑   7. Is the Subscriber an employee benefit plan within the meaning of ERISA that is qualified under Section 401(a) of the Internal Revenue Code and is sponsored solely by a broker-dealer?

**IF YOU ANSWERED "<u>YES</u>" TO ANY QUESTION IN PART B, THE SUBSCRIBER IS A RESTRICTED PERSON.**

**PLEASE TURN TO NEXT PAGE**

## REGISTRATION INFORMATION (ALL)

*(To Be Completed By All Subscribers)*

_____
*(Subscriber Name(s))*

_____      _____
*(Street Address)*                              *(City)*                    *(State/Zip Code/Country)*

_____      _____
*(Telephone and Facsimile Numbers)*              *(E-mail Required)*

**Are you a U.S. Person?**            ❑ YES          ❑ NO

**Are you an Existing Member?**       ❑ YES          ❑ NO

**Were you referred by someone else?** ❑ YES          ❑ NO

If "Yes" please name _____

| AMOUNT OF SUBSCRIPTION | FORM OF PAYMENT |
|---|---|
| $ _____ <br> *(Minimum $100,000)* <br><br> ❑ Cash    ❑ Assets[1] | **Wire Transfer.** See instructions below. A letter in the form of Appendix 4 should be sent by facsimile to the General Partner from the bank from which funds are wired to the Company. |

## WIRE INSTRUCTIONS

If your Subscription is made by wire transfer, please wire funds to:

Name of Bank:        ***(Provided upon request)***

ABA Number:
SWIFT BIC:
Account name:
Account number:

_____
[1] Please Provide details on Schedule I

Rosegold Investments LLP  |  Subscription Agreement

EXHIBIT C
PAGE 79

## WIRE TRANSFER PAYMENTS (ALL)

**If payment is by wire, please identify the source from which the subscription funds will be wired:**

_____     _____
(Name of Paying Bank)                (Routing ABA Number and SWIFT Code)

_____
(Address of Paying Bank)

_____     _____
(Beneficiary Account Name and Number)   (Account Representative)

_____     _____
(Paying Bank Telephone and Facsimile Numbers)   (e-mail)

## COMMUNICATION, DISTRIBUTION AND WITHDRAWAL INFORMATION

The full address to which any communications should be sent (if different from "Registration Information" on prior page).

_____     _____     _____
(Street Address)    (City)              (State/Zip Code/Country)

_____     _____     _____
(Telephone Number)  (Facsimile Number)  (e-mail - Optional)

**If you want distribution or withdrawal payments to you to be wired to an account which is different than the account from which your subscription funds are paid, the Company may reject this request if it is not satisfied with your reasons for wanting to do so. Please identify that account below and specify why you want to use it:**

_____     _____
(Name of Receiving Bank)             (Routing ABA Number and SWIFT Code)

_____
(Address of Receiving Bank)

_____     _____
(Beneficiary Account Name and Number)   (Account Representative)

_____     _____
(Further Credit to)                  (Account Number)

_____     _____
(Receiving Bank Telephone and Facsimile Numbers)   (e-mail)

_____
(Specify Reason(s) For Use of This Account)

Rosegold Investments LLP  |  Subscription Agreement

EXHIBIT C
PAGE 80

# SIGNATURE PAGE (ALL)

*(To Be Signed By All Subscribers)*

**INDIVIDUAL(S):**

_____
*(Signature of Subscriber)*                    *(Dated)*

_____
*(Print Name of Subscriber)*

_____
*(Signature of Co-Subscriber, if applicable)*        *(Dated)*

_____
*(Print Name of Co-Subscriber, if applicable)*

---

**ENTITIES (other than Retirement Plans):**

_____
*(Signature of Authorized Signatory)*            *(Dated)*

_____
*(Print Name of Subscriber)*                 *(Print Name and Title of Signatory)*

_____
*(Signature of Required Authorized Co-Signatory, if applicable)*

_____
*(Print Name and Title of Co-Signatory, if applicable)*

---

**RETIREMENT PLANS:**
*[Dual Signatures are required for individual plan participants of One Member Plans]:*

_____
*(Signature of Individual IRA or 401(K) Participant)*        *(Dated)*

_____
*(Print Name of the Subscriber)*

_____
*(Signature of Custodian or Trustee)*     *(Print Name)*        *(Dated)*

_____
*(Signature of Other Authorized Signatory)*     *(Print Name)*        *(Dated)*

<div style="border: 1px solid black;">

### ADDITIONAL AUTHORIZED SIGNATURE(S)
*(To Be Signed By All Subscribers)*

</div>

***IMPORTANT:** Only those persons whose name and signatures appear on this page or who are otherwise designated in writing by the Subscriber will be recognized as authorized signatories on behalf of the Subscriber. (Use additional sheets if necessary.)*

1) **Please check one of the following:**

   ❑   <u>Any one</u> of the signatures appearing below is authorized to issue instructions on behalf of the Subscriber

   ❑   <u>Any two</u> signatures appearing below, acting jointly are authorized to issue instructions on behalf of the Subscriber

   ❑   <u>Other</u> (Specify if different:) _____

2) **Please complete the following for all authorized signatories (Print Name, Sign and Date):**


   _____        _____        _____
   *Signature*                      *Name*                          *Title*


   _____        _____        _____
   *Signature*                      *Name*                          *Title*


   _____        _____        _____
   *Signature*                      *Name*                          *Title*

EXHIBIT C
PAGE 82

Rosegold Investments
## EXISTING MEMBERS SUBSCRIPTION REQUEST (ALL)
*(To Be Completed By Existing Investors Instead of Subscription Agreement)*

The undersigned Member hereby subscribes for the additional amount set forth below upon the terms and conditions described in the Memorandum. The undersigned restates all of the declarations in the undersigned's original Subscription Agreement as if they were made on the date hereof and certifies that all of the information set forth in the undersigned's original Subscription Agreement remains accurate and complete on the date hereof.

**Name of Member(s):** _____

| AMOUNT OF SUBSCRIPTION | FORM OF PAYMENT |
|---|---|
| $ _____ | Wire Transfer (see page 18) |

**INDIVIDUAL(S):**

_____        _____
*(Signature of Subscriber)*              *(Dated)*

_____
*(Print Name of Subscriber)*

_____        _____
*(Signature of Co-Subscriber)*          *(Dated)*

_____
*(Print Name of Co-Subscriber, if applicable)*

**ENTITIES (other than Retirement Plans):**

_____        _____
*(Signature of Authorized Signatory)*      *(Dated)*

_____
*(Print Name of Subscriber)*

_____
*(Print Name and Title of Signatory)*

_____
*(Signature of Required Authorized Co-Signatory, if applicable)*

_____
*(Print Name and Title of Co-Signatory, if applicable)*

**RETIREMENT PLANS:**
***[Dual Signatures are required for individual plan participants of One Member Plans]:***

_____        _____
*(Signature of Ind. IRA or*              *(Dated)*
*401(K) Part)*

_____
*(Print Name of the Subscriber)*

_____
*(Signature of Custodian or Trustee)*

_____        _____
*(Print Name)*                                *(Dated)*

_____
*(Signature of Other Authorized Signatory)*

_____        _____
*(Print Name)*                                *(Dated)*

EXHIBIT C
PAGE 83

## APPENDIX 1
## Definitions for New Issues Questionnaire for Individual Partners

A **"Beneficial Interest"** generally is any economic interest, such as the right to share in gains or losses. The receipt of a management or performance based fee for operating a Collective Investment Account (see footnote 7 below), or other fees for acting in a fiduciary capacity, are not considered a Beneficial Interest in an account.

A **"New Issue"** generally is any initial public offering of an equity security.

A **"Limited Business Broker-Dealer"** is a broker-dealer whose authorization to engage in the securities business is limited solely to the purchase and sale of investment company securities, variable contracts securities and direct participation program securities.

An **"Immediate Family Member"** includes parents, mother-in-law, father-in-law, spouse, brother, sister, brother-in-law, sister-in-law, son-in-law, daughter-in-law and children, and any other individual to whom the person provides Material Support (defined below).

**"Material Support"** is directly or indirectly providing more than 25% of a person's income in the prior calendar year. Immediate Family Members living in the same household are deemed to be providing each other Material Support.

A **"Finder or Fiduciary"** is, with respect to the public offering of any equity security, a finder or any person acting in a fiduciary capacity to the managing underwriter, including, but not limited to, attorneys, accountants and financial consultants.

A **"Portfolio General Partner"** is a person with authority to buy or sell securities for a bank, savings and loan institution, insurance company, investment company, investment adviser (including an unregistered investment adviser), or Collective Investment Account (defined below).

A **"Collective Investment Account"** is any hedge fund, Investment Company, Investment Corporation, or other collective investment vehicle that is engaged primarily in the purchase and/or sale of securities. A Collective Investment Account does not include a Family Investment Vehicle or an Investment Club (defined below).

A **"Family Investment Vehicle"** is a legal entity that is beneficially owned solely by Immediate Family Members. An **"Investment Club"** is a group of friends, neighbors, business associates or others that pool their money to invest in stock or other securities, and who are collectively responsible for making investment decisions.

A **"Person Owning a Broker-Dealer"** is:

(i) Any person listed, or required to be listed, in Schedule A of a broker-dealer's Form BD (generally, executive officers, direct owners, and depending on the structure of the entity, Managers, elected managers and trustees), except persons identified by an ownership code of less than 10%;

(ii) Any person listed, or required to be listed, in Schedule B of a Form BD (generally, indirect owners, and depending on the structure of the entity, Managers, elected managers and trustees), except persons whose listing on Schedule B relates to an ownership interest in a person listed on Schedule A identified by an ownership code of less than 10%;

(iii) Any person that directly or indirectly owns 10% or more of a public reporting company listed, or required to be listed, in Schedule A of a Form BD (other than a reporting company that is listed on a national securities exchange or is traded on the Nasdaq Stock Market, or other than with respect to a Limited Business Broker-Dealer);

(iv) Any person that directly or indirectly owns 25% or more of a public reporting company listed, or required to be listed, in Schedule B of a Form BD (other than a reporting company that is listed on a national securities exchange or is traded on the Nasdaq Stock Market, or other than with respect to a Limited Business Broker-Dealer); or

(v) An Immediate Family Member of a person described in

subparagraphs (i)-(iv), above, unless the Person Owning a Broker-Dealer (a) does not provide Material Support to or receive Material Support from the Immediate Family Member, (b) is not an owner of a broker-dealer (or an affiliate of the broker-dealer) selling New Issues, and (c) has no ability to control the allocation of New Issues.

A **"JBO Broker-Dealer"** (Joint Back Office Broker-Dealer) is a hedge fund, or subsidiary thereof, that elects to become registered as a broker-dealer and participates in a joint back office arrangement with another broker-dealer.

A **"Carve-Out Arrangement"** is any arrangement that is an effective means of segregating Beneficial Interests of Restricted Persons such that Beneficial Interests of Restricted Persons in the aggregate do not receive more than 10% of the pro rata proceeds of New Issues.

# APPENDIX 2
## Definitions for New Issues Questionnaire for Entities

A **"Beneficial Interest"** generally is any economic interest, such as the right to share in gains or losses. The receipt of a management or performance based fee for operating a Collective Investment Account, or other fees for acting in a fiduciary capacity, are not considered a Beneficial Interest in an account.

A **"New Issue"** generally is any initial public offering of an equity security.

**"Collective Investment Account"** means any hedge fund, Investment Company, Investment Corporation, or other collective investment vehicle that is engaged primarily in the purchase and/or sale of securities. A Collective Investment Account does not include a Family Investment Vehicle or an Investment Club.

**"Investment Club"** means a group of friends, neighbors, business associates or others that pool their money to invest in stock or other securities and who are collectively responsible for making investment decisions.

**"Family Investment Vehicle"** means a legal entity that is beneficially owned solely by Immediate Family Members. **"Restricted Person"** means any of the following:

(1)   A broker-dealer (other than a JBO Broker-Dealer with a Carve-Out Arrangement);

(2)   Any officer, director, General Partner, associated person, or employee of a broker-dealer (other than a Limited Business Broker-Dealer);

(3)   Any agent of a broker-dealer (other than a Limited Business Broker-Dealer) and engaged in the investment banking or securities business;

(4)   An Immediate Family Member of a person specified in subparagraph (2) or (3) who (a) provides Material Support to, or receives Material Support from, the Immediate Family Member, (b) is employed by or associated with a broker-dealer, or an affiliate of a broker-dealer, that sells New Issues, or (c) otherwise has the ability to control the allocation of New Issues;

(5)   A Finder or Fiduciary, or an Immediate Family Member of a Finder or Fiduciary, if the Finder or Fiduciary provides Material Support to, or receives Material Support from, the Immediate Family Member;

(6)   A Portfolio General Partner or an Immediate Family Member of a Portfolio General Partner who provides Material Support to, or receives Material Support from, the Portfolio General Partner;

(7)   A Person Owning A Broker-Dealer (other than a JBO Broker-Dealer with a Carve-Out Arrangement) or an Immediate Family Member of a Person Owning A Broker-Dealer who (a) provides Material Support to, or receives Material Support from, the Immediate Family Member, (b) is an owner of the broker-dealer, or an affiliate of a broker-dealer, that sells New Issues, or (c) otherwise has an ability to control the allocation of New Issues; or

(8)   An entity or account, including but not limited to a Collective Investment Account, in which Beneficial Interests of Restricted Persons exceed, in the aggregate, 10% (unless it has established a Carve-Out Arrangement for the purchase of New Issues).

For these purposes:

**"Immediate Family Member"** includes parents, mother-in-law, father-in-law, spouse, brother, sister, brother-in-law, sister-in-law, son-in-law, daughter-in-law and children, and any other individual to whom the person provides Material Support (defined below).

**"Material Support"** is directly or indirectly providing more than 25% of a person's income in the prior calendar year. Immediate Family Members living in the same household are deemed to be providing each other Material Support.

**"Carve-Out Arrangement"** means any arrangement that is an effective means of segregating Beneficial Interests of Restricted Persons such that Beneficial Interests of Restricted Persons in the aggregate do not receive more than 10% of the pro rata proceeds of New Issues.

**"JBO Broker-Dealer (Joint Back Office Broker-Dealer)"** means a hedge fund, or subsidiary thereof, that elects to become registered as a broker-dealer and participates in a joint back office arrangement with another broker-dealer.

**"Limited Business Broker-Dealer"** means a broker-dealer whose authorization to engage in the securities business is limited solely to the purchase and sale of investment company securities, variable contracts securities and direct participation program securities.

**"Finder or Fiduciary"** means with respect to the public offering of any equity security, a finder or any person acting in a fiduciary capacity to the managing underwriter, including, but not limited to, attorneys, accountants and financial consultants.

**"Portfolio General Partner"** means any person with authority to buy or sell securities for a bank, savings and loan institution, insurance company, investment company, investment adviser (including an unregistered investment adviser), or Collective Investment Account.

**"Person Owning A Broker-Dealer"** means any of the following:

(1)   Any person listed, or required to be listed, in Schedule A of a broker-dealer's Form BD (generally, executive officers, direct owners, and depending on the structure of the entity, Managers, elected managers and trustees), except persons identified by an ownership code of less than 10%;

(2)   Any person listed, or required to be listed, in Schedule B of a Form BD (generally, indirect owners, and depending on the structure of the entity, Managers, elected managers and trustees), except persons whose listing on Schedule B relates to an ownership interest in a person listed on Schedule A identified by an ownership code of less than 10%;

(3)   Any person that directly or indirectly owns 10% or more of a public reporting company listed, or required to be listed, in Schedule A of a Form BD (other than a reporting company that is listed on a national securities exchange or is traded on the Nasdaq Stock Market, or other than with respect to a Limited Business Broker-Dealer);

(4)   Any person that directly or indirectly owns 25% or more of a public reporting company listed, or required to be listed, in Schedule B of a Form BD (other than a reporting company that is listed on a national securities exchange or is traded on the Nasdaq Stock Market, or other than with respect to a Limited Business Broker-Dealer); or

(5)   An Immediate Family Member of a person described in subparagraphs (1)-(4) above, unless the Person Owning a Broker-Dealer (a) does not provide Material Support to or receive Material Support from the Immediate Family Member, (b) is not an owner of a broker-dealer (or an affiliate of the broker-dealer) selling New Issues, and (c) has no ability to control the allocation of New Issues.

# APPENDIX 3
## Definitions for Anti-Money Laundering

**Close Associate of a Senior Foreign Political Figure** is a person who is widely and publicly known internationally to maintain an unusually close relationship with the Senior Foreign Political Figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the Senior Foreign Political Figure.

**FATF-Compliant Jurisdiction** is a jurisdiction that (i) is a member in good standing of FATF and (ii) has undergone two rounds of FATF mutual evaluations.[*]

**FATF** means the Financial Action Task Force on Money Laundering.

**Foreign Bank** means an organization that (i) is organized under the laws of a non-U.S. country (ii) engages in the business of banking, (iii) is recognized as a bank by the bank supervisory or monetary authority of the country of its organization or principal banking operations, (iv) receives deposits to a substantial extent in the regular course of its business, and (v) has the power to accept demand deposits, but does not include the U.S. branches or agencies of a non-U.S. bank.

**Foreign Shell Bank** means a Foreign Bank without a Physical Presence in any country, but does not include a Regulated Affiliate.

**Immediate Family of a Senior Foreign Political Figure** typically includes such person's parents, siblings, spouse, children and in-laws.

**Non-Cooperative Jurisdiction** means any non-U.S. country that has been designated as non-cooperative with international anti-money laundering principles or procedures by an intergovernmental group or organization, such as the FATF, of which the United States is a member and with which designation the United States representative to the group or organization continues to concur.[**]

**Physical Presence** means a place of business that is maintained by a Foreign Bank and is located at a fixed address, other than solely a post office box or an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities, at which location the Foreign Bank (i) employs one or more individuals on a full-time basis, (ii) maintains operating records related to its banking activities, and (iii) is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities.

**Prohibited Investor** means (i) a person or entity whose name appears on any of the various lists issued and maintained by the U.S. Office of Foreign Assets Control ("OFAC"), including the List of Specially Designated Nationals and Blocked Persons, the Specially Designated Terrorists List and the Specially Designated Narcotics Traffickers List[***]; (ii) a Foreign Shell Bank; or (iii) a person or entity who is a citizen or resident of, or which is located in, or whose subscription funds are transferred from or through a Foreign Shell Bank in a Non-Cooperative Jurisdiction or Sanctioned Regime.

**Regulated Affiliate** means a Foreign Shell Bank that (i) is an affiliate of a depository institution, credit union, or Foreign Bank that maintains a Physical Presence in the United States or a non-U.S. country, as applicable, and (ii) is subject to supervision by a banking authority in the country regulating such affiliated depository institution, credit union, or Foreign Bank.

    For a current list of FATF compliant jurisdictions refer to the Financial Action Task Force website,

http://www1.oecd.org/fatf/NCCT_en.htm

..   The list of Non-Cooperative Countries and Territories is amended periodically. For a current list of Non-Cooperative Countries and Territories, refer to the Financial Action Task Force website, http:www.oecd.org/faff/NCCT_en.htm

    The OFAC lists may be found at the OFAC website: http://www.treas.gov/offices/enforcement/lists/

**Sanctioned Regimes** means targeted foreign countries, terrorism sponsoring organizations and international narcotics traffickers in respect of which OFAC administers and enforces economic and trade sanctions based on U.S. foreign policy and national security goals.[****]

**Senior Foreign Political Figure** means a senior official in the executive, legislative, administrative, military or judicial branch of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a Senior Foreign Political Figure includes any corporation, business or other entity that has been formed by, or for the benefit of, a Senior Foreign Political Figure.

**USA Patriot Act** means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001 (Pub. L. No. 107-56).

          ****

For a current list of those regimes in which OFAC has imposed sanctions refer to the following website:
http://www.treas.gov/offices/enforcement/ofac/programs

EXHIBIT C
PAGE 86

## APPENDIX 4
## Bank Letter for Wire Payment

*PLEASE GIVE THIS LETTER TO THE FINANCIAL INSTITUTION FROM WHICH SUBSCRIPTION MONIES ARE WIRED AND HAVE THE FINANCIAL INSTITUTION EITHER RETURN IT TO THE MANAGER AT THE SAME TIME THAT THE SUBSCRIPTION MONIES ARE WIRED, OR PROVIDE THE SAME INFORMATION IN A DIFFERENT FORM.*

**Via email: (**info@rosegoldinvestments.com)

**RE:**     **Rosegold Investments LLP**

To Whom It May Concern:

1.     Name of Remitting Financial Institution: _____

2.     Address of Remitting Financial Institution: _____

3.     Name of Customer: _____

4.     Address of Customer: _____

5.     We have credited your account, as follows:

        Bank: _____

        Account Number: _____

        Amount: _____

        By order of: _____ on _____
                        *(Subscriber)*                *(Date)*

The above information is given in strictest confidence for your own use only.

Yours faithfully,

Signed by: _____

Full Name: _____

Position: _____

## APPENDIX 5
## Documents Required

1.  **Documentation Required From the Subscribers on Initial Subscription:**

    **A. Individuals**

    1.1   Completed Subscription Documents duly executed.

    1.2   Copy of passport or other government issued picture identification duly certified.

    1.3   Proof of current address (e.g. current utility bill) if not included in 1.2 above.

    1.4   Completed required Exhibits and Appendixes.

    **B. Entities**

    2.1   Completed Subscription Documents duly-signed by authorized signatories.

    2.2   Copies of Certificate of Formation or formation documents (e.g. certificate of incorporation, by-laws, trust deed, Company agreement, etc. and, upon request, evidence of current good standing to conduct business.)

    2.3   A copy of current offering memorandum if the Subscriber is a fund-of-funds.

    2.4   Copy of authorized signatories list.

    2.5   Anti-money laundering certification in the form of Exhibit A if the Subscriber is investing on behalf of third parties.

    2.6   Completed required Exhibits and Appendixes.

2.  **Documentation Required From Investors For Subsequent Subscriptions:**

    A.   Individuals – completed Additional Subscription Request signed by registered Member.

    B.   Entities – completed Additional Subscription Request signed by authorized signatories of registered Member. If signatories differ from those on file, furnish copy of latest authorized signatories list.

    C.   IRA and other one member Plans - completed Additional Subscription Request signed by authorized signatories of registered Member, and the individual participant.

*Note: Your Subscription Application and Agreement will not be deemed complete until all of the required documentation listed above is received by the General Partner or the General Partner. Upon approval of the Subscriber's subscription and verification of the Subscriber's identity, the Subscriber will receive confirmation of its admission to the Company. If the subscription is not accepted, payment will be returned to the prospective Subscriber.*

# EXHIBIT A
## Anti-Money Laundering Certification Form

for Entities that invest on behalf of Third Parties

The undersigned, being the _____ of _____ a
                          *Insert Title*                             *Insert Name of Entity*

_____ organized under the laws of _____,
   *Insert Type of Entity*                                   *Insert Jurisdiction of Organization*

(the "Subscriber Entity"), does hereby certify on behalf of the Subscriber Entity that it is aware of the requirements of the USA PATRIOT Act of 2001, the regulations administered by the U.S. Department of Treasury's Office of Foreign Assets Control and the anti-money laundering laws and regulations as established in its jurisdiction of organization (collectively, the "anti-money laundering/OFAC laws"). The Subscriber Entity has anti-money laundering policies and procedures in place reasonably designed to verify the identity of the beneficial owners of the investment in the Company and their sources of funds. Such policies and procedures are properly enforced and are consistent with the anti-money laundering/OFAC laws such that the Company may rely on this Certification.

     The Subscriber Entity hereby represents to the Company that, to the best of its knowledge, the beneficial owners of the investment in the Company are not individuals, entities or countries that may subject the Company to criminal or civil violations of anti-money laundering/OFAC laws. The Subscriber Entity has read the Subscriber's Declarations in the Company's Subscription Documents. The Subscriber Entity has taken all reasonable steps to ensure that the owners of the investment in the Company are able to certify to such representations. The Subscriber Entity agrees promptly to notify the Company should the Subscriber Entity have any questions relating to any of the investors or become aware of any changes in the representation set forth in this Certification.

Date: SATURDAY
10 - 14 2017

By: _____

Name: CHRISTINE CARRISON

Title: CHIEF INVESTMENT OFFICER

EXHIBIT C
PAGE 89

# EXHIBIT B
## Instructions for Substitute Form W-9

1)   **SIGNATURE REQUIREMENTS**

You should fill in all information specified in the Signature Box, including your address and telephone number.

**Individual and Joint Owners – Signature Requirements.** After carefully reading and completing the attached Form, you must sign at the "X" in the Signature Box. The signature(s) must correspond exactly with your name on the signature page of the Subscription Agreement. *Note: If Memberships are being purchased by a custodial account, the beneficial owner(s) should sign in the Signature Box.* If Memberships are being purchased by two or more joint holders, all such holders must sign in the Signature Box.

**Trustees, Corporations and Fiduciaries – Signature Requirements.** Trustees, executors, Managers, guardians, attorneys-in-fact, officers of a corporation, authorized members of a Company or other persons acting in a fiduciary or representative capacity must sign at the "X" in the Signature Box. Signatories should indicate their title when signing and, if registered, must submit proper evidence satisfactory to the Company of their authority to act.

**Delivery Requirements.** A properly completed and duly executed copy of the attached Substitute Form W-9, together with any other documents required by the Subscription Documents, must be received by the Company.

2)   **U.S. PERSONS – BOX A.** A Subscriber who or which is a United States citizen or resident alien individual, a domestic corporation, a domestic Company, a domestic trust or a domestic estate (collectively, "United States Persons"), as those terms are defined in the Internal Revenue Code and Income Tax Regulations, should complete the attached Substitute Form W-9.

In order to avoid federal income tax backup withholding, the Subscriber must provide to the Company the Subscriber's correct Taxpayer Identification Number ("TIN") and certify, under penalties of perjury, that the Subscriber is not subject to such backup withholding. The TIN that must be provided on the Substitute W-9 is that of the Subscriber listed on the signature page of the Subscription Agreement. If a correct TIN is not provided, penalties may be imposed by the Internal Revenue Service ("IRS"), in addition to the Subscriber being subject to backup withholding. Certain Subscribers (including, among others, all corporations) are not subject to backup withholding. Backup withholding is not an additional tax. If backup withholding results in an overpayment of taxes, a refund may be obtained from the IRS.

*NOTE: The correct TIN for an IRA account is that of the Custodian (not the individual Social Security number of the beneficial owner).*

The Company reserves the right to request additional information from the Subscriber.

## SUBSTITUTE FORM W-9
### BEFORE SIGNING AND RETURNING THIS FORM
### PLEASE REFER TO THE ACCOMPANYING INSTRUCTIONS ABOVE

---

### SIGNATURE BOX

Please sign exactly as the Subscriber's name is shown on the signature page of the Subscription Agreement. For joint owners, each owner must sign. (See Instruction 1 on Instructions Exhibit B)

The signatory(ies) hereto certify(ies) under penalties of perjury the accuracy of the information and statements set forth in this signature box and in Box A.

X _____     X _____
   *(Signature)*                            *(Signature)*

_____       _____
*Name and Capacity (if other than individual)*    *Title*

_____       _____
*(Street Address)*                       *(City)*              *(State/Zip)*

_____       _____
*(Home Telephone)*                       *(Business/Work Telephone)*

---

### BOX A
### SUBSTITUTE FORM W-9
### (See Instruction 2 on Instructions Exhibit B)

The Subscriber hereby certifies the following to the Company under penalties of perjury:

(i)     The Taxpayer Identification Number ("TIN") below is the correct TIN of the Subscriber;

(ii)    Unless this box ❑ is checked, the Subscriber is not subject to backup withholding because the Subscriber (a) is exempt from backup withholding, (b) has not been notified by the IRS that the Subscriber is subject to backup withholding as a result of a failure to report all interest or dividends, or (c) has been notified by the IRS that the Subscriber is no longer subject to backup withholding; and

(iii)   Unless this box ❑ is checked, the Subscriber is a U.S. person (including a U.S. resident alien).

Taxpayer I.D. Number: _____ _____ _____

---